## THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## LUFKIN DIVISION

| | | |
|---|---|---|
| **MATTHEW RANKIN,** | § | |
| **MELANIE TRIMBLE, and** | § | |
| **BRANDON MICHAEL WHITE,** | § | |
| *Plaintiffs,* | § | |
| | § | |
| **vs.** | § | |
| | § | **CIVIL ACTION NO.:** |
| **CITY OF LIVINGSTON,** | § | |
| **DETECTIVE KALEB BARKER,** | § | **Hon.** |
| **SERGEANT RONNIE BOGANY,** | § | |
| **OFFICER SCOTT PASKE,** | § | |
| **DETECTIVE LEON MIDDLETON, and** | § | |
| **OFFICER CHRISTOPHER SIMMONS,** | § | |
| *Defendants.* | § | |
| | § | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

## TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES .................................................................................................3

I.      INTRODUCTION ................................................................................................5

II.     JURISDICTION AND VENUE ..........................................................................6

III.    PARTIES ..............................................................................................................7

IV.     STATEMENT OF FACTS ...................................................................................9

Initial Statement ......................................................................................................9

First Incident ..........................................................................................................10

Interlude .................................................................................................................19

Second Incident ......................................................................................................22

A Tale Told ............................................................................................................40

A Tale Believed......................................................................................................62

COUNT I:       First Amendment – Retaliation...........................................................66

COUNT II:      Fourth Amendment – Unlawful Seizure ............................................67

COUNT III:     Fourth Amendment – Unlawful Arrest ..............................................67

COUNT IV:      Fourth Amendment – Malicious Prosecution ....................................68

*MONELL* LIABILITY .......................................................................................68

DAMAGES............................................................................................................69

PRAYER FOR RELIEF ........................................................................................70

JURY DEMAND ...................................................................................................71

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Terry v. Ohio*,
  392 U.S. 1 (1968) ..................................................................................... 16

*Turner v. Driver*,
  848 F.3d 678 (5th Cir. 2017) ................................................................... 24

**Federal Constitutional Provisions**

U.S. Const. amend. I ............................................................................ 5, 6, 66, 67

U.S. Const. amend. II ........................................................................................... 5

U.S. Const. amend. IV ............................................................................. 6, 67, 68

U.S. Const. amend. XIV ....................................................................................... 6

**Federal Statutes**

28 U.S.C. § 1331 ................................................................................................... 6

28 U.S.C. § 1391(b)(2) ......................................................................................... 7

42 U.S.C. § 1983 ................................................................................. 6, 7, 8, 69

42 U.S.C. § 1988 ................................................................................................. 70

**Federal Rules**

Fed. R. Civ. P. 38(b) ......................................................................................... 71

**State Statutes**

Tex. Gov't Code § 2.102(a) .......................................................................... 14, 16

Tex. Penal Code § 37.02 ..................................................................................... 58

Tex. Penal Code § 37.03 ..................................................................................... 59

Tex. Penal Code § 38.02 .............................................................................. passim

**Other Authorities**

Ben Smith, *7 deadly sins of police report writing*,
  Police 1 (Oct. 3, 2022) ......................................................................... 41

Chen and Brueck, *Noise and Lead Exposures at an Outdoor Firing Range – California*,
NATIONAL INSTITUTE FOR OCCUPATIONAL SAFETY AND HEALTH (Sept. 2011) ........................ 11

Debunked, *How Silent Are Gun Silencers? DEBUNKED*,
https://www.youtube.com/watch?v=ivL-KHS9IMw (Jul. 8, 2023) .......................................... 11

Fortenbary, *Developing Ethical Law Enforcement Leaders*,
FBI LAW ENFORCEMENT BULLETIN (May 5, 2015) .................................................................. 59

Henry, *"Give Me Liberty or Give Me Death!"*,
Colonial Williamsburg (Mar. 3, 2020) .................................................................................. 66

KGUN9, *How "silent" are gun silencers?*
https://www.youtube.com/watch?v=FbfJ4fsOqDA (Feb. 28, 2023) ....................................... 11

Liberty Safe, *How Do Gun Suppressors Work*,
https://www.libertysafe.com/blogs/the-vault/how-do-gun-suppressors-work (2023) ............. 12

Merriam-Webster, Inc., *Merriam-Webster.com Dictionary*,
https://www.merriam-webster.com (2024) ................................................................. 10, 41, 52

Mooney, *The Hero of the Sutherland Springs Shooting*,
TEXAS MONTHLY (Nov. 2018) .............................................................................................. 11

Paine, *Common Sense*,
R. BELL, IN THIRD-STREET (1776) ......................................................................................... 9

Terrence P. Dwyer, *Falsified facts by any other name are still false*,
POLICE1 (Jan. 13, 2022) ...................................................................................................... 59

The Daily Signal, *Here's What a Gun Silencer Really Sounds Like*,
https://www.youtube.com/watch?v=yHk_232MpL0 (Oct. 3, 2017) ....................................... 11

Turk, *Options to Reduce or Modify Firearms Regulations*,
BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES (Jan. 20, 2017)...................... 11

Twain, *The Innocents Abroad*,
https://archive.org/details/bub_gb_fFjyA7FJorUC/page/649/mode/2up (1869) ..................... 53

Willeford, *Stephen Willeford Statement*,
U.S. House of Representatives Committee Repository (Aug. 29, 2022) ................................. 11

Williams, *Style: Lessons in Clarity and Grace*,
(Joseph Bizup rev., 11th ed. 2013). ................................................................................. 45, 59

NOW COME Plaintiffs **MATTHEW RANKIN, MELANIE TRIMBLE,** and **BRANDON MICHAEL WHITE,** by and through their attorney, Brandon J. Grable of Grable Grimshaw PLLC, complaining of Defendants **CITY OF LIVINGSTON, DETECTIVE KALEB BARKER, SERGEANT RONNIE BOGANY, OFFICER SCOTT PASKE, DETECTIVE LEON MIDDLETON,** and **OFFICER CHRISTOPHER SIMMONS,** and respectfully alleging as follows:

**I.**
**INTRODUCTION**

1.     MATTHEW RANKIN, MELANIE TRIMBLE, and BRANDON MICHAEL WHITE bring this civil action for damages against the CITY OF LIVINGSTON, (including the CITY MANAGER BILLY S. WIGGINS, the CITY COUNCIL including the MAYOR, and the CITY OF LIVINGSTON POLICE DEPARTMENT with its POLICE CHIEF MATT PARRISH), DETECTIVE KALEB BARKER, SERGEANT RONNIE BOGANY, OFFICER SCOTT PASKE, DETECTIVE LEON MIDDLETON, and OFFICER CHRISTOPHER SIMMONS for retaliatory conduct in response to Plaintiffs exercising their First and Second Amendment rights, including lawfully carrying a handgun in compliance with state and federal laws, filming police activity, contradicting police officers' understanding of the law; refusing to submit to unlawful searches without a search warrant, probable cause, or even reasonable suspicion; and refusing to comply with orders contrary to state law.  This retaliatory conduct includes the unlawful arrest of Plaintiffs Trimble and White by KALEB BARKER, RONNIE BOGANY, SCOTT PASKE, LEON MIDDLETON, CHRISTOPHER SIMMONS, and/or other CITY OF LIVINGSTON police officers at the direction or under the supervision of MATT PARRISH; and the issuance of the unlawful arrest warrants for Plaintiff Rankin and Mr. Rincon by which they were arrested in San Antonio.  It also includes the retaliatory prosecution following all of those arrests.  These incidents

clearly violated Plaintiffs' rights afforded to them under the United States Constitution.  Plaintiffs were harmed and seek recovery in this suit.

2.      Plaintiffs allege that the **CITY OF LIVINGSTON** and its policymakers, City Manager **BILLY S. WIGGINS** ("Wiggins"), Chief of Police **MATT PARRISH** ("Chief Parrish"), Mayor **JUDY B. COCHRAN** ("Cochran"), and the City of Livingston City Council Members: Alan Cook, Elgin Davis, Bobby Jackson, and Raymond Luna (collectively referred herein as the "Policymakers") not only failed to uphold the laws of the land and to abide by the Constitution of the United States of America, but rather allowed the officers of the Livingston Police Department to brazenly operate outside the bounds of law and conscience.  This sanctioned absence of morality—from the top, down—resulted in officers committing egregious violations of state and federal laws.  These Policymakers, specifically the city manager, Wiggins; mayor, Cochran; and the police chief, Chief Parrish, had a duty to implement and/or enforce policies, practices, and procedures for the Livingston Police Department that respected Plaintiffs' constitutional rights.  They failed.  They failed to abide by the rule of law, and they failed to respect the authority vested in them by their City.  The police department appeared to recognize that people have a right to film them but still allowed their officers to run rampant without fear of discipline or restraint knowing this conduct deprived Plaintiffs of their rights under the Constitution.  Plaintiffs were harmed and seek answers and compensation in this lawsuit for their damages.

## II.
## JURISDICTION AND VENUE

3.      This is a civil rights action in which the Plaintiffs seek relief for the violations of their rights secured by 42 U.S.C. § 1983 and the First, Fourth, and Fourteenth Amendments.

4.      Jurisdiction of this Court is found upon 28 U.S.C. § 1331.

5.      Venue is properly laid in the Eastern District of Texas under 28 U.S.C. § 1391(b)(2).

6.      The events that gave rise to this lawsuit primarily took place in Livingston, Texas, in Polk County.

7.      Pursuant to 42 U.S.C. § 1983, and other applicable laws, the Court may award nominal, compensatory, and punitive damages, as well as equitable relief against all of the Defendants in their individual capacity, for the violations of Plaintiffs' Constitutional rights and harm caused by their actions/inactions.

### III.
### PARTIES

8.      Plaintiff MATTHEW RANKIN ("Plaintiff Rankin") is a law-abiding citizen of the United States and a resident of the City of Corpus Christi, County of Nueces, State of Texas.

9.      Plaintiff MELANIE TRIMBLE ("Plaintiff Trimble") (formerly Melanie McCrory) is a law-abiding citizen of the United States and a resident of the City of Livingston, County of Polk, State of Texas.

10.     Plaintiff BRANDON MICHAEL WHITE ("Plaintiff White") is a law-abiding citizen of the United States and a resident of the City of Dayton, County of Liberty, State of Texas.

11.     Defendant KALEB BARKER ("Defendant Barker") was at all pertinent times a detective employed by the City of Livingston and was at all pertinent times acting under color of state law in the performance of his duties as a Livingston police officer.

12.     Defendant RONNIE BOGANY ("Defendant Bogany") was at all pertinent times a sergeant employed by the City of Livingston and was at all pertinent times acting under color of state law in the performance of his duties as a Livingston police officer.

13. Defendant SCOTT PASKE ("Defendant Paske") was at all pertinent times a police officer employed by the City of Livingston and was at all pertinent times acting under color of state law in the performance of his duties as a Livingston police officer.

14. Defendant LEON MIDDLETON ("Defendant Middleton") was at all pertinent times a detective employed by the City of Livingston and was at all pertinent times acting under color of state law in the performance of his duties as a Livingston police officer.

15. Defendant CHRISTOPHER SIMMONS ("Defendant Simmons") was at all pertinent times a police officer employed by the City of Livingston and was at all pertinent times acting under color of state law in the performance of his duties as a Livingston police officer.

16. Defendant CITY OF LIVINGSTON ("Defendant City") is a political subdivision of the State of Texas, acting under color of state law, and is a person for the purposes of a 42 U.S.C. § 1983 action. Defendant City is responsible for the policies, practices, and procedures of its Police Department and individual officers. Defendant City is also responsible for the policies implemented, endorsed, and enforced by its Policymakers, the ordinances passed by its Councilmembers and Mayor, and even the actions and statements of its Police Chief.

17. Each and all of the acts of Defendant Officers alleged herein were committed by said Defendants while acting within the scope of their employment with Defendant City, including Defendant City's Police Department.

18. These Defendant Officers committed each and all of the acts herein despite their knowledge that they were engaging in unlawful and unconstitutional acts. Yet, they did them anyway, knowingly, recklessly, intentionally, wantonly, callously, purposely, purposefully, sadistically, cruelly, deliberately, and/or with deliberate indifference, gross negligence, and/or reckless disregard.

# IV.
## STATEMENT OF FACTS

*Initial Statement*

19.     In 1776 Thomas Paine published the pamphlet *Common Sense* advocating for the Colonies' separation from England.  In updated publications printed the same year, he added the following words in an appendix: "We have it in our power to begin the world over again."[1]  People read this work, these words, and they believed them.  They believed them so much that they went and liberated the American colonies from the tyranny of their British overlords and established a new system of government.  Words have power, or, as John Adams wrote, "Without the pen of the author of *Common Sense*, the sword of Washington would have been raised in vain."

20.     The pen is mightier than the sword.  Written words, the foundation for modern civilization, can raise countries to greatness or topple them to the ground.  Written words can change lives for good or for ill.  Words have power.  That is why one must be careful what one writes.  That is also why one must be very careful that the words one writes conveys exactly the meaning that one intended to convey.  In the end, word choice matters more than intent, because the words on the page are what the readers actually see and understand, not the words left in the author's head.

21.     One writing technique known as *slant* makes especial use of this power.  The act of slanting means to take specific facts and then "to interpret or present [them] in line with a special

---

[1] Thomas Paine, *Common Sense; with the whole appendix: the address to the Quakers: also, the Large additions, and A dialogue between the ghost of General Montgomery, just arrived from the Elysian Fields; and an American delegate in a wood, near Philadelphia: on the grand subject of American independency*, R. BELL, IN THIRD-STREET., 1776, at 134, available at https://quod.lib.umich.edu/cgi/t/text/text-idx?c=evans;idno=N11853.0001.001;rgn=div1;view=text;cc=evans;node=N11853.0001.001:17.

interest"—to "angle" them.[2]  Slant effectively reveals opinions; however, this is not the furthest

extent to which slant can be used.  Slant also can take specific facts and "maliciously or dishonestly

distort or falsify" them.[3]  It is all in how one presents the facts, in which facts get presented and

which get left out, or even in a combination of both.

22.     The following incidents which occurred would have been nearly unremarkable had

it not been for a number of individuals wanting to tell a story—whether or not the facts actually

supported that story.  Those stories told, those stories believed, those stories acted upon are why

Plaintiffs bring this complaint today.

### First Incident

23.     On February 4, 2022, Plaintiffs Matthew Rankin and Brandon White gathered at

Plaintiff Melanie Trimble's apartment to decorate posters for a peaceful protest they intended to

stage the next day at a nearby city.  Plaintiffs planned to protest that nearby city's contempt for

First Amendment expression, while drawing community awareness to the situation.

24.     After exchanging pleasantries with everyone inside, Plaintiff Rankin walked back

out to his vehicle to grab their supplies, including posters, from his trunk.  There would be nothing

remarkable about this little jaunt had he not been legally openly carrying his firearm at the time.

Now, Plaintiff Trimble's apartment—where he was present at that time—is in Texas, and plenty

of individuals open carry handguns in Texas.  His openly carried handgun was unremarkable.

What some might consider unusual was that Plaintiff Rankin had a silencer attached to his

handgun.[4]

---

[2] Merriam-Webster, Inc., *Merriam-Webster.com Dictionary* (2024) https://www.merriam-webster.com/dictionary/slant.

[3] *Id.*

[4] Plaintiff Matthew Rankin legally possessed this suppressor in compliance with all federal and state laws.

25.     While action movies might persuade the ignorance that silencers are primarily used by assassins (or special agents) to kill from the shadows with hardly a sound, this is not an accurate depiction of silencers.[5]  One, silencers, also known as suppressors, in general, do not actually silence the sound of gunfire; rather, this tool merely decreases the decibels created by the gun when fired.[6]  Two, per retired Brigadier General Ronald B. Turk, former Associate Deputy Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives, "silencers are very rarely used in criminal shootings."[7]

26.     People carry handguns to defend themselves, their families, their friends, and their neighborhoods from violence.  Unfortunately, guns are loud, and people do not always have time to don hearing protection before using a gun in self-defense or in the protection of others.  Stephen Willeford, the hero of the Sutherland Springs massacre, did not even have time to put his shoes on.[8]  Using a gun in self-defense comes with the risk of permanently damaging one's ears.[9]

---

[5] Debunked, *How Silent Are Gun Silencers? DEBUNKED*, YouTube (Jul. 8, 2023), https://www.youtube.com/watch?v=ivL-KHS9IMw.

[6] The Daily Signal, *Here's What a Gun Silencer Really Sounds Like | The Daily Signal*, YOUTUBE (Oct. 3, 2017), https://www.youtube.com/watch?v=yHk_232MpL0; KGUN9, *How "silent" are gun silencers?*, YOUTUBE (Feb. 28, 2023), https://www.youtube.com/watch?v=FbfJ4fsOqDA.

[7] Ronald Turk, *Options to Reduce or Modify Firearms Regulations: White Paper*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, at 6 (Jan. 20, 2017), https://shared.nrapvf.org/sharedmedia/1509466/atf-white-paper-options-to-reduce-or-modify.pdf.

[8] Stephen Willeford, *Stephen Willeford Statement*, Hearing: "Examining the Practices and Profits of Gun Manufacturers" by the Committee on Oversight and Reform, U.S. House of Representatives Committee Repository (Aug. 29, 2022), https://docs.house.gov/Committee/Calendar/ByEvent.aspx?EventID=115024; Mooney, *The Hero of the Sutherland Springs Shooting Is Still Reckoning With What Happened That Day*, TEXAS MONTHLY (Nov. 2018), https://www.texasmonthly.com/true-crime/stephen-willeford-sutherland-springs-mass-murder/.

[9] "Noise produced by impulsive noise, such as gunfire, has sufficient intensity to permanently damage unprotected ears in a very short period of time. . . ." Lilia Chen and Scott E. Brueck, *Noise and Lead Exposures at an Outdoor Firing Range – California*, DEPARTMENT OF HEALTH AND HUMAN SERVICES CENTERS FOR DISEASE CONTROL AND PREVENTION: NATIONAL INSTITUTE FOR OCCUPATIONAL SAFETY AND HEALTH, at 6 (Sept. 2011), https://www.cdc.gov/niosh/hhe/reports/pdfs/2011-0069-3140.pdf.

Suppressors, or silencers, are an easy-to-carry means to decrease this risk.[10]  [After all, if a device designed to reduce the volume of sound generated when a gun is fired is already attached to your gun, one does not need to worry about finding ear protection, grabbing, it, and putting it on properly during a do-or-die moment.]   Even the CDC as far back as 2011 has recommended the use of suppressors as an effective form of hearing protection.[11]

27.     So, there Plaintiff Rankin was, walking directly between his vehicle and a residence in which he was a guest with his handgun for self-defense—with a little added hearing protection—minding his own business and focusing on gearing up for the civic duty of peacefully assembling and protesting government actions he believed to be unlawful.  He filled his arms with poster boards and bags and proceeded back inside his friend's apartment.  To a well-informed citizen, his actions were generally unremarkable and well within his rights as an American citizen.

28.     Plaintiff Trimble's neighbor had a different perspective.  She saw the holstered handgun, panicked, and called the cops.

---

[10] "The first and most important benefit of a suppressor or silencer is that it greatly reduces the potential for permanent hearing loss to the firearm user and others in the area. Gunshots are extremely loud, usually over 140 decibels and up to 175 dB or more for some high-pressure cartridges.

"It's important to understand how decibels work: It's not a linear scale. Decibels are measured and graphed logarithmically, or exponentially. Every increase of 10 dB on the decibel scale is equal to a 10-fold increase in sound pressure level. So, if 1 decibel is nearly silent, a 10 dB increase means 10 times louder, while a 20 dB increase means 100 times louder. So the difference between a hearing safe 115-130 dB shot from a suppressed firearm and a not-hearing-safe shot from an unsuppressed firearm at 140+ dB is huge. For reference, a rock concert may average between 90 and 120 dB. A jet engine at takeoff is around 140 dB.

"Your hearing can be permanently damaged by a single close-range exposure to a loud noise over 140 dB, or by prolonged exposure to noises as low as 80-110 dB. . . . Suppressors are important safety features on many firearms." Liberty Safe, *How Do Gun Suppressors Work* (2023), https://www.libertysafe.com/blogs/the-vault/how-do-gun-suppressors-work.

[11] "One of the primary sources of noise generated during gunfire is the muzzle blast during firing, which generates high noise across the mid to high frequency range. The only potentially effective noise control method to reduce . . . noise exposure from gunfire is through the use of noise suppressors that can be attached to the end of the gun barrel." *Supra* note 9, at 4-5.

29.    A couple of minutes later, officers from the Livingston Police Department pulled their patrol vehicles up to the curb outside.  Defendants Sergeant Ronnie Bogany and Officer Scott Paske approached Plaintiff Trimble's apartment; Defendant Bogany knocked on her door.

30.    When Plaintiff Trimble opened the door and asked what the problem was, Defendant Bogany told her that someone had called saying a guy had come over to her apartment with a gun.  Plaintiff Trimble told the officers that Plaintiff Rankin did not intend to speak with them.   Both Defendant Officers declared that would not be good enough as he had a gun. Defendant Bogany threatened to get the manager Ginger over there, while Defendant Paske demanded that Plaintiff Rankin come speak with them.

31.    Given the nature of this conversation, Plaintiffs and their friend started filming the police officers for their safety and to have their own records of the interaction.[12]

32.    Accordingly, Plaintiff Rankin moved near the door to speak with the police officers standing outside.  When Plaintiff Rankin asked the officers what was going on, Defendant Paske told him that they just wanted to speak to him for a moment.  Defendant  Paske then explained that they were trying to learn where the gun with a silencer on it was.  Plaintiff Rankin showed the officers the gun he was openly carrying in a hip holster.  Defendant Paske asked him if he was carrying it with the silencer on it.  Plaintiff Rankin told him, "Yeah."  Defendant Paske then asked if he had the paperwork for silencer.  Plaintiff Rankin told him, "Yeah."  Defendant Paske asked to see the paperwork.  Plaintiff Rankin told him, "Nope."

---

[12] Blue The Blue Line Watcher, *Tyrant Livingston Tx Cops Threatened Me and kids.*, YOUTUBE (Feb. 6, 2022), https://www.youtube.com/watch?v=sYF2vs6EB_w.

33.     At the point when the officers had arrived on scene following two calls of a strange man with a silenced handgun entering an apartment, the officers had enough reasonable suspicion to speak with the individuals in the apartment and to check on their well-being and safety.  At this point in the conversation, however, once the officers had spoken with the resident of the apartment and ascertained that she did not feel threatened, nor was she a victim; and once the officers had spoken with the owner of the silenced handgun and been unable to confirm whether he illegally possessed the suppressor, the officers no longer had reasonable suspicion to continue the detainment.  They should have wished everyone a good day and left.

34.     Unfortunately for Plaintiffs, neither officer liked being told no.  Defendant Bogany ordered one of the several John Doe officers milling around outside as backup to try to get the housing manager Ginger on scene, while Defendant Paske threatened Plaintiff Rankin, ordering him to get out of the apartment or they were going to tow his vehicle.

35.     When Plaintiff Rankin did not immediately respond to this threat, Defendant Paske claimed that he had to have his paperwork on him to carry his suppressor.[13] Plaintiff Rankin again told the officer that he had the paperwork.  Defendant Paske again demanded to view it. Plaintiff Rankin informed the officer that he lacked the legal right to demand to view it.  In response, Defendant



Paske told Plaintiff Rankin that he was going to get Plaintiff Trimble kicked out over this.  When

---

[13] Defendants Paske and Bogany knew or should have known that TEX. GOV'T CODE § 2.102(A) which went into effect on September 1, 2021, forbade municipalities and their officers or employees from adopting any rule, order, or policy to enforce a federal statute, order, rule, or regulation for a firearm suppressor which imposes a prohibition, restriction, or other regulation that does not exist under Texas law.  The Livingston Police Department failed to train or to supervise the training of their officers on this legislative update.

Plaintiff Rankin told Defendant Paske, "Just hold on, sir," Defendant Paske sniped back, "No, you hold on."

36.    Plaintiff Rankin tried to explain that there was the difference between a private property trespass and a violation of the National Firearms Act (NFA).   If the apartment owner wanted to trespass him from the property, that would be a completely separate matter.  However, Plaintiff Rankin informed the officers that if the property owner tried trespassing him for firearms such an action would be against the Texas state law.   Plaintiff Rankin then tried to explain how residents and guests of residents—but at this point, he was interrupted.   Defendant Bogany who had been standing behind Defendant Paske backing him up during this conversation interrupted Plaintiff Rankin to ask if he was on the lease to be there.

37.    Plaintiff White, who had been standing nearby, asked if the government was now claiming that individuals cannot have friends.   Defendant Bogany told the Plaintiffs that that would be the property owner's decision.   Plaintiff White asked Defendant Bogany, "You don't have the right to assemble?"



38.    Meanwhile, Plaintiff Rankin continued trying to educate the officers that residents and guests of residents have the right to bring firearms to their abode and back again to their vehicle.   Defendant Bogany shut the screen door, so he would not have to listen, but

Defendant Paske interjected, "Not with a silencer."[14]  Plaintiff Rankin corrected him, "Yes, with

a silencer.  These are not illegal."  Plaintiff Rankin then referenced *Terry v. Ohio* and the Indiana

case to inform the officers that they did not get to demand ID or paperwork without RAS

(reasonable suspicion) of a crime, first.[15]  He also agreed that if the officers had RAS to detain

him, they could have his NFA paperwork—but they did not have that.

39.     Defendant Officers both ignored this argument.  Defendant Bogany told Plaintiff

Rankin that they had received word that the apartment owner was on the way.  Plaintiff Rankin

agreed that if the apartment owner trespassed him, he would leave and be gone.  He just was not

going to show his paperwork to somebody on a trespass warning when he had not done anything

illegal.  At this, Defendant Officers moved back away from both the door and the Plaintiffs

gathered inside.

40.     Defendant Paske approached the apartment a few minutes later on the phone and

asked for Plaintiff Trimble's name for the apartment owner.  The general consensus among the

Plaintiffs was that the landlady would know from the unit number.  Defendant Paske interpreted

this to mean that Plaintiff Trimble did not wish to answer and left again.

41.     About twenty-five minutes later, another officer, Defendant Detective Kaleb

Barker, came to the screen door to speak with Plaintiffs.  Defendant Barker asked whose apartment

it was and then confirmed that Plaintiff Trimble was okay with Plaintiff Rankin being there and

that he was a guest of hers.

42.     Plaintiff Rankin tried to explain to the detective that, similar to the requirement for

showing an ID for TEXAS PENAL CODE § 38.02 or for *Terry v. Ohio*, an officer would need some

---

[14] *Supra* note 13.

[15] *Terry v. Ohio*, 392 U.S. 1 (1968).

RAS (reasonable suspicion) first.  If the officers had some reason to believe—with evidence—that he was a felon who could not have a suppressor or that he did not legally own the suppressor, and they legally detained him, he would give them the NFA paperwork; he had it all.  However, just because someone saw him walking around with a suppressor does not justify the officers demanding to see his paperwork.

43.     Defendant Barker told Plaintiff Rankin that he was really just there to keep the peace, before letting Plaintiffs know that the housing authority liked to be kept informed if the officers got a call regarding a firearm, so the officers had notified the front office.  He also warned Plaintiffs and their friends that someone might stop by from that housing authority office to talk with them.

44.     Plaintiff Rankin explained that they were less concerned about that and more concerned that Defendant Paske had made threats about getting Plaintiff Trimble and her children kicked out of her home because of Plaintiff Rankin or threats about arresting Plaintiff Rankin or towing his vehicle for not showing his paperwork. Defendant Barker informed them that he was not a supervisor, so he could not help with that, but he could get them the information to file a complaint.



Plaintiffs reassured the detective that they had the information to file a complaint against the officers.  Plaintiff Rankin also informed Defendant Barker that he did not intend to go walking around Section 8 housing with his openly carried firearm.  [There is a difference between meandering about and walking directly between a residence and a vehicle.]  He also let the detective know that he might see him out later with a camera watching.  With a laugh, Defendant

Barker told them, "Somebody's got to watch us.  We can't watch ourselves."  After providing his name and joking about being unable to golf, the detective wished them a good day and left.



45.     Plaintiffs Trimble and White then ventured outside.  Plaintiff White had a vague notion of asking Defendant Paske to apologize to Plaintiff Trimble for threatening her children's home, but he discarded the idea when he saw the officers talking to the Housing manager and he realized they might be trying still to get Plaintiff Rankin criminally trespassed from the property.

46.     Plaintiff Trimble, meanwhile, approached Defendant Paske to remind him that they had been friends for 16 years and to ask how he could make such threats against her family.  While Defendant Paske did recognize that they had been friends for years, he was dismissive of Plaintiff Trimble's critique of his conduct.

47.     After the Livingston Police Department finished communicating with Plaintiff Trimble's neighbor, Plaintiff Trimble reassured her that Plaintiff Rankin was indeed her friend and a welcome guest in her home.  She was not and had not been in danger from his lawfully carried firearm.  Plaintiffs then returned to Plaintiff Trimble's apartment.

**Comments**

HAD 2 CALLERS ADVD THAT THEY SAW A W/M SUBJ GO INTO ABOVE RESIDENCE WITH A
GUN IN HIS HAD THAT HAS A SILENCER ON IT--WEARING TAN PANTS

***1334--212--BE OUT AT 113 BANKS
***1335--205--CONTACT HOUSING DIRECTOR AND HAVE HER COME TO THIS LOCATION
***1338--TO ALL UNITS--MADE CONTACT WITH HER--SHE'S 7 MILES OUT OF TOWN BUT IS
ON HER WAY
***1407--212--ALL UNITS BACK IN--EVERYTHING IS 10.4 AT THIS TIME--==NOTHING
CRIMINAL HAPPENED--== LEFT STATEMENT FORMS FOR COMPL IN CASE SHE WANTED TO
FILL THEM OUT--NO REPORT AT THIS TIME

48.     The officers outside eventually left
and Plaintiffs, free to resume their day, finished
making their signs and went to run an errand in a
nearby city.



*Interlude*

49.     Five years ago, the Livingston Police Department compiled a video of Livingston
police officers—all the way up to the Chief of Police—wiggling their hips, lip-syncing to "What
Is Love" by Haddaway, and eating donuts and posted it on YouTube.[16]



---

[16] Livingston Police Department Livingston, Texas, *Livingston Police*, YOUTUBE (Jul. 20, 2018),
https://www.youtube.com/watch?v=8evtD_L4j48.















50.     Why is this relevant?

51.     This is relevant because the Livingston Police Department does not mind being filmed in public and having that video posted on YouTube.  It also shows that these officers are familiar with the videographic form of First Amendment expression, with YouTube fame, and even with YouTube advertisements.  None of the above bother them.

52.     The Livingston Police Department also does not mind when they are filmed by someone whom they consider to be a member of the press.[17, 18]

53.     The Livingston Police do mind very much, however, when a dissenting voice challenges their conduct.  Publicly.  Openly.  Fearlessly.  It bothers them.  It bothers them so much they willingly conspire to contrive false allegations of criminal conduct in violation of the Fourth and Fourteenth Amendments to suppress the creation and dissemination of those messages in violation of the First and Fourteenth Amendments.

54.     This attitude can be glimpsed in the next incident and their collusion is fully seen in the events that followed after.

***Second Incident***

55.     After their visit to the neighboring city, Plaintiffs returned to Livingston.  The rest of the day had gone quietly, and Plaintiffs were now looking for a little excitement.  Accordingly, Plaintiffs Trimble, White, and Rankin met up with Mr. Rincon to go driving around Livingston looking for entertainment.

56.     While parked in the Livingston Walmart parking lot, Plaintiffs noticed a Livingston patrol vehicle rapidly leaving the parking lot and heading northwest on U.S. Highway 190, going faster than the 45-mph speed limit.  Operating under the assumption that the officer—at that speed—must be heading out for a call for service, the Plaintiffs decided to follow the officer to see what was happening.

---

[17] willie preston, *Cop Shop 2014, Livingston, Texas…*, YOUTUBE (Dec. 20, 2014), https://www.youtube.com/watch?v=UeWJFwM0CUQ.

[18] willie preston, *ENGINE FAILURE, SMALL PLANE CRASH, LIVINGSTON, TEXAS 06/13/20...*, YOUTUBE (Jun. 13, 2020), https://www.youtube.com/watch?v=2MFMCQVcD-M.

57.     Now Plaintiffs are the sort of people who start conversations.  Mr. Ismael Rincon runs the YouTube channel "Corners News" with 49,800 subscribers; he describes himself as a "Constitutional Rights Exerciser/Defender" and "Human Rights Exerciser/Defender."[19]  Plaintiff Matthew Rankin runs the YouTube channel "hbomatt" with 8,790 subscribers; he describes himself as a "Constitutional activist and journalist focused on 2nd amendment rights and police accountability."[20]  Plaintiff Brandon Michael White runs the YouTube channel "America First" with 2,060 subscribers; he describes his mission statement as follows:

> My goal is to effect as much change as I can, with as much civil disobedience as the law allows, and I deem appropriate. As James Baldwin is quoted "Freedom is not something anybody can be given. Freedom is something people take, and people are as free as they want to be." A few years ago we the people were quoting Benjamin Franklin about Liberty and Safety. We are again allowing our Liberties to be constrained for Safety and this time we are selling it. Ben Franklin is by far my favorite Founding Father and the only to sign the four documents that kickstarted our young Nation. Like a selection of verses from a musical by Lin-Manuel Miranda-"just like my country. I'm young, scrappy, and hungry. And I'm not throwing away my shot."[21]

Plaintiff Melanie Trimble runs the YouTube channel "Blue The Blue Line Watcher" with 1,490 subscribers; she describes her mission statement as follows: "Our Veterans fought for OUR Freedom and Rights, and OUR PUBLIC SERVANTS WILL BE EDUCATED and HELD ACCOUNTABLE."[22]

---

[19] Corners News, YOUTUBE (accessed on Dec. 19, 2023), https://www.youtube.com/@CornersLaredo.

[20] hbomatt, YOUTUBE (accessed on Dec. 19, 2023), https://www.youtube.com/@hbomatt.

[21] America First, YOUTUBE (accessed on Dec. 19, 2023), https://www.youtube.com/@AmericaFirst77000.

[22] Blue The Blue Line Watcher, YOUTUBE (accessed on Dec. 19, 2023), https://www.youtube.com/@BlueTheBlueLineWatcher.

58.     They are each different individuals with differing motivations and methods.  They do all film police officers performing their duties as public servants in the public purview.  This conduct is established First Amendment protected activity.[23]

59.     Plaintiffs followed the Livingston police officer intent on filming police activity. To the Plaintiffs' surprise and disappointment, the police officer only stopped at the Stripes convenience store to buy a beverage before leaving again.  Accordingly, the Plaintiffs headed back into Livingston proper.

60.     Still hoping to see police activity, Plaintiffs headed to the Livingston joint City Hall and Police Department, where they circled the building looking for any other events involving police officers.  When they found none, Plaintiffs parked near the mixed-use municipal building to wait and see if anything else might be going on.  As the Friday night remained quiet, Plaintiffs went back to driving around Livingston looking for excitement.  There was nothing.



61.     Plaintiffs returned to City Hall, but even a few laps around the building revealed no new police activity.  Plaintiffs drove around Livingston again before returning to circle City Hall

---

[23] *Turner v. Driver*, 848 F.3d 678 (5th Cir. 2017).

and the police department.  As they passed, an officer in the parking lot shouted out, "Hey!"  He did not order Plaintiffs to stop or pull over, so Mr. Rincon continued driving.

62.     Finally, Mr. Rincon parked out front of the First Community Financial Group. While stopped, Mr. Rincon, who had been driving, exited the car to retrieve his binoculars from the trunk.



63.     Prior to his exiting the vehicle, Mr. Rincon had already been wearing a load bearing vest with items in some of the pockets.[24]  He had been wearing this vest all evening.  He did not take this vest off, adjust anything on the vest, put anything on the vest, add to the vest, or otherwise do anything to the vest except to casually wear it during this brief stop.

---

[24] The first picture of the vest was taken at a different time.  The second two photos were taken later that night.  It is a load-bearing vest.  It is *not* a tactical plate carrier vest.  A trained professional would easily be able to determine based on the slouchiness of the fabric that the vest lacks the stiff rigidity of a vest carrying an armor plate.



64.     As he did so, a police officer approached Plaintiffs' parking spot in his patrol vehicle.  Concerned that Mr. Rincon had not parked straight enough and that the officer could cite him for that, the other Plaintiffs encouraged him to get back into the vehicle and move the car. Plaintiffs also checked to make certain that everyone had their seatbelts on.  Everyone did.



65.     Mr. Rincon hastily re-entered the vehicle.  As, the police officer—who did *not* have his lights or siren on—passed behind Plaintiffs and pulled into the parking spot next to them, Mr. Rincon backed out and headed down the street.

66.     Mr. Rincon in accordance with the Texas Transportation Code drove until the officer ceased following him.  He then parked on the other side of the Livingston City Hall and parked—between the lines—in a spot at the First National Bank of Livingston.  A different officer pulled his patrol vehicle with its lights on in behind Plaintiffs, blocking their vehicle in.  The officer, Defendant Christopher Simmons, then initiated either a traffic stop in a private parking lot



or an investigative detention.  Accordingly, the Plaintiffs recorded the police stop on their cameras

or phones while Defendant Simmons (presumably) did the same on his body-worn camera (BWC).[25, 26]



67.     Defendant Simmons approached the driver's side window of Plaintiff's car and calmly introduced himself as Officer Simmons with the Livingston Police Department.  Since it was dark outside, he utilized a flashlight to observe the occupants of the vehicle.[27, 28]

68.     Mr. Rincon asked him, "¿Mande?" [Translation: "Yes?" or "What?"]

69.     Defendant Simmons asked Mr. Rincon if he was saying he didn't speak English.  Mr. Rincon responded by telling him, "No entiendo." [Translation: "I don't understand."][29]

70.     While Defendant Simmons requested a Spanish-speaking officer make the scene, Plaintiff White, who was sitting behind the driver's seat, told Defendant Simmons that he speaks English and asked why the officer had pulled them over.  Defendant Simmons ignored him.

---

[25] Corner News, *ID Refusal – Give me your LICENCIA or i'll arrest you SEÑOR*, YOUTUBE (Feb. 8, 2022), https://www.youtube.com/watch?v=d7NNzHn0KS0.

[26] America First, *Videos turned over to the DA*, YOUTUBE (Dec. 15, 2023), https://www.youtube.com/watch?v=IQW3aMlW0sM.

[27] He was not armed with a weapon, shouting about weapons, utilizing body armor, or even carrying a tactical shield. He did not mention concerns about officer safety.

[28] hbomatt, *Cops threaten illegal arrest of @Corners News Livingston TX. Have now retaliated with felony charges*, YOUTUBE (Feb. 4, 2022), https://www.youtube.com/watch?v=PqeU2tpp0wA&t=0s.

[29] Mr. Rincon never actually claimed to not speak English; he stated he did not understand.  Defendant Simmons assumed Plaintiff only spoke one language because he preferred to respond in Spanish, and Defendant Simmons does not speak Spanish.  "I do not understand" could also refer to not understanding why the officer had initiated a traffic stop while Mr. Rincon was parked in a private parking lot.

71.     As they waited for a Spanish-speaking officer to make scene, Mr. Rincon asked Defendant Simmons, "¿Que lo que pasa?" [Translation: "What's happening?" or "What's going on?"]

72.     Defendant Simmons tried asking, "¿Que?" before admitting, "No understand."[30]

73.     When Mr. Rincon asked Defendant Simmons if he spoke Spanish, Defendant Simmons responded, "Uno momento."  (His accent answered that question.)  He then told Mr. Rincon in English that someone would be there shortly.  After a couple of seconds, Defendant Simmons tried asking, "¿Licencia?" [Translation: "License?"]

74.     In response, Mr. Rincon asked, "¿Qué hice?" [Translation: "What did I do?"] Defendant Simmons gave up and told Mr. Rincon to wait, "Just a sec'."  Mr. Rincon asked him, "¿Qué es eso?" [Translation: "What is that?"]  Defendant Simmons admitted, in English, that he did not know what Mr. Rincon was saying, but if Mr. Rincon gave him one second, they would find out.  Mr. Rincon agreed, "Sí."



75.  Plaintiff White asked the officer if he was being detained or if he could step out of the car.  The officer maintained his position, standing with one arm braced against Plaintiff White's door, a flashlight pointed inside the driver's side window, but refused to answer.  Mr. Rincon, and Plaintiffs Rankin, White, and Trimble did not feel free to leave the scene.

---

[30] Defendant Chris A. Simmons received *32 hours* of TCOLE credit for an Intermediate Spanish for Law Enforcement class in April of 2015.

76.     At this point, Officer Tito Reyes made the scene.  Defendant Simmons told the officer that the driver did not speak English.  He concluded with, "So I'm trying to find out why they're here, what they're doing, why are they being suspicious."

77.     Officer Reyes approached the vehicle with a, "Hello. How are you all doing?" and a friendly wave.



78.     Mr. Rincon responded with a friendly, "¿Cómo estás?" [Translation: "How are you?"]  Officer Reyes responded, "Bien.  ¿Usted?" [Translation: "Good. You?"]  Mr. Rincon told him in Spanish that he was doing well, but he did not know that Defendant Simmons wanted. Officer Reyes introduced himself in Spanish by name and provided the name of the police department he was with.

79.     Officer Reyes switched back to speaking to Defendant Simmons.  "And, so, I guess they're recording."  He did not provide any context for why he felt this fact merited comment.  He then asked Mr. Rincon (in English), "Do you have a weapon on you, sir?"  Before Mr. Rincon

could respond, Defendant Simmons interjected, **"I don't care if he has a weapon,** but why are they following the police around?  Why are they acting suspicious?  Who are they?"



80.     Officer Reyes asked Mr. Rincon, "¿Lo que el está preguntando porque estas sospechoso y perseguiendo la policía?"  [Translation: "What he is asking: Why are you acting suspicious and following the police?"]  Mr. Rincon queried, "¿Persiguiendo?  ¿Qué es sospechoso? ¿Es contra la ley?"  [Translation: "Following?  What is suspicious?  Is that against the law?"]

81.     Defendant Simmons told Officer Reyes he wanted Mr. Rincon's driver's license.[31] Officer Reyes translated this command.  Mr. Rincon asked Officer Reyes in Spanish why and

---

[31] At the time of the incident, Tex. Penal Code § 38.02 only required an individual to identify if he was "lawfully arrested."  Otherwise, an individual could not provide an "intentionally false or fictitious name, residence address, or date of birth if he was "lawfully arrested," "lawfully detained," or if an officer believed the individual was "a witness to a criminal offense.

[The 88th Texas Legislature added several subparts to the section which took effect on September 1, 2023, including Tex. Penal Code § 38.02(b-1), which requires an operator of a motor vehicle who has been "lawfully detained by a peace officer for an alleged violation of a law" to provide his driver's license or name, driver's license number, residence address, and date of birth.]

wanted to know what the nature of the encounter was.   Defendant Simmons told Officer Reyes that they were suspicious.  He then claimed, "And I can stop anybody that's acting suspicious."

82.     Mr. Rincon asked in Spanish what crime that would be.  Plaintiff White asked who determined what was "suspicious."  Defendant Simmons ignored Plaintiff White.

83.     Without answering Mr. Rincon's question, Officer Reyes asked Mr. Rincon to stop moving his hands around and to avoid looking suspicious.  He also asked him if he had a firearm. (Defendant Simmons, meanwhile, did not look  concerned.)  Mr. Rincon told him that he usually did not answer questions.  Assuming Mr. Rincon had a firearm, Officer Reyes asked Mr. Rincon to not do anything to indicate danger to him or move his hands out of his sight.  When Mr. Rincon asked Officer Reyes if he was assuming he had a gun, Officer Reyes argued that one usually does not have magazines without a firearm. Defendant Simmons, watching the exchange, asked Officer Reyes what they were saying, twice. After finishing the conversation, Officer Reyes explained the situation, pointing out the bullets Mr. Rincon had stored in magazines in his vest's pockets.

84.     With that matter settled, Officer Reyes asked Defendant Simmons what was going on.  What did he want?  Defendant Simmons answered, "I want his ID.  Texas law says if you're

---

As Plaintiffs had not committed any crimes and were not lawfully arrested, none of them were required to provide their licenses or identities to Defendant Simmons per Texas law which Defendant Simmons knew or should have known.

suspicious in a suspicious place, I can get your ID.  I can ID you.  I can stop you.  I can find out what you're doing."[32]  He continued, "So that's what I want to know.  What are you doing?"[33]

85.     Officer Reyes asked Mr. Rincon what he was doing in Spanish.  Mr. Rincon replied in Spanish that, right then, he was parked there.  Officer Reyes explained that Defendant Simmons was claiming that he had stopped Mr. Rincon because he was driving around acting suspicious—

86.     Defendant Simmons interrupted.  "Licencia, por favor."

87.     Officer Reyes ignored his fellow officer's interruption and continued explaining.  Mr. Rincon asked if he had committed a crime.  Officer Reyes responded that Plaintiff was suspicious.  Mr. Rincon asked Officer Reyes to listen to his question: Did he commit a crime?  Officer Reyes denied seeing it and directed Plaintiff to Defendant Simmons.

88.     Defendant Simmons, who had been quietly listening to a conversation he could not understand, interrupted again.  "Okay.  Give me your license or get out of the car."  Officer Reyes translated the command.  Mr. Rincon asked why he needed to get out of the car.  Officer Reyes told Plaintiff that he needed to give Defendant Simmons the license he had been asking for.

89.     Mr. Rincon asked Officer Reyes why Defendant Simmons had detained him.  Officer Reyes told Defendant Simmons Plaintiff's question.  Defendant Simmons responded, "I just told him.  He's suspicious."  He then commanded Mr. Rincon (in English), "Step out of the vehicle, or give me your license.  One of the two.  Which one are you going to do?"  Officer Reyes did not translate this order; Mr. Rincon did not respond.  Defendant Simmons tried again, "Right now you're failing to ID, so I'm about to arrest you for that."

---

[32] The Livingston Police Department clearly provided substandard training to their officers or neglected to verify that their officers had received adequate training before placing their officers in positions of authority to enforce the law. This statement is NOT true under Texas law.  Texas is NOT a stop and ID state.

[33] Police officers are not God.  They are not entitled to know everything, just as the government must respect the privacy of its citizens.

90.     Plaintiff Rankin interjected with expletives, asking Defendant Simmons if he had ever heard of 38.02.  He then explained that one only must give ID under arrest.[34]

91.     Defendant Simmons ignored Plaintiff Rankin and, gesturing at Mr. Rincon, told him, "Step out of the vehicle."  Officer Reyes tried to explain something, but Defendant Simmons spoke over him.  "You're not going to tell me what the law is.  I know what the law is."

92.     Defendant Simmons, in fact, did not know what the law was.

93.     Plaintiff Rankin again tried to explain Texas Penal Code § 38.02, Failure to ID, requires an arrest.  Defendant Simmons told him, "Okay.  Then that's what I'm about to do." Plaintiff Rankin asked him, "For what?"  Defendant Simmons responded, "For being suspicious. For failing to ID."  Plaintiff Rankin informed him that Failing to ID is a secondary charge.

94.     At this point, Officer Reyes stepped back into the conversation.  He told Mr. Rincon (in Spanish) that he did not know why Defendant Simmons had pulled him over, because he was not there; Defendant Simmons was telling him what had happened.  Obviously, Plaintiffs had been driving around.  Officer Reyes had intended to speak with them and ask if they needed help or something.  He didn't know if they were lost.  But, Plaintiffs left, so. . . .

95.     Mr. Rincon noncommittally agreed with Officer Reyes.

96.     Officer Reyes then told Defendant Simmons about their previous interaction. Defendant Simmons interrupted Officer Reyes to tell him that Plaintiffs had been following him around.  "They're suspicious as far as I'm concerned. I don't know if they've got partners that are

---

[34] Defendant Simmons knew or should have known TEX. PENAL CODE § 38.02.  The Livingston Police Department knew or should have known that Defendant Simmons would need to know this statute to fulfill his duties and failed to train him or to supervise his training accordingly.  One could easily foresee that Defendant Simmons not knowing this statute would result in egregious Constitutional violations.

committing crimes somewhere else, and they're keeping an eye on our location.  So, you're going to give me your ID, or I'm going to arrest you for Fail to ID."

97.     Plaintiff Rankin tried to explain to Defendant Simmons the consequences of that decision.  Defendant Simmons interrupted him, "And that's fine.  Okay, so you're either going to do it, or that's what's going to happen."  Officer Reyes translated for Mr. Rincon.

98.     The conversation devolved at that point, until Officer Reyes again interrupted.  He told Mr. Rincon (in Spanish) that he was going to ask a question and then everything would be okay: Was he just driving around recording?  Mr. Rincon told him that he was just driving, enjoying the city.  Officer Reyes explained that the people in his car were recording, and that Defendant Simmons had seen him recording as well.  Officer Reyes then asked if that would distract Mr. Rincon from driving? Mr. Rincon denied doing that.



99.     Defendant Simmons, once again, tired of being left out of the conversation.  In English, he interjected, "Right now you're failing to ID.  Give me your license."  Plaintiff Rankin again referred the officer to TEX. PENAL CODE § 38.02.

100.    Officer Reyes ignored Defendant Simmons's interruption and continued trying to communicate with Mr. Rincon.  Mr. Rincon told Officer Reyes that he needed Defendant Simmons to tell him what crime he had committed.  Accordingly, Officer Reyes asked Defendant Simmons. Defendant Simmons again insisted, "He's been suspicious.  I want to know who he is and why is he—huh?"

101.    During Defendant Simmons's monologue, Mr. Rincon continued explaining to Officer Reyes that there had to be a crime.  At this point, Officer Reyes again interrupted Defendant Simmons to tell him that Mr. Rincon was asking for the crime.  Defendant Simmons defensively responded, "He is detained." Officer Reyes told Defendant Simmons that Mr. Rincon said that there had to be a crime for him to show his license.  Defendant Simmons disagreed.  "No, it doesn't. He has to be legally detained by the police."  He then continued demanding Mr. Rincon's ID while Plaintiff White continued providing the officer with the section number for the relevant Texas code.

102.    Officer Reyes then tried to regain control of the conversation.  He asked Mr. Rincon, por favor, to answer his question: "¿Tiene armas de fuego en el vehículo? Sí o no." [Translation: "Do you have firearms in the vehicle? Yes or no."]  Mr. Rincon again told him that he usually does not answer questions.  Officer Reyes told him that he was assuming he had firearms because he had ammo and a bullet proof vest.[35]  He further told Mr. Rincon that he was going to assume because Mr. Rincon did not answer his questions. He then asked Plaintiff Rankin if he had any firearms on him.  Plaintiff Rankin told him that he does not answer questions.

103.    Defendant Simmons told Officer Reyes, **"It doesn't matter if they have a firearm."**  Officer Reyes told Defendant Simmons that <u>he was not saying that it mattered</u>. Plaintiff

---

[35] It was a load-bearing vest, not a plate carrier vest.  It was not a bullet proof vest as Officer Reyes assumed.

Rankin tried to interrupt again, but Officer Reyes stopped him, claiming that he was talking to the driver and not him.

104.    At this point, Officer Reyes had had enough.  He asked everyone to give him a second and pulled Defendant Simmons to the side to talk to him.  Defendant Simmons went, protesting that he just wanted a license.

105.    Plaintiffs either recorded audio from that conversation or were able to obtain a copy.[36]

106.    Defendant Simmons accused Plaintiffs of following him around all night.  Officer Reyes reminded him of training they had received on America First and Mr. White and explained that that was what Plaintiffs had been doing.  Defendant Simmons argued that Mr. Rincon was still failing to ID.  Officer Reyes reminded him that they were not supposed to interfere because of that communication and that they needed to be careful.  That was all he was trying to say.

107.    Defendant Simmons returned to the driver's side window.  "Okay, so again.  You're a suspicious person.  I need your ID."  When Officer Reyes did not immediately move to translate, Defendant Simmons asked, "Tito?  ¿Licencia?"  Officer Reyes still did not provide a translation.

108.    Plaintiff Rankin told Defendant Simmons that he was going to lose the next five years of his life in court, bro.  Defendant Simmons ignored him and addressed Mr. Rincon in English: "Are you going to give me your license or am I going to arrest you for Fail to ID?  Which one is it?"  Mr. Rincon did not respond.

109.    Plaintiff Rankin asked the officers if they were of equal rank.  Defendant Simmons confirmed they were.  Plaintiff Rankin let Officer Reyes know that he could face liability for failing

---

[36] America First, *Livingston Felony Update: Obstruction/Retaliation enhanced w/ Organized Criminal Activity*, YOUTUBE 6:36-7:23 (Jan. 1, 2023), https://www.youtube.com/watch?v=_4O46t7TX_w.

to intervene.  Officer Reyes objected several times that Plaintiff Rankin did not know what he had discussed with Defendant Simmons, and Plaintiff Rankin told Officer Reyes also several times that he was just letting him know.

110.    Mr. Rincon asked Officer Reyes in Spanish if he knew about TEXAS PENAL CODE § 38.02.  Officer Reyes asked, "¿De qué?" [Translation: "About what?" or "What is it about?"] Mr. Rincon told Officer Reyes it was about Defendant Simmons talking about failing to ID. Defendant Simmons could only identify Mr. Rincon if he was lawfully arrested.  That was the only way.  Officer Reyes argued that if Mr. Rincon committed a violation, then Defendant Simmons could identify him as well.  Mr. Rincon responded that Defendant Simmons had not told him of a violation he had committed.  Officer Reyes told Mr. Rincon that he had already made Defendant Simmons aware of that, but that Defendant Simmons still wanted Mr. Rincon's ID.

111.    Mr. Rincon asked if Officer Reyes had a supervisor.  <u>He denied having one at that time</u>.  Mr. Rincon told him that he needed a supervisor on scene.  Officer Reyes translated that request for Defendant Simmons.  Even though Defendant Simmons and Officer Reyes had already confirmed that they were of equal rank, Defendant Simmons claimed to be the supervisor.  While Defendant Simmons continued demanding Mr. Rincon's license, Mr. Rincon told Officer Reyes, "Necesito, por favor." [Translation: "I need, please."]   Neither officer moved to radio for a supervisory officer.

112.    Instead, Defendant Simmons continued repeating himself like a scratched record. Mr. Rincon asked Officer Reyes why would he get out; Officer Reyes translated this for Defendant Simmons.  Defendant Simmons responded, "Cause I need to ID him."  Officer Reyes clarified. "What crime has he committed?"  "He's being suspicious," Defendant Simmons responded.[37]  Mr.

---

[37] This is not a crime.

Rincon asked in Spanish what the probable cause was.  Defendant Simmons spoke over Mr. Rincon, "Therefore, I have every right to ID him."  Plaintiff Rankin told the officers that they have every right to make contact and investigate.  That's it.  Nothing more.  Texas is not a stop and ID state.

113.    At this, Officer Reyes pulled Defendant Simmons to the side again.  Plaintiffs also obtained this audio.[38]

114.    Officer Reyes started off with conciliatory statements, before asking Defendant Simmons, **"What is your reasonable suspicion?"**  "I just told you.  They've been following me around town," Defendant Simmons replied.  "And they could very well be somebody watching us to have another  team commit a crime."  Officer Reyes asked, "What have you determined right now?  **We already know who they are and what they're doing here."**  "Do we know who they are?" Defendant Simmons asked.  Officer Reyes told him, "Yeah, Brandon White.  Mr. White, the America First. That's what they call him in the media." "Oh," Defendant Simmons said. "So, we do know who they are then.  Okay."  Officer Reyes asked him what he intended to do now; could they let them go?  "Yeah.  I didn't realize that was Mr. White back there.  Who's Mr. White?  Which one?"

115.    The officers approached the driver's side window again, and Officer Reyes pointed to Plaintiff White sitting behind the driver.  "Mr. Popular."

116.    Defendant Simmons confirmed, "Right here?"  He then asked, "How are you doing, Mr. White?"  Plaintiff White asked if the officers had received phone calls, which the officers

---

[38] *Supra* note 36, at 10:48-11:40.

denied.  When Plaintiff White asked why Defendant Simmons was shining his light in his eyes, Defendant Simmons told him it was so he could see through the window.  Officer Reyes volunteered that he could remember stuff.



117.    Defendant Simmons loudly proclaimed, "Now I know who you are, so I will be happy to let you go."  Officer Reyes tried to get Defendant Simmons to explain that statement, but this just confused Defendant Simmons.  Accordingly, Officer Reyes told the Plaintiffs, "The reason why he needs to identify you is 'cause he doesn't know who you are.  I know who Mr. White is."

118.    Here, Defendant Simmons interjected with his theory that they could be in collusion with another team to commit a crime.

119.    Mr.  Rincon  asked  Defendant Simmons (in Spanish) to move the light away from his eyes.   When Defendant Simmons did not

immediately move it, Mr. Rincon shone his own little flashlight at the officers.

120.    Officer Reyes decided not to deal with that and continued.  "Like I said, if you're good, and you're all just recording for the media purposes that y'all say, like Mr. White says, man," he gestured.  "We're done here."  Officer Reyes then walked away.

121.    Mr. Rincon leaned out his window and asked Defendant Simmons, "Did you understand the law or no?"  Defendant Simmons tried to claim that he does understand the law. (Right.  Sure.)  Mr. Rincon asked him if he knew 38.02.  Defendant Simmons tried to claim expertise based on the fact that he was the one working as a cop.  (Regrettably, that does not guarantee superior knowledge.)  Mr. Rincon asked him again if he knew 38.02.  When Defendant Simmons told him, "Yeah," Mr. Rincon told him, "Obviously you don't, man."

122.    As the officers were leaving, Officer Reyes wished them, "Be safe," while Defendant Simmons called back, "By the way, you're English got real good."  Plaintiff Rankin called after him, "Yeah, you just got stupider."

123.    Ultimately Plaintiffs were detained for over fifteen minutes by an officer who lacked particularized reasonable suspicion—let alone probable cause—to stop them in the first place.

124.    This should have been the end of it.  It was not.

***A Tale Told***

125.    Officers are supposed to be trustworthy.  If one can trust anyone, one should be able to believe a police officer.  When an officer tells one something, one should be able to think that it is the truth.  Unfortunately, not all officers are good; not all officers tell the truth, the whole truth, and nothing but the truth.  Sometimes officers lie, and sometimes they slant their stories— which is nearly the same thing.

126.     Heretofore, only one narrative has been presented: Plaintiffs' account of the events that occurred to them.  Now, this complaint turns to the stories the Defendant Officers told.[39]

127.     Defendant Officers Detective Kaleb Barker, Sergeant Ronnie Bogany, Officer Scott Paske, John Doe Officers, Detective Leon Middleton, and Officer Christopher Simmons with other officers from Defendant City's police department, including Police Chief Matt Parrish, conspired as members of the Livingston Police Department to intentionally and knowingly harm Plaintiffs by unlawful acts in retaliation for their status as independent journalists and activists.

128.     Together, these Defendant Officers determined to take the above events and twist the facts to support affidavits for arrest warrants for misdemeanor and felony charges.[40]

129.     Before the Defendant Officers could bring these charges, they first had to discover the identities of the individuals involved.  They eventually confirmed the identities of three of the people present for the first incident and all four individuals present for the second encounter.  They must have ultimately decided that this was an acceptable percentage of alleged participants, because these were the only individuals they charged with crimes.

---

[39] Notice the subtle slant: "Plaintiffs' *account* of the events that *occurred*" versus the words "stories" and "told." "Story" can mean "an account of incidents or events;" it can also mean "a fictional narrative shorter than a novel" or even "a widely circulated rumor."  "Story" introduces doubt in the tale, whereas "account" suggests a bald recitation of facts.  "Told," the past tense of tell, means "to relate in detail" or "to express in words."  It suggests words spoken about an event, not the cold hard facts associated with the actual event that happened.

Slant can use specific word choices to steer the reader's thoughts in the direction the author wants the reader to go.  A slanted affidavit crafted by a police officer could persuade a judge unfamiliar with the facts to grant an arrest or search warrant that would not have been granted had the officer been more straightforward—as seen in these incidents.

Merriam-Webster, Inc., *Merriam-Webster.com Dictionary* (2024) https://www.merriam-webster.com.

[40] **"It should go without saying that lying is unacceptable in police reports.** Intentionally inventing facts or misrepresenting the truth can get you fired, sued, or prosecuted. While most officers would never blatantly lie in a police report, even unintentional factual errors or omissions can mislead readers into thinking something happened that didn't, or something didn't happen that should have."

Ben Smith, *7 deadly sins of police report writing*, POLICE 1 (Oct. 3, 2022), https://www.police1.com/police-products/police-technology/software/report-writing/articles/7-deadly-sins-of-police-report-writing-FRy5EMai7H29O1dA/.

130.    For the first incident, Defendant Barker, with the help of Defendant Officers and under the direction or supervision of Police Chief Parrish, drafted an affidavit for the misdemeanor offense "False Report to Induce Emergency Response."

131.    To claim a crime where none existed, Defendant Barker had to first toss out the totality of circumstances.  After all, Defendants Bogany, Paske, Baker, and all the other John Doe Officers on scene knew that Plaintiffs had not committed a crime.  He then had to do away with any facts that could conceivably dispel probable cause.  A judge might ask questions he did not wish to answer if the probable cause seemed iffy.  Finally, he had to use a number of writing tactics including slant to transform a benign misunderstanding into criminal activity.

132.    One, to accuse Plaintiffs of wasting police resources by making a false report, he had to exclude the fact that the police knew who had called 9-1-1.  The first caller Megan Ross, a neighbor of Plaintiff Trimble's, had provided the officers with her name, address, and phone number when she called asking the officers to come investigate.  The second person who called

## LPD
### DETAILED CALL REPORT

| | | | | |
|---|---|---|---|---|
| CFS#: | 202200736 | | INCIDENT#: | 220200736 |
| | | | SOURCE: | PHONE |
| DATE: | 2/4/2022 | | DISPOSITION: | WRITTEN REPORT |
| | | | DISPATCHER ID: | 583 |
| SIGNAL: | FALSE ALARM OR REPORT | | LICENSE NO: | . |

| LOCATION: | | | | | | |
|---|---|---|---|---|---|---|
| 113 BANKS DR | | APT: | DISTRICT | | PHONE: | (936) - |
| BUSINESS: | | | | CALLER PHONE: | | ▓▓▓▓▓ |
| CALLER NAME: | MEGAN | | ROSS | | | |
| ADDRESS: | ▓▓▓▓ | | | | APT: | |
| CITY: | LIVINGSTON | | STATE: | TX | ZIP: | 77351 |

| UNIT:  212 | OFFICER: 199 | Agency CFS: 202200736 | TIME RECEIVED: | 13:30 |
|---|---|---|---|---|
| TIME DISPATCHED: 13:30 | TIME ARRIVED:    13:32 | | TIME CLEARED: | 14:10 |
| TIME OUT: | TIME CLR SCENE: | | TIME AT HOSP: | |
| TIME CLR HOSP: | TIME BACK: | | TIME FREED: | |
| | | | RESPONSE TIME: | 2 |
| | | | TOTAL TIME: | 40 |

was Ms. Ross's self-described baby daddy who later admitted that he never saw Plaintiff Rankin's gun merely listened to what his girlfriend told him. How could he persuade a judge that Plaintiffs had made a false call to waste police resources, if none of them were even the individual that had called 9-1-1? A judge would have had uncomfortable questions over *that*, so Defendant Barker intentionally excluded this information from the affidavit.

133. Two, Defendant Barker selected facts to include out of context to create a picture of behavior that seemed suspicious:

> Affiant would show White, McCrory, and the unidentified male immediately began filming Sergeant Bogany and Officer Paske with their cell phones. Affiant would show another cell phone was observed propped up in a window that faced the front door where Sergeant Bogany and Officer Paske were standing. Affiant would show Sergeant Bogany began an investigation and attempted to identify the individuals in the residence however they refused to comply with his demand to identify themselves. Affiant would show Rankin was the suspect in possession of the handgun and also refused to show any paperwork in regards to the silencer on his handgun which was requested by Officer Paske.

134. Defendant Barker could have included any number of details: Plaintiffs were gathered in Plaintiff Trimble's living room making posters when the officers arrived. Defendants Bogany and Paske filmed Plaintiffs on their BWC. Plaintiffs informed the officers—and provided laws and cases in support—that they legally could not demand they identify or require Plaintiff Rankin to show the officers his NFA paperwork absent the belief a crime had been committed. Defendant Paske threatened to tow Plaintiff Rankin's truck unless he exited the apartment. Defendants Bogany and Paske tried to convince the landlady to criminally trespass Plaintiff Rankin, and she refused. Plaintiff Trimble's neighbor and her boyfriend refused to file a complaint after the officers finished investigating. He did not include any of these details.

135. Defendant Barker instead narrowed in on two sets of facts: Plaintiffs filmed a police interaction initiated and continued by the police officers, and Plaintiffs did not comply with

Defendants' unlawful commands made after they realized no crime had been committed.[41]  This narrowing of facts further deprived the magistrate judge of information he should have been able to consider before he agreed to sign the arrest warrant.

136.    Three, Defendant Barker included imagery that portrayed Plaintiffs' actions in a suspicious light.  The imagery of a cell phone "observed propped up in a window" filming where the officers stood suggested Plaintiffs were covertly watching the officers.  The cell phone in the window was not a phone that had been converted into a cloud security camera months ago and left there to film a long, long time ago before the officers arrived.  No, according to Defendant Barker, they were trying to surveil the officers with a (poorly) hidden camera.  This carefully crafted imagery created further doubt in the reader's mind about Plaintiff's intentions.

137.    Four, Defendant Barker used strategic word choice to make the Plaintiffs' actions seem insurrectionary and the officers' common place.  The officers' actions are described with standard law enforcement terminology such as: "observed," "began an investigation," "attempted to identify," "demand to identify," and "requested," while Plaintiffs "refused to comply" and Plaintiff Rankin "refused to show."  "Refused" is a strong word with connotations like "hindered," "rebuffed," and "spurned" and is used in this instance to suggest an insurgent attitude.[42]  Instead

---

[41] Both sets of facts should raise concerns with this Court.  The first, because it clearly shows that Defendant Officers believed filming police officers should be viewed as a suspicious activity—not protected First Amendment speech. The second, because it clearly shows that Defendant Officers lacked the basic training needed to know even a simple Texas law like Tex. Penal Code § 38.02: "(a) A person commits an offense if he intentionally refuses to give his name, residence address, or date of birth to a peace officer who has lawfully *arrested* the person and requested the information.  (b) A person commits an offense if he intentionally *gives a false or fictitious* name, residence address, or date of birth to a peace officer who has: (1) lawfully arrested the person; (2) lawfully detained the person; or (3) requested the information from a person that the peace officer has good cause to believe is a witness to a criminal offense."  As Plaintiffs were only detained, they were not required to identify themselves.  Merely, if they *chose* to identify, they could not provide a knowingly false identity.

[42] Of particular note, Defendant Barker claimed that Plaintiff Rankin refused to show his paperwork; Plaintiff Rankin made abundantly clear to the officers that he would provide his paperwork if they had reasonable suspicion he had committed a crime.  The officers could not even dredge up enough facts to support a suspicion—let alone probable cause—at the scene.  Defendant Barker intentionally excluded those facts.

of showing Defendant Officers posturing, threatening, and sputtering while Plaintiffs calmly imparted information about the law, Defendant Barker created a picture of harassed police officers dealing with recalcitrant suspects.  This negative portrayal was designed to persuade the judge to look with disfavor on Plaintiffs.

138.    Five, Defendant Barker used passive verb choice to shift the blame onto Plaintiff Rankin.  Joseph M. Williams, a writing professor for more than three decades at the University of Chicago and the 2006 Golden Pen Award recipient from the Legal Writing Institute, discussed this type of literary chicanery in his book *Style: Lessons in Clarity and Grace*: "Our choice of subjects is crucial not only when we want to be clear, but also when we want to be honest or deceptive."[43] Stylistic manipulation allows a writer to deflect focus or to misdirect the reader.[44]  Instead of honestly writing that Ms. Ross called the cops on her neighbor's guest, Defendant Barker used the wording "due to the actions of" to shift the blame to Plaintiff Rankin.[45]  This passive tense moved the sentence structure from the more honest format *Person 1 performed Action 1* to *Person 2's actions caused Person 1 to perform Action 1*.  This sentence structure unfairly shifted the blame onto Plaintiff Rankin.  According to Defendant Barker, it was Plaintiff Rankin's fault Ms. Ross called 9-1-1 when no crime had been committed.  This intentional sentence structure choice allowed Defendant Barker to shift blame to the victim.  Since none of the Plaintiffs had called the cops, this was the only way Defendant Barker could accuse any of the Plaintiffs with the crime.

139.    Six, all three affidavits were identical.  Defendant Barker did not tailor the narratives to explain how each Plaintiff had allegedly committed the crime they were charged with

---

[43] Joseph M. Williams, *Style: Lessons in Clarity and Grace*, 194 (Joseph Bizup rev., 11th ed. 2013).

[44] *Id.* at 191-194.

[45] "Affiant would show *due to the actions of* Rankin this agency received two 9-1-1 calls from individuals who perceived his actions as alarming."

outside of changing the name in bold listed as the Defendant.  Defendant Barker claimed that because Plaintiff Rankin openly carried his handgun "this agency received two 9-1-1 calls from individuals who perceived his actions as alarming."  He never justified why he believed that Plaintiffs Trimble and White had committed the crime outside of mentioning in passing the facts that (1) they were present and (2) they filmed the encounter with the police.  Even without offering any flimsy justification for why he believed that Plaintiffs Trimble and White had committed a crime, Defendant Barker still swore "upon [his] oath" that they had.

140.    Defendant Barker crafted a narrative that made the Plaintiffs' actions out to be alarming, suspicious, and generally disruptive to the rule of law or at least to poor officers trying to complete their investigations while *inferring* that the Plaintiffs are guilty of committing the offense "False Report to Induce Emergency Response."  He then swore based on those facts that Plaintiffs "did knowingly initiate a report of a present offense . . . and the defendant knew that said report was false or baseless and would ordinarily cause action by an official agency organized to deal with emergencies, namely, the Livingston Police Department."

141.    The Polk County District Court Judge, absent any outside knowledge of the events that occurred, trusted Defendant Barker's deceit and signed the arrest warrants for Plaintiffs.  Plaintiffs Rankin, White, and Trimble were arrested and held in jail until they could bail out as a result.

142.    "Somebody's got to watch us.  We can't watch ourselves," indeed.[46]

143.    In the same way, with the help of Defendant Officers and under the direction or supervision of Police Chief Parrish, Defendant Detective Leon Middleton drafted an affidavit for

---

[46] Defendant Barker's words to Plaintiff Rankin, when Plaintiff Rankin informed him that he might see them filming police activity in the area at a later time.

the second incident claiming that Plaintiffs White, Trimble, Rankin and Mr. Rincon "Engage[ed] in Organized Criminal Activity."

144.    Like Defendant Barker, to claim a crime where none existed, Defendant Middleton had to first toss out the totality of circumstances.  After all, Defendant Simmons and Officer Reyes knew that Plaintiffs had not committed a crime.  Defendant Middleton also had to do away with any facts that could conceivably dispel probable cause and to use a number of writing tactics including slant; logical fallacies; and even lying to transform a series of unrelated events into criminal activity.

145.    One, to accuse Plaintiffs of engaging in organized crime, Defendant Middleton had to exclude the fact that no crime had been committed.  Defendant Simmons detained Plaintiffs with the assistance of Officer Reyes to investigate a situation he believed to be suspicious—not criminal, just suspicious.  After learning the identity of Plaintiff White—and presumably determining what Plaintiffs were doing (filming police activity)—at the urging of Officer Reyes, Defendant Simmons let Plaintiffs leave.  Any reasonable suspicion he might have had prior to the traffic and/or investigative stop was dispelled by the time the stop ended.  Based on the totality of circumstances, Defendant Simmons knew no crime had been committed.  How could Defendant Middleton persuade a judge that Plaintiffs had engaged in organized criminal activity if he admitted that Defendant Simmons had previously determined no crime had been committed? ("Now I know who you are, so I will be happy to let you go.")  A judge would have had to deny the arrest warrants.  So, Defendant Middleton excluded this information.

146.    Two, Defendant Middleton tried to cleverly hide that he had no personal knowledge of the validity of any of the information to which he was swearing.  He wrote, "Affiant would show that on February 4th, 2022, *his agency* investigated the offense. . . ."  This sentence

sidestepped the matter of personal knowledge.  If Defendant Middleton had bluntly written, "I am swearing this affidavit based on third-party knowledge," the judge would have rightly questioned why either Defendant Simmons or Officer Reyes, as the investigating officers (and the only officers on scene), had not written the affidavits.  Defendant Middleton also failed to provide any sources for his information.  Nowhere in his affidavit did Defendant Middleton specify whether he spoke with Defendant Simmons and Officer Reyes, watched body worn camera or dash camera footage, read incident reports, or just spoke to another officer in the department.  His level of knowledge of the incidents could have affected how much trust the judge placed in the facts presented.  Accordingly, Defendant Middleton tried to minimize this information.

147.    Three, like Defendant Barker, he presented facts out of context to create a picture of suspicious behavior:

> Affiant would show that Officer Chris Simmons . . . observed a small 4 door blue car stalking him as he drove his marked patrol unit.  Affiant would show Officer Simmons stopped at a local convenience store and the vehicle stopped . . . in the parking lot. . . . Affiant would show no one ever exited the vehicle. . . . Affiant would show Officer Simmons exited the business, entered his patrol unit and the vehicle continued to stalk Officer Simmons as he exited the parking lot.  Affiant would show the suspect's vehicle later turned off and a short time later, it was circling the police department. . . .

> Affiant would show Officer Simmons was able to obtain the license plate of the vehicle bearing Texas MRB1920.  Affiant would show the vehicle registration was out of Laredo, Texas. . . .

> Affiant would show the driver of the vehicle pretended he did not speak or understand the English language and was video recording all the actions of Officer Simmons. . . . Affiant would show the front seat white male passenger was video recording with his cell phone and being verbally rude to Officer Simmons while conducting his investigation. Affiant would show the white male sitting in the back seat behind the driver was positively identified and known as Brandon Michael White based on past law enforcement encounters for calls relating to his cell phone recordings and harassment of law enforcement. . . . Affiant would show . . . it was later determined the Hispanic male knew and could speak the English language after being verbally abusive to Officer Simmons. . . .

Affiant would further show Mr. Rincon has been stopped by the Texas Department of Public Safety in this same vehicle on at least four different traffic stops and issued citations.

148.    These were the five behaviors Defendant Middleton felt could be considered suspicious when divorced from any context: (1) Plaintiffs drove to several locations that Defendant Simmons drove to at about the same time and they traveled the roads around City Hall several times; (2) Mr. Rincon drove a vehicle registered in a different part of Texas; (3) Plaintiffs either offended Defendant Simmons with their language during the traffic stop or had previously offended officers with their word choices; (4) Plaintiffs filmed the police officers in public with their phones while the police officers filmed them with their BWC; (5) Mr. Rincon had previously received traffic tickets while driving.

149.    The last fact is hardly related to the present offense, especially since Defendant Middleton did not specify which traffic laws other officers had cited Mr. Rincon for violating: Headlight burnt out?  Speeding?  Failing to stop for a full four seconds at a stop sign?  Not using a turn signal?  Defendant Middleton wanted to present Mr. Rincon as a man frequently on the wrong side of the law, but he stopped short of actually providing the full facts for the judge to consider.

150.    Defendant Middleton also tried to claim Mr. Rincon's place of residence was a source of suspicion and fear, but lots of people travel and Mr. Rincon was with friends who were locals.  Since pointing that information out would diminish his goal of making Plaintiffs' behavior seem suspicious, Defendant Middleton left that information out.

151.    Defendant Middleton highlighted any rude behavior he could attribute to Plaintiffs—even hearsay, but he avoided mentioning that Defendant Simmons had also been rude to Plaintiffs with his dismissive, unlawful commands and that Officer Reyes had had to step in as a voice of reason.  He included details on how Plaintiffs followed Defendant Simmons from the

Walmart parking lot, but he failed to mention that at the time Defendant Simmons had been driving at a speed above the posted speed limit without his lights or sirens on.  Defendant Middleton focused on Plaintiffs continuing to follow Defendant Simmons after the gas station, but he neglected to mention that (1) Plaintiffs pulled out of the gas station parking lot directly onto U.S. Hwy 190 instead of following Defendant Simmons down a side road past the Discount Tire before he turned ahead of them onto U.S. Hwy 190, and (2) if Plaintiffs wanted to return to Livingston proper without going ten minutes out of their way, they had to drive southeast down U.S. Hwy 190 as well.



152.    Defendant Middleton highlighted the fact that Plaintiffs were filming the officers, but he only later mentioned in passing that the officers had been filming the traffic stop as well. He also did not mention that there is a growing trend in America for individuals to film traffic stops for their own safety or for their own records, as many police departments do not like to

release BWC footage even if something happens, or that the Livingston Police Department had received training on the presence of auditors (people who film government officials including police officers to hold them accountable for their official conduct) in Polk County—as evidenced by Defendant Simmons and Officer Reyes's knowledge concerning Plaintiff White.

153.    He described Plaintiffs as "circling the police department" but failed to mention that the Livingston Police Department had received training on individuals who film police officers.  He accused Mr. Rincon of pretending to not speak English, but he chose not to mention that Mr. Rincon speaks Spanish.  Defendant Middleton's carefully curated collection of facts prevented the magistrate judge from understanding the totality of circumstances before he agreed to sign the arrest warrant.

154.    Four, Defendant Middleton used careful word choice to make the Plaintiffs' actions seem insurrectionary and the officers' common place.  He stated that Defendant Simmons was "on a routine patrol and performing his law enforcement duties" in "his marked patrol unit."  Officer Reyes "observed" and "notified" Defendant Simmons "of what he had witnessed."  Defendant Simmons "request[ed] . . . identification" "while conducting his investigation."  Officer Reyes "arrived on scene for Officer safety and to assist in translating."  These words are bland and formal and standard law enforcement terminology.  In comparison, Plaintiffs are accused three times of "stalking" and once of "circling the police department."  Defendant Middleton calls them or their actions "suspicious" four times.  Plaintiff Rankin is accused of being "verbally rude," Plaintiff White is accused of previously "harass[ing] . . . law enforcement," and Mr. Rincon is accused of being "verbally abusive."  There is no emotion associated with the officers' actions; Plaintiffs' actions, on the other hand, range from mean to alarming to outright dangerous.  With these representations, the judge would not have had any knowledge that Defendant Simmons had been

decidedly unprofessional, nor could he, in good conscience, look at Plaintiffs with anything but animosity.

155.    Five, Defendant Middleton further resorted to logical fallacies.  He started with an alarming statement to add a touch of hysteria.  "Affiant would show Officer Simmons was concerned for his safety due to the recent killings and ambush of police officers on duty."  Defendant Middleton, who in his sworn statement did not mention (1) having any conversations with Defendant Simmons or (2) reading any statements made by Defendant Simmons, provided no basis for his supposed knowledge of Defendant Simmons's thoughts.  He also failed to provide any factual basis for this sentiment.  Neither Livingston, Texas, nor Polk County, Texas, have a history of citizens ambushing police officers.[47]  Nor is there a trend for police ambushes in cities demographically similar to Livingston.  Defendant Middleton simply presented an emotional appeal as fact absent any proof or other basis for this claim.  An appeal to emotion is a logical fallacy.

156.    Defendant Middleton further wrote, after pointing out Mr. Rincon had traveled to Livingston from Laredo, "Affiant would show this raised more suspicion for the safety of Officers Simmons and Reyes due to their suspicious actions and stalking."  This statement is a non sequitur.[48]  Person A is from City A.  Person A traveled to City B.  Therefore, Person A is suspicious.  This conclusion does not logically follow the premises.  Traveling is a normal activity

---

[47] Livingston Police Officer Caran Renee Coward died while on duty in April of 2008, but her death was ruled a murder-suicide, with her dead husband blamed for her murder.

[48] Non sequitur (noun): "1: an inference . . . that does not follow from the premises . . . specifically : a fallacy resulting from a simple conversion of a universal affirmative . . . proposition or from the transposition of a condition and its consequent. . . .  2: a statement (such as a response) that does not follow logically from or is not clearly related to anything previously said."

Merriam-Webster, Inc., *Merriam-Webster.com Dictionary* (2024) https://www.merriam-webster.com/dictionary/non%20sequitur.

pursued by billions of people worldwide.  It is not inherently suspicious.  As Mark Twain once wrote, "Travel is fatal to prejudice, bigotry, and narrow-mindedness, and many of our people need it sorely on these accounts.  Broad, wholesome, charitable views of men and things cannot be acquired by vegetating in one little corner of the earth all one's lifetime."[49]  Claiming Plaintiffs were more suspicious because Mr. Rincon's vehicle was registered in Laredo is another logical fallacy.

157.    Six, when those tactics were insufficient to establish a felony crime, Defendant Middleton lied.  Multiples times.  (1) Defendant Middleton claimed that Plaintiffs parked "adjacent" to Defendant Simmons at the convenience store.  Defendant Simmons, in fact, parked in front of the convenience store, while Plaintiffs parked in a parking spot on the side of the building.  (2) Defendant Middleton lied about the interaction at the gas station.  Without providing a source, Defendant Middleton claimed that "no one ever exited the vehicle while it waited on Officer Simmons to exit the business."  Except, Plaintiffs were parked on the side of the building, so Defendant Simmons could not have observed them while he was inside the convenience store



---

[49] Mark Twain (Samuel Clemens), *The Innocents Abroad or The New Pilgrims' Progress* 650 (1869), https://archive.org/details/bub_gb_fFjyA7FJorUC/page/649/mode/2up.

purchasing his beverage.  Defendant Middleton also does not claim knowledge obtained from viewing videos of the scene, such as surveillance video from the convenience store.  Did he make this assertion up?  Did he provide conjecture as fact?  Or did he simply feel a judge did not need to know the basis for this information, because the judge might then question his basis for next claiming the occupants of the vehicle were "wait[ing] on Officer Simmons to exit the business." Defendant Middleton did not know Plaintiffs' motivations or plans.  He had not questioned them, watched a recording of them discussing their motivations, or even read their diaries (if they even have them).  He certainly did not read their minds, as that ability still firmly falls into the category of science fiction.  He could not truthfully, factually make this statement, but he still stated this opinion as a fact in his sworn testimony.

158.    (3) Defendant Middleton later in his affidavit swore that "Officer Reyes . . . observed a Hispanic male exit the blue vehicle, put on a ballistic body armor vest and then entered the driver's side of the vehicle."  When Mr. Rincon exited his parked vehicle to access his trunk, he was already wearing a (non-ballistic) vest.  He, further, only removed his binoculars from his trunk.  He did not take his vest off, put it back on, or put another vest on.  Defendant Middleton brazenly lied about this event.  (4) Even if Mr. Rincon had put on a vest—which he did not—his alleged actions would not have been "overt" as Defendant Middleton claimed because Officer Reyes had to go looking to find Plaintiffs in the out-of-the-way parking spot.

159.    (5) Immediately following Lies #3 and #4, Defendant Middleton made a very serious accusation, "Officers felt as if they were about to commit a criminal act and cause them bodily injury and/or death."  First off, one can logically deduce that if the alleged causes are made up, so too must be the alleged effect.  Defendant Middleton failed to provide factual support for

his contention that the officers felt fear of imminent injury because the initial incident—Mr. Rincon overtly donning a vest—never occurred.

160.    Secondly, this claim completely contradicts the officers' words and actions recorded at the traffic stop.  (a) The officers clearly had not discussed Plaintiffs prior to Defendant Simmons's asking for a translator at his traffic stop.  Officer Reyes admitted as much to Plaintiffs when he told them that Defendant Simmons had not communicated which crime he believed Mr. Rincon had committed.  This was also clear when Officer Reyes then took the time to tell Defendant Simmons that he had previously stopped beside Plaintiffs because he thought they might be lost or need help, and when Defendant Simmons, in turn, responded by informing Officer Reyes that Plaintiffs had been following him earlier.  There was no previous conference that resulted in fears of a police ambush; the two officers filled each other in mid-detention.  (b) If Defendant Simmons had feared for his life, after he had parked behind Plaintiffs' vehicle to block



their vehicle from leaving, he would have approached the situation tactically, such as (at a minimum) staying sheltered behind his patrol vehicle while, with his gun drawn and at the low ready, yelling at Plaintiffs to slowly exit the vehicle with their hands above their heads.  He would not have approached the driver's side

window in a non-tactical manner with his gun holstered and then presented his open profile (see white rectangles) to potentially get shot at.   Nor would Officer Reyes, if he had feared imminent bodily injury or death, have approached weaponless without cover to duck behind and with an equally open profile (see white rectangle) to also get shot at.  These officers did not fear imminent



bodily injury or death.  Defendant Simmons even told Officer Reyes twice he did not care if Plaintiffs had a firearm, and Officer Reyes agreed with him the second time.  (c) Near the end of the traffic stop, Officer Reyes pulled Defendant Simmons to the side to talk.  This conversation was not for the officers to confer on whether they still believed Plaintiffs were planning an ambush. This conversation was so Officer Reyes could ask Defendant Simmons why he had detained and was still detaining Plaintiffs.  Defendant Middleton perjured himself when he swore that these officers detained Plaintiffs because they feared imminent bodily injury or death.

161.    Lastly, (6) the windows of Mr. Rincon's vehicle were not "dark tinted windows," as Defendant Middleton claimed.

162.    By claiming that Plaintiffs were "stalking a uniformed police officer in his marked patrol unit while driving a vehicle *with dark tinted windows*, wearing a *ballistic proof* vest with ammunition" that Mr. Rincon allegedly "*put on*" as an "overt action" so that officers "*felt*" they might suffer imminent "bodily injury and/or death" Defendant Middleton was able to manufacture

some semblance of a crime that he could argue Plaintiffs had committed.  Defendant Middleton as a "credible person" swore that this testimony was true even though he knew it was a lie.  He knew that no crime had been committed—Defendant Simmons had released Plaintiffs at Officer Reyes's urging because he did not even have a suspicion that a crime had been committed—but Defendant Middleton wanted or was instructed to charge Plaintiffs with a felony crime, so he resorted to deception to support this agenda.

163.    Seven, Plaintiffs were not charged with a crime related to officer safety.  They were not even charged with Stalking.  Plaintiffs were charged with criminal activity because they appeared suspicious, used language the officers did not like, disagreed with the officers' understanding of the law, and filmed the encounter.  The last three are protected under the First Amendment.  The first is not a crime.  Defendant Middleton still swore to a judge that, based on all of the above, Plaintiffs had committed the crime "Engaging in Organized Criminal Activity."

164.    Eight, all four affidavits were essentially identical.  Defendant Middleton did not tailor the narratives to explain how each Plaintiff had allegedly committed the crime they were charged with outside of changing which name was listed in bold as the Defendant and which were listed as other defendants.  Defendant Middleton claimed that because Mr. Rincon allegedly "stalk[ed] a uniformed police officer in his marked patrol unit while driving a vehicle with dark tinted windows, wearing a ballistic proof vest with ammunition," all four Plaintiffs not only obstructed or retaliated against Defendant Simmons and Officer Reyes, but also conspired to commit this crime together.  This conspiracy charge enhanced a felony of the third degree to the second degree.  Defendant Middleton never justified why he believed that Plaintiffs Trimble, Rankin, and White had committed either crime outside of mentioning in passing the facts that (1) they were present in the vehicle, (2) they did not identify themselves (even though Defendant

Simmons only asked for Mr. Rincon to identify himself), (3) Plaintiff Rankin filmed the encounter and questioned the officers, and (4) Plaintiff White had a history with local law enforcement.  Even without offering any flimsy justification for why he believed that Plaintiffs Trimble, Rankin, and White had committed a crime, Defendant Middleton still swore "upon his oath" that they had.  He further used their inclusion to justify bringing a conspiracy charge against Mr. Rincon.

165.    The Polk County District Court Judge, absent any outside knowledge of the events that occurred, trusted Defendant Middleton's deceit and signed the arrest warrants for Plaintiffs. After all, Defendant Middleton is a police detective.  A man in his position of authority ought to be a trustworthy individual.  Plaintiffs Rankin, White, Trimble and Mr. Rincon were arrested and held in jail until they could bail out as a result.

166.    Defendant Middleton's affidavits for felony charges against all Plaintiffs were submitted to the Honorable Judge John Wells of the 411th District Court on February 8, 2022— four days post-incidents—with the recommended bond of $100,00.00.  Defendant Barker's affidavits for the misdemeanor charges against three of the Plaintiffs were submitted to the same judge the next day with the recommended bond of $5,000.00.

167.    In submitting these affidavits to the judge, Defendants Barker and Middleton, with either the support of or under the supervision of Police Chief Parrish, Defendant City's Manager, and/or Defendant City's City Council, knowingly perjured themselves to bring these false charges against Plaintiffs.[50]  In particular, Defendant Middleton committed Aggravated Perjury, a third-

---

[50] Tex. Penal Code § 37.02.  "Perjury. (a) A person commits an offense if, with intent to deceive and with knowledge of the statement's meaning: (1) he makes a false statement under oath or swears to the truth of a false statement previously made and the statement is required or authorized by law to be made under oath; or (2) he makes a false unsworn declaration under Chapter 132, Civil Practice and Remedies Code.  (b) An offense under this section is a Class A misdemeanor."

degree felony, in his attempt to bring third-degree felony charges against Plaintiffs, and Defendant Barker committed the same in his attempt to bring misdemeanor charges against Plaintiffs.[51]

168.    Defendants Middleton and Barker's perjuries violated the public trust placed in them as law enforcement officers, the entire Livingston Police Department, and Defendant City.[52] They also "abrade[d] the trust that sustains a civil society."[53]

169.    Such egregious violations of ethics, duty, and law should not have occurred under the supervision of Defendant City's Police Chief, Matt Parrish.[54]  Yet they did.

---

[51] Tex. Penal Code § 37.03.  "Aggravated Perjury. (a) A person commits an offense if he commits perjury as defined in Section 37.02, and the false statement: (1) is made during or in connection with an official proceeding; and (2) is material. (b) An offense under this section is a felony of the third degree."

[52] "Facts are not negotiable, or as John Adams more eloquently stated, 'facts are stubborn things.' Criminal complaints signed by arresting officers must retain all the relevant facts and accurately describe the crimes committed. When police officers have failed to do this and falsified facts, prosecutors have rightfully prosecuted them for doing so. . . . It is . . . a fraud that causes harm and negatively reflects on the integrity of the criminal justice system."

Terrence P. Dwyer, *Falsified facts by any other name are still false*, POLICE1 (Jan. 13, 2022), https://www.police1.com/patrol-issues/articles/falsified-facts-by-any-other-name-are-still-false-zPuNbX3kTHAFmJg3/.

[53] "But what is at stake here . . . is the ethical foundation of a literate society.  We write ethically when, as a matter of principle, we would trade places with our intended readers and experience the consequences they do after they read our writing. . . . The ethics of writing are clearer when writers knowingly use language . . . to disguise their own [interests]. . . . When we knowingly write in ways that we would not want others to write to us, we abrade the trust that sustains a civil society."

Williams, *supra* note 43, at 190, 191, 193.

[54] "The prevalence of ethics violations in an organization often is proportionate to the quality of its leadership. . . . Directing the actions of subordinates is an important function of effective leaders. If a supervisor notices unethical activities and fails to take immediate corrective action, that supervisor has conveyed to the officer that the behavior was acceptable. Leaders constantly must display strong moral character and not tolerate unscrupulous activities on any level. . . . To ensure and motivate compliance with rules, regulations, and policies, law enforcement organizations must have strict guidelines and investigate all ethics complaints. Agencies must not tolerate unscrupulous actions. They consistently must maintain clear and accurate standards in all investigations. An incident of unethical conduct that is not dealt with sends mixed messages to officers that can upset years of ethical behavior enforcement. . . .  The public image of an agency is determined greatly by the quality of the internal affairs function. How the department responds to misconduct complaints is crucial in the struggle to maintain ethical behavior and community trust."

Jay Fortenbary, *Developing Ethical Law Enforcement Leaders: A Plan of Action*, FBI LAW ENFORCEMENT BULLETIN (May 5, 2015), https://leb.fbi.gov/articles/featured-articles/developing-ethical-law-enforcement-leaders-a-plan-of-action.

170.    Chief Parrish not only allowed such violations to occur, but he also approved of them.

171.    Seven days post-incidents, Defendant City's police chief released an official statement in the form of a press release on behalf of the Livingston Police Department, a division of Defendant City.  During those seven days, Chief Parrish had every opportunity to thoroughly investigate the events that occurred: to not just read his officers' reports or his detectives' affidavits, but also to watch the BWC footage from his officers' cameras and Plaintiff Trimble's YouTube video of Plaintiff Rankin's conversation with the Livingston police at her apartment,[55] Plaintiff Rankin's YouTube livestream of the traffic stop,[56] and Mr. Rincon's YouTube video of the detention with Spanish translations.[57]  Defendant City's police chief had every opportunity and resource needed to personally confirm the veracity of any information he released to the public under his name and Defendant City's authority.

172.    This is what he chose to write:

> During the investigation officers recognized two of the individuals in the apartment as Melanie McCrory and Brandon White. Officers determined that there was no threat to anyone and that these individuals had created the panic in the residential district to have police respond so that they could be recorded for their social media channels. . . .

> While this was going on Officers recognized Brandon White in the back seat of the vehicle. Officers again, [sic] realized that that this was a staged event to record the officer's response and for individuals to post on their social media pages. Upon realizing this, officers disengaged with the individuals. . . .

> On February 9th, 2022, Melanie Renee McCrory 39 of Livingston TX. And Brandon Michael White 38 of Dayton, TX. both were arrested on warrants for Engaging in

---

[55] Blue The Blue Line Watcher, *supra* note 12.

[56] hbomatt, *Cops threaten illegal arrest of @Corners News Livingston TX. Have now retaliated with felony charges*, YOUTUBE (Feb. 4, 2022), https://www.youtube.com/watch?v=PqeU2tpp0wA.

[57]  Corners News, *ID Refusal – Give me your LICENCIA or i'll arrest you SEÑOR*, YOUTUBE (Feb. 8, 2022), https://www.youtube.com/watch?v=d7NNzHn0KS0.

Organized Criminal Activity-Obstruction or Retaliation (F2) and False Report to Induce Emergency Response (MA).

173.    These statements can be broken down as follows:

- o Fact 1: Plaintiffs Rankin, Trimble, White and Mr. Rincon exercised their constitutional rights.

- o Fact 2: The Livingston Police Department knew Plaintiffs Trimble and White frequently exercised their constitutional rights.

- o Fact 3: Defendant Officers engaged in interactions with Plaintiffs because they felt that Fact 1 (in spite of Fact 2) was suspicious.

- o Fact 4: Defendant Officers determined on-scene that Plaintiffs had committed no crimes and released them.  Twice.

- o Fact 5: Defendant Officers later decided, based on Plaintiffs' status alone (Fact 2), that they could be charged with crimes despite Fact 4.

- o Fact 6: Plaintiffs were clearly treated differently from other members of society (see Fact 5) because of Facts 1 and 2.

- o Fact 7: Defendant City's Chief of Police proclaimed Facts 5 and 6 to the public in his official statement.

- o Fact 8: Defendant City did not retract or even apologize for Fact 7, nor did Defendant City stop Chief Parrish or his officers from submitting charges against Plaintiffs to the District Attorney's office.

- o Fact 9: Defendant City clearly *approved* of Chief Parrish's public statement and of the charges his officers brought against Plaintiffs (see Fact 8).

- o Fact 10: Defendant Officers, Chief Parrish, and Defendant City clearly violated Plaintiffs' First, Second, Fourth, and/or Fourteenth Amendment rights.

174.    The commanding officer over an entire police department supported his officers bringing felony charges against Plaintiffs even though they all knew no crimes had been committed.  Why?  Because Plaintiffs "record[ officer interactions] for their social media channels."

175.    Restated, all that the affidavits and the press release show is that these police officers find it disturbing when someone else films them.  Why else would they continually

mention in their affidavits or press releases—as if it was somehow suspicious behavior—that these individuals were filming them?  (Especially in this day and age.)[58]

176.    Defendants, part of the dancing Livingston Police Department, intentionally and knowingly harmed Plaintiffs by unlawful acts in retaliation for their status as independent journalists and activists.

### *A Tale Believed*

177.    Defendant Officers put words down on paper.  Words with the power to change lives.  Words that when taken together amounted to lies.  They then maliciously submitted those life-altering words on arrest affidavits to the honorable Judge John Wells of the 411th District Court.

178.    Judge Wells signed on those arrest warrants.  Defendant City's officers, to potentially include Defendant Officers Middleton, Barker, Simmons, Bogany, Paske, and John Doe Officers, then arrested Plaintiff Trimble and White on the warrants on February 9, 2022.

179.    During Plaintiff Trimble's arrest, Defendant Paske told her she was being arrested for "Conspiracy."  When she asked conspiracy for what, Defendant Paske only responded, "When you run with people and you do things like the things you have all been doing—"  He never provided an explanation for the charge.

180.    Defendant City's officers also forced Plaintiff Trimble to sign a temporary agreement with CPS while she was in jail.  This agreement prevented her two children who have developmental disabilities from staying with a neighbor and family friend in their school district as planned and, instead, forced them to stay with their great-grandmother, who was in her 80's, in a town an hour away in a completely different school district while Plaintiff Trimble was

---

[58] Snapchat.  TikTok.  Instagram.  Facebook.  YouTube.  Vimeo.  X.  Tumblr.

imprisoned.  During this time, Plaintiff Trimble's son broke his arm.  His mother was not able to be present to comfort him in his pain.

181.    Following the arrests of Mr. Rincon and Plaintiffs Trimble and White, Plaintiffs Rankin and Mr. Rincon learned that there were outstanding arrest warrants for themselves as well. Mr. Rincon and Plaintiff Rankin, who live outside of east Texas, traveled to San Antonio, where they attempted to coordinate surrendering themselves to the San Antonio Police Department on the active warrants, but the Livingston Police Department refused to publish the warrants in the Texas database—let alone acknowledge the existence of the warrants a judge had already signed. After four days of delays and excuses, Plaintiffs secured an attorney to facilitate their surrender in an attempt to speed up the process.  The Livingston Police Department still refused to produce a copy of the arrest warrants for an additional three days.  Mr. Rincon and Plaintiff Rankin both missed a week of work as a result of this childish delay.

182.    Mr. Rincon was held on a $100,000.00 bond for the Conspiracy charge, while Plaintiffs Rankin, White, and Trimble were held on $105,000.00 in bonds for the False Report and Conspiracy charges.  Mr. Rincon and Plaintiff Rankin were able to gather the resources in order to bond out right away.  Plaintiffs White and Trimble, however, lacked the money needed to cover the cost for a bond that high and remained stuck in jail for 28 and 35 days, respectively.[59]

183.    While stuck in the Polk County Jail, at about three o'clock on February 16, 2022, Plaintiff Trimble was brought from her cell to meet with two of the Defendants who introduced themselves as Detectives Middleton and Barker with the Livingston Police Department. Defendant Middleton explained the purpose of the meeting as follows: "We come over here to talk

---

[59] hbomatt, *Unlawfully charged with Organized Crime and false 911 call. Retaliation by Livingston TX, 105k bond.*, YOUTUBE (Feb. 24, 2022), https://www.youtube.com/watch?v=0acD3f0xF3M.

to you about why you're in jail right now.  So, my question is if you want to talk to us, I got to

read your Miranda warning.  Okay, so we can talk about what we're here for."  Plaintiff Trimble

informed the officers that she did not understand why she was there, because she had not done

anything, nor had she planned to do anything—especially with a bond amount like that.  Following

Defendant Paske telling Plaintiff Trimble she was being arrested for "Conspiracy," no one had

ever explained what conspiracy she had committed.

184.    One of the Defendant Officers asked her what her highest level of education was.

Plaintiff Trimble told them that she had had some college.  Defendant Middleton then told her to

initial a document as he read it to her.  He proceeded to provide her with a Miranda warning.

185.    Plaintiff Trimble told the officers that she did not have an attorney, but she had

already filled out paperwork requesting an attorney and did not understand why the Court had not

already appointed her one.  Defendant Middleton acknowledged this statement and then continued,

"If you waive your rights, you can freely, voluntarily sign your signature right there, and I'll put

today's date and the time on there."

186.    Plaintiff Trimble insisted that she did want an attorney present.

187.    Defendants Middleton and Barker ignored this request.

188.    Defendant Middleton told her they would talk about her lack of an attorney in just

a second.  Plaintiff Trimble insisted that she wanted to be advised by one.  Defendant Barker told

her that that was fine and that they would not force her to sign it.

189.    Despite these assurances, Defendant Middleton continued, "I'm not going to force

you to sign it, but in order for me to talk any further we got to get past this point.  Then I can give

you a lot of the information that you're asking right now."  Defendant Barker added, "And if you

don't want to talk without him here, we can shut it down."

190.     Defendant Middleton continued, speaking over Defendant Barker, "And like it says right there, you can decide to talk with anyone and you can stop talking with anyone anytime you want.  That's number five right there."

191.     Under pressure from the police officers and deprived of her constitutional right to legal counsel, Plaintiff Trimble, operating under the belief that the police officers were there to help her, signed the document waiving her right to remain silent.  Defendant Officers then questioned her without an attorney present.  They did not provide any of the answers they promised when coercing Plaintiff Trimble to sign away her rights.

192.     Following Plaintiffs' release from jail, Defendant Officers under the direction or supervision of Chief Parrish, the Chief of Police for Defendant City, continued the deception that they had concocted.  As a result, the Grand Jury believed Defendant Officers' perjuries, mistruths, and false statements; and Plaintiffs were indicted on the felony charges.  Accordingly, Plaintiffs had to hire criminal attorneys to defend themselves from these baseless misdemeanor and felony charges.

193.     The last charges have only just been dismissed, but the Plaintiffs live in fear that they could still face criminal charges for these incidents as the Polk County's prosecutor's office re-indicted Plaintiff White with a third degree felony for Obstruction/Retaliation for Assault on a Public Servant after his initial felony charge was dismissed.  This felony charge was also dismissed after the court recognized that the State failed to identify any criminal activity.

194.     Following this dismissal, Plaintiffs McCrory and White finally received their cell phones back from the Livingston Police Department.  These officers seized their phones when they were arrested without a warrant and did not return them to Plaintiffs when they were released from

jail.  Defendant City's officers held these phones for 22 months before finally releasing Plaintiffs' property back to them.

195.    Back in 1775, Delegate Patrick Henry openly challenged the Second Virginia Convention with the following words: "Is life so dear, or peace so sweet, as to be purchased at the price of chains and slavery? Forbid it, Almighty God! I know not what course others may take; but as for me, give me liberty or give me death!"[60]

196.    Today, just telling a police officer he does not know the law he swore to uphold and sharing that comment publicly can land a person in jail for over a month on a $105,000.00 bond followed by years of criminal prosecution for a felony charge of the second degree with the risk of two to twenty years in prison and a fine of up to $10,000.00.

197.    This country's Founding Fathers fought and died so that all Americans would be free to speak their thoughts without fear of governmental retaliation.

198.    Do those who have sworn to preserve, protect, and defend that very law still believe in their oath?  In that freedom?  In morality at all?

199.    Defendant Officers' and Defendant City's actions are inexcusable.  Plaintiffs have been harmed.  They seek redress in this matter.

## COUNT I
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (First Amendment - Retaliation)

200.    Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above and incorporate them as is fully set forth herein.

---

[60] Patrick Henry, *"Give Me Liberty or Give Me Death!"*, Colonial Williamsburg (Mar. 3, 2020), https://www.colonialwilliamsburg.org/learn/deep-dives/give-me-liberty-or-give-me-death/.

201.    This First Amendment retaliation claim is asserted against all Defendant Officers as they all actively participated in initiating the arrests and prosecutions of Plaintiffs simply because they did not agree with Plaintiffs' viewpoints, namely that they are First Amendment auditors, that they verbally challenge the officer's conduct, or that they film the officers performing their public duties—all conduct which the First Amendment protects.

202.    Defendants knew that Plaintiffs were engaged in protected First Amendment activity; their conduct of seeking and initiating the arrest and prosecution of Plaintiffs without any lawful basis resulted in injuries that would chill a person of ordinary firmness from continuing to engage in that activity; and the Defendant Officers' adverse actions were substantially motivated against their exercise of constitutionally protected conduct.

**COUNT II**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983**
**(Fourth Amendment – Unlawful Seizure)**

203.    Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above and incorporate them as is fully set forth herein.

204.    Plaintiffs assert that Defendant Simmons lacked any lawful authority to initiate a traffic stop of Plaintiffs on February 4, 2022, while they were on private property.  Defendant Simmons then unreasonably prolonged the traffic stop in further violation of Plaintiffs' rights guaranteed under the Fourth Amendment.

**COUNT III**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983**
**(Fourth Amendment – Unlawful Arrest)**

205.    Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above and incorporate them as is fully set forth herein.

206.    Plaintiffs assert this claim against Defendants Barker and Middleton for submitting arrest affidavits that they knew were false or would have known it was false had they not recklessly disregarded the truth.

207.    Defendants Barker and Middleton supplied false affidavits with the specific intent of misleading the judge and permitting the unlawful arrest of Plaintiffs despite lacking any probable cause or other lawful basis to arrest Plaintiffs.

208.    These Defendants violated clearly established law as the Constitution prohibits an officer from making perjurious or recklessly false statements in support of a warrant.  This is especially true, whereas here, the Defendants knew or had reason to know that they supplied information that materially misled a judge on the basis of a finding of probable cause.

209.    Had Defendants Barker and Middleton provided truthful information in their affidavits, they would have clearly failed to establish probable cause to seek the arrest of Plaintiffs.

## COUNT IV
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (Fourth Amendment – Malicious Prosecution)

210.    Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above and incorporate them as is fully set forth herein.

211.    Plaintiffs assert this claim against Defendants Barker and Middleton who initiated criminal prosecution against Plaintiffs without any lawful basis.  These Defendants knew they lacked probable cause or legal justification to initiate prosecution but did it anyway.  The false charges were terminated in favor of the Plaintiffs.

## *MONELL* LIABILITY

212.    Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above and incorporate them as is fully set forth herein.

213.    The individual Defendants at all times relevant were City of Livingston police officers.

214.    Defendant City maintains a spoken or unspoken policy, practice or custom to permit the unlawful arrests and prosecutions of people they believe are engaged in First Amendment conduct without fear of investigation or discipline.

215.    Defendant City knew that Plaintiffs have a First Amendment right to engage in auditor activities.  They provide training informing their officers of this right.  However, Defendant City repeatedly fails to hold its officers accountable for violating the rights of people they assume are auditors.

216.    Defendant Officers knew they would face no repercussions for conspiring to initiate false arrests and prosecutions of Plaintiffs.  They were right.  The City and its policymakers ratified the officers' conduct when the Police Chief published an official statement declaring that the recklessly false statements made in affidavits by his officers were true.

217.    The City of Livingston acted with deliberate indifference, and it was foreseeable that by permitting the custom, policies, and practices would violate Plaintiffs' constitutional rights.

218.    Defendant City is directly responsible for the individual Defendants' conduct described herein.

## **DAMAGES**

219.    **Actual damages.**  Defendants' acts or omissions were a proximate cause and the moving force behind actual damages suffered by the Plaintiffs, and the Defendants should be held jointly and severally liable.

220.    **Punitive/Exemplary   Damages   against   individual   defendants.** Punitive/exemplary damages are recoverable under Section 1983 when the conduct is shown to be

motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.  Here, the conduct of the Defendant Officers were done with evil motive or intent, or at the very least, was reckless or callously indifferent to the federally protected rights of Plaintiffs.  As such, Plaintiffs request punitive and exemplary damages from the individual officers to deter this type of conduct in the future.

221.    Nominal Damages.

222.    Prejudgment and post judgment interest.

223.    Costs of court.

224.    Reasonable and necessary attorney's fees incurred by the Plaintiffs through trial, and reasonable and necessary attorney's fees that may be incurred by Plaintiffs for any post-trial proceedings, or appeal, interlocutory or otherwise, pursuant to 42 U.S.C. § 1988, and as otherwise permitted by law.

225.    Plaintiffs seek unliquidated damages in an amount that is within the jurisdictional limits of the Court.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray Defendants be cited to appear and answer herein; and upon final trial hereof the Court grant Plaintiffs declaratory and injunctive relief; and judgment be entered in favor of Plaintiffs awarding from Defendants actual damages, exemplary damages, pre-judgment interest at the legal rate; interest on said judgment at the legal rate; attorney fees; costs of court; and such other and further relief, both general and special, at law and in equity, to which Plaintiffs are justly entitled.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury of all issues so triable, pursuant to Fed. R. Civ. P.

38(b).

Respectfully submitted,

**GRABLE GRIMSHAW PLLC**

*/s/ Brandon J. Grable*
**BRANDON J. GRABLE**
Texas State Bar No. 24086983
brandon@g2.law
1603 Babcock Road, Suite 280
San Antonio, Texas 78229
Telephone: (210) 963-5297
Facsimile: (210) 641-3332
**COUNSEL FOR PLAINTIFFS**