## THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## LUFKIN DIVISION

MATTHEW RANKIN,                          §
MELANIE TRIMBLE, and                     §
BRANDON MICHAEL WHITE,                   §
    *Plaintiffs,*                       §
                                         §
vs.                                      §
                                         §    **CIVIL NO. 9:24-CV-00027-MJT**
CITY OF LIVINGSTON,                      §
DETECTIVE KALEB BARKER,                  §
SERGEANT RONNIE BOGANY,                  §
OFFICER SCOTT PASKE,                     §
DETECTIVE LEON MIDDLETON, and            §
OFFICER CHRISTOPHER SIMMONS,             §
    *Defendants.*                      §
                                         §

---

## PLAINTIFF MATTHEW RANKIN'S FIRST AMENDED COMPLAINT
## AND DEMAND FOR JURY TRIAL

---

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ................................................................................................... iii

I.      JURISDICTION AND VENUE ................................................................................... 1

II.     PARTIES ....................................................................................................................... 1

III.    STATEMENT OF FACTS ........................................................................................... 3

  Initial Statement ............................................................................................................ 3

  First Incident .................................................................................................................. 5

  Interlude ........................................................................................................................ 14

  Second Incident ............................................................................................................ 15

  A Tale Told ................................................................................................................... 15

  A Tale Believed ............................................................................................................ 15

COUNT I:       First Amendment – Retaliation ........................................................... 19

COUNT II:      Fourth Amendment – Unlawful Seizure ............................................. 20

COUNT III:     Fourth Amendment – Unlawful Arrest ................................................ 20

COUNT IV:      Fourth Amendment – Malicious Prosecution ..................................... 21

*MONELL* LIABILITY ........................................................................................................ 21

DAMAGES ....................................................................................................................... 22

PRAYER FOR RELIEF ................................................................................................... 23

JURY DEMAND ............................................................................................................... 24

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Terry v. Ohio*,
 392 U.S. 1 (1968) .................................................................................................. 11

**Federal Constitutional Provisions**

U.S. Const. amend. IV .................................................................................... 1, 20, 21

U.S. Const. amend. XIV ............................................................................................. 1

**Federal Statutes**

28 U.S.C. § 1331 ......................................................................................................... 1

28 U.S.C. § 1391(b)(2) ............................................................................................... 1

42 U.S.C. § 1983 .............................................................................................. 1, 2, 23

42 U.S.C. § 1988 ....................................................................................................... 23

**Federal Rules**

Fed. R. Civ. P. 38(b) ................................................................................................. 24

**State Statutes**

Tex. Gov't Code § 2.102(a) ................................................................................ 9, 10

Tex. Penal Code § 38.02 .......................................................................................... 11

**Other Authorities**

Chen and Brueck, *Noise and Lead Exposures at an Outdoor Firing Range – California,*
 National Institute for Occupational Safety and Health (Sept. 2011) ......................... 6

Debunked, *How Silent Are Gun Silencers? DEBUNKED,*
 https://www.youtube.com/watch?v=ivL-KHS9IMw (Jul. 8, 2023) ........................... 5

Henry, *"Give Me Liberty or Give Me Death!",*
 Colonial Williamsburg (Mar. 3, 2020) .................................................................. 19

KGUN9, *How "silent" are gun silencers?*
 https://www.youtube.com/watch?v=FbfJ4fsOqDA (Feb. 28, 2023) ........................ 5

Liberty Safe, *How Do Gun Suppressors Work,*
   https://www.libertysafe.com/blogs/the-vault/how-do-gun-suppressors-work (2023) ............... 6

Merriam-Webster, Inc., *Merriam-Webster.com Dictionary,*
   https://www.merriam-webster.com (2024) ................................................................................. 4

Mooney, *The Hero of the Sutherland Springs Shooting,*
   TEXAS MONTHLY (Nov. 2018) .................................................................................................. 6

Paine, *Common Sense,*
   R. BELL, IN THIRD-STREET (1776) ........................................................................................... 4

The Daily Signal, *Here's What a Gun Silencer Really Sounds Like,*
   https://www.youtube.com/watch?v=yHk_232MpL0 (Oct. 3, 2017) ........................................ 5

Turk, *Options to Reduce or Modify Firearms Regulations,*
   BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES (Jan. 20, 2017)........................ 6

Willeford, *Stephen Willeford Statement,*
   U.S. House of Representatives Committee Repository (Aug. 29, 2022) .................................... 6

NOW COMES Plaintiff **MATTHEW RANKIN,** by and through his attorney, Brandon J. Grable of Grable Grimshaw PLLC, complaining of Defendants **CITY OF LIVINGSTON, DETECTIVE KALEB BARKER, SERGEANT RONNIE BOGANY, OFFICER SCOTT PASKE, DETECTIVE LEON MIDDLETON,** and **OFFICER CHRISTOPHER SIMMONS,** and respectfully alleging as follows:

## I.
## JURISDICTION AND VENUE

1.      This is a civil rights action in which the Plaintiff Rankin seeks relief for the violations of his rights secured by 42 U.S.C. § 1983 and the First, Fourth, and Fourteenth Amendments.

2.      Jurisdiction of this Court is found upon 28 U.S.C. § 1331.

3.      Venue is properly laid in the Eastern District of Texas under 28 U.S.C. § 1391(b)(2).

4.      The events that gave rise to this lawsuit primarily took place in Livingston, Texas, in Polk County.

5.      Pursuant to 42 U.S.C. § 1983, and other applicable laws, the Court may award nominal, compensatory, and punitive damages, as well as equitable relief against all of the Defendants in their individual capacity, for the violations of Plaintiff Matthew Rankin's Constitutional rights and harm caused by their actions/inactions.

## II.
## PARTIES

6.      Plaintiff MATTHEW RANKIN ("Plaintiff Rankin") is a law-abiding citizen of the United States and a resident of the City of Corpus Christi, County of Nueces, State of Texas.

7.      Plaintiff MELANIE TRIMBLE ("Plaintiff Trimble") (formerly Melanie McCrory) is a law-abiding citizen of the United States and a resident of the City of Livingston, County of Polk, State of Texas.

8.      Plaintiff BRANDON MICHAEL WHITE ("Plaintiff White") is a law-abiding citizen of the United States and a resident of the City of Dayton, County of Liberty, State of Texas.

9.      Defendant KALEB BARKER ("Defendant Barker") was at all pertinent times a detective employed by the City of Livingston and was at all pertinent times acting under color of state law in the performance of his duties as a Livingston police officer.

10.     Defendant RONNIE BOGANY ("Defendant Bogany") was at all pertinent times a sergeant employed by the City of Livingston and was at all pertinent times acting under color of state law in the performance of his duties as a Livingston police officer.

11.     Defendant SCOTT PASKE ("Defendant Paske") was at all pertinent times a police officer employed by the City of Livingston and was at all pertinent times acting under color of state law in the performance of his duties as a Livingston police officer.

12.     Defendant LEON MIDDLETON ("Defendant Middleton") was at all pertinent times a detective employed by the City of Livingston and was at all pertinent times acting under color of state law in the performance of his duties as a Livingston police officer.

13.     Defendant CHRISTOPHER SIMMONS ("Defendant Simmons") was at all pertinent times a police officer employed by the City of Livingston and was at all pertinent times acting under color of state law in the performance of his duties as a Livingston police officer.

14.     Defendant CITY OF LIVINGSTON ("Defendant City") is a political subdivision of the State of Texas, acting under color of state law, and is a person for the purposes of a 42 U.S.C. § 1983 action.  Defendant City's policymakers include City Manager BILLY S. WIGGINS

("Wiggins"), Chief of Police MATT PARRISH ("Chief Parrish"), Mayor JUDY B. COCHRAN ("Cochran"), and the City of Livingston City Council Members: Alan Cook, Elgin Davis, Bobby Jackson, and Raymond Luna (collectively referred herein as the "Policymakers"). Defendant City is responsible for the policies, practices, and procedures of its Police Department and individual officers. Defendant City is also responsible for the policies implemented, endorsed, and enforced by its Policymakers, the ordinances passed by its Councilmembers and Mayor, and even the actions and statements of its Police Chief.

15.      Each and all of the acts of Defendant Officers alleged herein were committed by said Defendants while acting within the scope of their employment with Defendant City, including Defendant City's Police Department.

16.      These Defendant Officers committed each and all of the acts herein despite their knowledge that they were engaging in unlawful and unconstitutional acts. Yet, they did them anyway, knowingly, recklessly, intentionally, wantonly, callously, purposely, purposefully, sadistically, cruelly, deliberately, and/or with deliberate indifference, gross negligence, and/or reckless disregard.

### III.
### STATEMENT OF FACTS

*Initial Statement*

17.      In 1776 Thomas Paine published the pamphlet *Common Sense* advocating for the Colonies' separation from England. In updated publications printed the same year, he added the following words in an appendix: "We have it in our power to  begin the world over again."[1] People

---

[1] Thomas Paine, *Common Sense; with the whole appendix: the address to the Quakers: also, the Large additions, and A dialogue between the ghost of General Montgomery, just arrived from the Elysian Fields; and an American delegate in a wood, near Philadelphia: on the grand subject of American independency*, R. BELL, IN THIRD-STREET.,

read this work, these words, and they believed them.  They believed them so much that they went and liberated the American colonies from the tyranny of their British overlords and established a new system of government.  Words have power, or, as John Adams wrote, "Without the pen of the author of *Common Sense*, the sword of Washington would have been raised in vain."

18.     The pen is mightier than the sword.  Written words, the foundation for modern civilization, can raise countries to greatness or topple them to the ground.  Written words can change lives for good or for ill.  Words have power.  That is why one must be careful what one writes.  That is also why one must be very careful that the words one writes conveys exactly the meaning that one intended to convey.  In the end, word choice matters more than intent, because the words on the page are what the readers actually see and understand, not the words left in the author's head.

19.     One writing technique known as *slant* makes especial use of this power.  The act of slanting means to take specific facts and then "to interpret or present [them] in line with a special interest"—to "angle" them.[2]  Slant effectively reveals opinions; however, this is not the furthest extent to which slant can be used.  Slant also can take specific facts and "maliciously or dishonestly distort or falsify" them.[3]  It is all in how one presents the facts, in which facts get presented and which get left out, or even in a combination of both.

20.     The following incidents which occurred would have been nearly unremarkable had it not been for a number of individuals wanting to tell a story—whether or not the facts actually

---

1776, at 134, available at https://quod.lib.umich.edu/cgi/t/text/text-idx?c=evans;idno=N11853.0001.001;rgn=div1;view=text;cc=evans;node=N11853.0001.001:17.

[2] Merriam-Webster, Inc., *Merriam-Webster.com Dictionary* (2024) https://www.merriam-webster.com/dictionary/slant.

[3] *Id.*

supported that story.  Those stories told, those stories believed, those stories acted upon are why Plaintiffs bring this complaint today.

### First Incident

21.     On February 4, 2022, Plaintiffs Matthew Rankin and Brandon White gathered at Plaintiff Melanie Trimble's apartment to decorate posters for a peaceful protest they intended to stage the next day at a nearby city.  Plaintiffs planned to protest that nearby city's contempt for First Amendment expression, while drawing community awareness to the situation.

22.     After exchanging pleasantries with everyone inside, Plaintiff Rankin walked back out to his vehicle to grab their supplies, including posters, from his trunk.  There would be nothing remarkable about this little jaunt had he not been legally openly carrying his firearm at the time.  Now, Plaintiff Trimble's apartment—where he was present at that time—is in Texas, and plenty of individuals open carry handguns in Texas.  His openly carried handgun was unremarkable.  What some might consider unusual was that Plaintiff Rankin had a silencer attached to his handgun.[4]

23.     While action movies might persuade the ignorance that silencers are primarily used by assassins (or special agents) to kill from the shadows with hardly a sound, this is not an accurate depiction of silencers.[5]  One, silencers, also known as suppressors, in general, do not actually silence the sound of gunfire; rather, this tool merely decreases the decibels created by the gun when fired.[6]  Two, per retired Brigadier General Ronald B. Turk, former Associate Deputy

---

[4] Plaintiff Matthew Rankin legally possessed this suppressor in compliance with all federal and state laws.

[5] Debunked, *How Silent Are Gun Silencers? DEBUNKED*, YouTube (Jul. 8, 2023), https://www.youtube.com/watch?v=ivL-KHS9IMw.

[6] The Daily Signal, *Here's What a Gun Silencer Really Sounds Like | The Daily Signal*, YOUTUBE (Oct. 3, 2017), https://www.youtube.com/watch?v=yHk_232MpL0; KGUN9, *How "silent" are gun silencers?*, YOUTUBE (Feb. 28, 2023), https://www.youtube.com/watch?v=FbfJ4fsOqDA.

Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives, "silencers are very rarely used in criminal shootings."[7]

24.     People carry handguns to defend themselves, their families, their friends, and their neighborhoods from violence.  Unfortunately, guns are loud, and people do not always have time to don hearing protection before using a gun in self-defense or in the protection of others.  Stephen Willeford, the hero of the Sutherland Springs massacre, did not even have time to put his shoes on.[8]  Using a gun in self-defense comes with the risk of permanently damaging one's ears.[9]  Suppressors, or silencers, are an easy-to-carry means to decrease this risk.[10]  [After all, if a device designed to reduce the volume of sound generated when a gun is fired is already attached to your

---

[7] Ronald Turk, *Options to Reduce or Modify Firearms Regulations: White Paper*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, at 6 (Jan. 20, 2017), https://shared.nrapvf.org/sharedmedia/1509466/atf-white-paper-options-to-reduce-or-modify.pdf.

[8] Stephen Willeford, *Stephen Willeford Statement*, Hearing: "Examining the Practices and Profits of Gun Manufacturers" by the Committee on Oversight and Reform, U.S. House of Representatives Committee Repository (Aug. 29, 2022), https://docs.house.gov/Committee/Calendar/ByEvent.aspx?EventID=115024;
Mooney, *The Hero of the Sutherland Springs Shooting Is Still Reckoning With What Happened That Day*, TEXAS MONTHLY (Nov. 2018),
https://www.texasmonthly.com/true-crime/stephen-willeford-sutherland-springs-mass-murder/.

[9] "Noise produced by impulsive noise, such as gunfire, has sufficient intensity to permanently damage unprotected ears in a very short period of time. . . ." Lilia Chen and Scott E. Brueck, *Noise and Lead Exposures at an Outdoor Firing Range – California*, DEPARTMENT OF HEALTH AND HUMAN SERVICES CENTERS FOR DISEASE CONTROL AND PREVENTION: NATIONAL INSTITUTE FOR OCCUPATIONAL SAFETY AND HEALTH, at 6 (Sept. 2011), https://www.cdc.gov/niosh/hhe/reports/pdfs/2011-0069-3140.pdf.

[10] "The first and most important benefit of a suppressor or silencer is that it greatly reduces the potential for permanent hearing loss to the firearm user and others in the area. Gunshots are extremely loud, usually over 140 decibels and up to 175 dB or more for some high-pressure cartridges.

"It's important to understand how decibels work: It's not a linear scale. Decibels are measured and graphed logarithmically, or exponentially. Every increase of 10 dB on the decibel scale is equal to a 10-fold increase in sound pressure level. So, if 1 decibel is nearly silent, a 10 dB increase means 10 times louder, while a 20 dB increase means 100 times louder. So the difference between a hearing safe 115-130 dB shot from a suppressed firearm and a not-hearing-safe shot from an unsuppressed firearm at 140+ dB is huge. For reference, a rock concert may average between 90 and 120 dB. A jet engine at takeoff is around 140 dB.

"Your hearing can be permanently damaged by a single close-range exposure to a loud noise over 140 dB, or by prolonged exposure to noises as low as 80-110 dB. . . . Suppressors are important safety features on many firearms." Liberty Safe, *How Do Gun Suppressors Work* (2023), https://www.libertysafe.com/blogs/the-vault/how-do-gun-suppressors-work.

gun, one does not need to worry about finding ear protection, grabbing, it, and putting it on properly during a do-or-die moment.]    Even the CDC as far back as 2011 has recommended the use of suppressors as an effective form of hearing protection.[11]

25.    So, there Plaintiff Rankin was, walking directly between his vehicle and a residence in which he was a guest with his handgun for self-defense—with a little added hearing protection— minding his own business and focusing on gearing up for the civic duty of peacefully assembling and protesting government actions he believed to be unlawful.  He filled his arms with poster boards and bags and proceeded back inside his friend's apartment.  To a well-informed citizen, his actions were generally unremarkable and well within his rights as an American citizen.

26.    Plaintiff Trimble's neighbor had a different perspective.  She saw the holstered handgun, panicked, and called the cops.

27.    A couple of minutes later, officers from the Livingston Police Department pulled their patrol vehicles up to the curb outside.  Defendants Sergeant Ronnie Bogany and Officer Scott Paske approached Plaintiff Trimble's apartment; Defendant Bogany knocked on her door.

28.    When Plaintiff Trimble opened the door and asked what the problem was, Defendant Bogany told her that someone had called saying a guy had come over to her apartment with a gun.  Plaintiff Trimble told the officers that Plaintiff Rankin did not intend to speak with them.  Both Defendant Officers declared that would not be good enough as he had a gun.  Defendant Bogany threatened to get the manager Ginger over there, while Defendant Paske demanded that Plaintiff Rankin come speak with them.

---

[11] "One of the primary sources of noise generated during gunfire is the muzzle blast during firing, which generates high noise across the mid to high frequency range. The only potentially effective noise control method to reduce . . . noise exposure from gunfire is through the use of noise suppressors that can be attached to the end of the gun barrel." *Supra* note 9, at 4-5.

29.     Given the nature of this conversation, Plaintiffs and their friend started filming the police officers for their safety and to have their own records of the interaction.

30.     Accordingly, Plaintiff Rankin moved near the door to speak with the police officers standing outside.  When Plaintiff Rankin asked the officers what was going on, Defendant Paske told him that they just wanted to speak to him for a moment.  Defendant  Paske then explained that they were trying to learn where the gun with a silencer on it was.  Plaintiff Rankin showed the officers the gun he was openly carrying in a hip holster.  Defendant Paske asked him if he was carrying it with the silencer on it.  Plaintiff Rankin told him, "Yeah."  Defendant Paske then asked if he had the paperwork for the silencer.  Plaintiff Rankin told him, "Yeah."  Defendant Paske asked to see the paperwork.  Plaintiff Rankin told him, "Nope."

31.     At the point when the officers had arrived on scene following two calls of a strange man with a silenced handgun entering an apartment, the officers had enough reasonable suspicion to speak with the individuals in the apartment and to check on their well-being and safety.  At this point in the conversation, however, once the officers had spoken with the resident of the apartment and ascertained that she did not feel threatened, nor was she a victim; and once the officers had spoken with the owner of the silenced handgun and been unable to confirm whether he illegally possessed the suppressor, the officers no longer had reasonable suspicion to continue the detainment.  They should have wished everyone a good day and left.

32.     Unfortunately for Plaintiffs, neither officer liked being told no.  Defendant Bogany ordered one of the several John Doe officers milling around outside as backup to try to get the

housing manager Ginger on scene, while Defendant Paske threatened Plaintiff Rankin, ordering him to get out of the apartment or they were going to tow his vehicle.

33.    When Plaintiff Rankin did not immediately respond to this threat, Defendant Paske claimed that he had to have his paperwork on him to carry his suppressor.[12] Plaintiff Rankin again told the officer that he had the paperwork.  Defendant Paske again demanded to view it. Plaintiff Rankin informed the officer that he lacked the legal right to demand to view it.  In response, Defendant 

Paske told Plaintiff Rankin that he was going to get Plaintiff Trimble kicked out over this.  When Plaintiff Rankin told Defendant Paske, "Just hold on, sir," Defendant Paske sniped back, "No, you hold on."

34.    Plaintiff Rankin tried to explain that there was the difference between a private property trespass and a violation of the National Firearms Act (NFA).  If the apartment owner wanted to trespass him from the property, that would be a completely separate matter. 

However, Plaintiff Rankin informed the officers that if the property owner tried trespassing him for firearms such an action would be against the Texas state law.  Plaintiff Rankin then tried to

---

[12] Defendants Paske and Bogany knew or should have known that TEX. GOV'T CODE § 2.102(A) which went into effect on September 1, 2021, forbade municipalities and their officers or employees from adopting any rule, order, or policy to enforce a federal statute, order, rule, or regulation for a firearm suppressor which imposes a prohibition, restriction, or other regulation that does not exist under Texas law.  The Livingston Police Department failed to train or to supervise the training of their officers on this legislative update.

explain how residents and guests of residents—but at this point, he was interrupted.  Defendant Bogany who had been standing behind Defendant Paske backing him up during this conversation interrupted Plaintiff Rankin to ask if he was on the lease to be there.

35.     Plaintiff White, who had been standing nearby, asked if the government was now claiming that individuals cannot have friends.  Defendant Bogany told the Plaintiffs that that would be the property owner's decision.  Plaintiff White asked Defendant Bogany, "You don't have the right to assemble?"



36.     Meanwhile, Plaintiff Rankin continued trying to educate the officers that residents and guests of residents have the right to bring firearms to their abode and back again to their vehicle.  Defendant Bogany shut the screen door, so he would not have to listen, but Defendant Paske interjected, "Not with a silencer."[13]  Plaintiff Rankin corrected him, "Yes, with a silencer.  These are not illegal."  Plaintiff Rankin then referenced *Terry v. Ohio* and the Indiana case to inform the officers that they did not get to demand ID or paperwork without RAS (reasonable suspicion) of a crime, first.[14]  He also agreed that if the officers had RAS to detain him, they could have his NFA paperwork—but they did not have that.

37.     Defendant Officers both ignored this argument.  Defendant Bogany told Plaintiff Rankin that they had received word that the apartment owner was on the way.  Plaintiff Rankin agreed that if the apartment owner trespassed him, he would leave and be gone.  He just was not

---

[13] *Supra* note 13.

[14] *Terry v. Ohio*, 392 U.S. 1 (1968).

going to show his paperwork to somebody on a trespass warning when he had not done anything illegal.  At this, Defendant Officers moved back away from both the door and the Plaintiffs gathered inside.

38.    Defendant Paske approached the apartment a few minutes later on the phone and asked for Plaintiff Trimble's name for the apartment owner.  The general consensus among the Plaintiffs was that the landlady would know from the unit number.  Defendant Paske interpreted this to mean that Plaintiff Trimble did not wish to answer and left again.

39.    About twenty-five minutes later, another officer, Defendant Detective Kaleb Barker, came to the screen door to speak with Plaintiffs.  Defendant Barker asked whose apartment it was and then confirmed that Plaintiff Trimble was okay with Plaintiff Rankin being there and that he was a guest of hers.

40.    Plaintiff Rankin tried to explain to the detective that, similar to the requirement for showing an ID for TEXAS PENAL CODE § 38.02 or for *Terry v. Ohio*, an officer would need some RAS (reasonable suspicion) first.  If the officers had some reason to believe—with evidence—that he was a felon who could not have a suppressor or that he did not legally own the suppressor, and they legally detained him, he would give them the NFA paperwork; he had it all.  However, just because someone saw him walking around with a suppressor does not justify the officers demanding to see his paperwork.

41.    Defendant Barker told Plaintiff Rankin that he was really just there to keep the peace, before letting Plaintiffs know that the housing authority liked to be kept informed if the officers got a call regarding a firearm, so the officers had notified the front office.  He also warned Plaintiffs and their friends that someone might stop by from that housing authority office to talk with them.

42.     Plaintiff Rankin explained that they were less concerned about that and more concerned that Defendant Paske had made threats about getting Plaintiff Trimble and her children kicked out of her home because of Plaintiff Rankin or threats about arresting Plaintiff Rankin or towing his vehicle for not showing his paperwork. Defendant Barker informed them that he was not a supervisor, so he could not help with that, but he could get them the information to file a complaint.



Plaintiffs reassured the detective that they had the information to file a complaint against the officers.  Plaintiff Rankin also informed Defendant Barker that he did not intend to go walking around Section 8 housing with his openly carried firearm.  [There is a difference between meandering about and walking directly between a residence and a vehicle.]  He also let the detective know that he might see him out later with a camera watching.  With a laugh, Defendant Barker told them, "Somebody's got to watch us.  We can't watch ourselves."  After providing his name and joking about being unable to golf, the detective wished them a good day and left.



43.     Plaintiffs Trimble and White then ventured outside.  Plaintiff White had a vague notion of asking Defendant Paske to apologize to Plaintiff Trimble for threatening her children's home, but he discarded the idea when he saw the officers talking to the Housing manager and he realized they might be trying still to get Plaintiff Rankin criminally trespassed from the property.

44.     Plaintiff Trimble, meanwhile, approached Defendant Paske to remind him that they had been friends for 16 years and to ask how he could make such threats against her family.  While Defendant Paske did recognize that they had been friends for years, he was dismissive of Plaintiff Trimble's critique of his conduct.

45.     After the Livingston Police Department finished communicating with Plaintiff Trimble's neighbor, Plaintiff Trimble reassured her that Plaintiff Rankin was indeed her friend and a welcome guest in her home.  She was not and had not been in danger from his lawfully carried firearm.  Plaintiffs then returned to Plaintiff Trimble's apartment.

---

**Comments**

HAD 2 CALLERS ADVD THAT THEY SAW A W/M SUBJ GO INTO ABOVE RESIDENCE WITH A GUN IN HIS HAD THAT HAS A SILENCER ON IT--WEARING TAN PANTS

***1334--212--BE OUT AT 113 BANKS
***1335--205--CONTACT HOUSING DIRECTOR AND HAVE HER COME TO THIS LOCATION
***1338--TO ALL UNITS--MADE CONTACT WITH HER--SHE'S 7 MILES OUT OF TOWN BUT IS ON HER WAY
***1407--212--ALL UNITS BACK IN--EVERYTHING IS 10.4 AT THIS TIME--NOTHING CRIMINAL HAPPENED--LEFT STATEMENT FORMS FOR COMPL IN CASE SHE WANTED TO FILL THEM OUT--NO REPORT AT THIS TIME

---

46.     The officers outside eventually left and Plaintiffs, free to resume their day, finished making their signs and went to run an errand in a nearby city.



*Interlude*

47.     Five years ago, the Livingston Police Department compiled a video of Livingston police officers—all the way up to the Chief of Police—wiggling their hips, lip-syncing to "What Is Love" by Haddaway, and eating donuts and posted it on YouTube.[15]

48.     Why is this relevant?

49.     This is relevant because the Livingston Police Department does not mind being filmed in public and having that video posted on YouTube.  It also shows that these officers are familiar with the videographic form of First Amendment expression, with YouTube fame, and even with YouTube advertisements.  None of the above bother them.

50.     The Livingston Police Department also does not mind when they are filmed by someone whom they consider to be a member of the press.[16, 17]

51.     The Livingston Police do mind very much, however, when a dissenting voice challenges their conduct.  Publicly.  Openly.  Fearlessly.  It bothers them.  It bothers them so much they willingly conspire to contrive false allegations of criminal conduct in violation of the Fourth and Fourteenth Amendments to suppress the creation and dissemination of those messages in violation of the First and Fourteenth Amendments.

52.     This attitude can be glimpsed in the next incident and their collusion is fully seen in the events that followed after.

---

[15] Dkt. No. 4-1, Exhibit 1.

[16] willie preston, *Cop Shop 2014, Livingston, Texas…*, YOUTUBE (Dec. 20, 2014), https://www.youtube.com/watch?v=UeWJFwM0CUQ.

[17] willie preston, *ENGINE FAILURE, SMALL PLANE CRASH, LIVINGSTON, TEXAS 06/13/20...*, YOUTUBE (Jun. 13, 2020), https://www.youtube.com/watch?v=2MFMCQVcD-M.

***Second Incident***

53. Plaintiff Rankin fully incorporates, by reference, pages 6-23, paragraphs 28-96, for the section "Second Incident," of *Plaintiff Melanie Trimble's First Amended Complaint and Demand for Jury Trial*, filed at Dkt. No. 5.

***A Tale Told***

54. Plaintiff Rankin fully incorporates, by reference, pages 4-24, paragraphs 20-66, for the section "A Tale Told," of *Plaintiff Brandon Michael White's First Amended Complaint and Demand for Jury Trial*, filed at Dkt. No. 6.

***A Tale Believed***

55. Defendant Officers put words down on paper. Words with the power to change lives. Words that when taken together amounted to lies. They then maliciously submitted those life-altering words on arrest affidavits to the honorable Judge John Wells of the 411th District Court.

56. Judge Wells signed on those arrest warrants. Defendant City's officers, to potentially include Defendant Officers Middleton, Barker, Simmons, Bogany, Paske, and John Doe Officers, then arrested Plaintiff Trimble and White on the warrants on February 9, 2022.

57. During Plaintiff Trimble's arrest, Defendant Paske told her she was being arrested for "Conspiracy." When she asked conspiracy for what, Defendant Paske only responded, "When you run with people and you do things like the things you have all been doing—" He never provided an explanation for the charge.

58. Defendant City's officers also forced Plaintiff Trimble to sign a temporary agreement with CPS while she was in jail. This agreement prevented her two children who have developmental disabilities from staying with a neighbor and family friend in their school district

as planned and, instead, forced them to stay with their great-grandmother, who was in her 80's, in a town an hour away in a completely different school district while Plaintiff Trimble was imprisoned.  During this time, Plaintiff Trimble's son broke his arm.  His mother was not able to be present to comfort him in his pain.

59.      Following the arrests of Plaintiffs Trimble and White, Plaintiffs Rankin and Mr. Rincon learned that there were outstanding arrest warrants for themselves as well.  Mr. Rincon and Plaintiff Rankin, who live outside of east Texas, traveled to San Antonio, where they attempted to coordinate surrendering themselves to the San Antonio Police Department on the active warrants, but the Livingston Police Department refused to publish the warrants in the Texas database—let alone acknowledge the existence of the warrants a judge had already signed.  After four days of delays and excuses, Plaintiffs secured an attorney to facilitate their surrender in an attempt to speed up the process.  The Livingston Police Department still refused to produce a copy of the arrest warrants for an additional three days.  Mr. Rincon and Plaintiff Rankin both missed a week of work as a result of this childish delay.

60.      Mr. Rincon was held on a $100,000.00 bond for the Conspiracy charge, while Plaintiffs Rankin, White, and Trimble were held on $105,000.00 in bonds for the False Report and Conspiracy charges.  Mr. Rincon and Plaintiff Rankin were able to gather the resources in order to bond out right away.  Plaintiffs White and Trimble, however, lacked the money needed to cover the cost for a bond that high and remained stuck in jail for 28 and 35 days, respectively.

61.      While stuck in the Polk County Jail, at about three o'clock on February 16, 2022, Plaintiff Trimble was brought from her cell to meet with two of the Defendants who introduced themselves as Detectives Middleton and Barker with the Livingston Police Department. Defendant Middleton explained the purpose of the meeting as follows: "We come over here to talk

to you about why you're in jail right now.  So, my question is if you want to talk to us, I got to

read your Miranda warning.  Okay, so we can talk about what we're here for."  Plaintiff Trimble

informed the officers that she did not understand why she was there, because she had not done

anything, nor had she planned to do anything—especially with a bond amount like that.

(Following Defendant Paske telling Plaintiff Trimble she was being arrested for "Conspiracy," no

one had ever explained what conspiracy she had committed.)

62.     One of the Defendant Officers asked her what her highest level of education was.

Plaintiff Trimble told them that she had had some college.  Defendant Middleton then told her to

initial a document as he read it to her.  He proceeded to provide her with a Miranda warning.

63.     Plaintiff Trimble told the officers that she did not have an attorney, but she had

already filled out paperwork requesting an attorney and did not understand why the Court had not

already appointed her one.  Defendant Middleton acknowledged this statement and then continued,

"If you waive your rights, you can freely, voluntarily sign your signature right there, and I'll put

today's date and the time on there."

64.     Plaintiff Trimble insisted that she did want an attorney present.

65.     Defendants Middleton and Barker ignored this request.

66.     Defendant Middleton told her they would talk about her lack of an attorney in just

a second.  Plaintiff Trimble insisted that she wanted to be advised by one.  Defendant Barker told

her that that was fine and that they would not force her to sign it.

67.     Despite these assurances, Defendant Middleton continued, "I'm not going to force

you to sign it, but in order for me to talk any further we got to get past this point.  Then I can give

you a lot of the information that you're asking right now."  Defendant Barker added, "And if you

don't want to talk without him here, we can shut it down."

68.     Defendant Middleton continued, speaking over Defendant Barker, "And like it says right there, you can decide to talk with anyone and you can stop talking with anyone anytime you want.  That's number five right there."

69.     Under pressure from the police officers and deprived of her constitutional right to legal counsel, Plaintiff Trimble, operating under the belief that the police officers were there to help her, signed the document waiving her right to remain silent.  Defendant Officers then questioned her without an attorney present.  They did not provide any of the answers they promised when coercing Plaintiff Trimble to sign away her rights.

70.     Following Plaintiffs' release from jail, Defendant Officers under the direction or supervision of Chief Parrish, the Chief of Police for Defendant City, continued the deception that they had concocted.  As a result, the Grand Jury believed Defendant Officers' perjuries, mistruths, and false statements; and Plaintiffs were indicted on the felony charges.  Accordingly, Plaintiffs had to hire criminal attorneys to defend themselves from these baseless misdemeanor and felony charges.

71.     The last charges have only just been dismissed, but the Plaintiffs live in fear that they could still face criminal charges for these incidents as the Polk County's prosecutor's office re-indicted Plaintiff White with a third-degree felony for Obstruction/Retaliation for Assault on a Public Servant after his initial felony charge was dismissed.  This felony charge was also dismissed after the court recognized that the State failed to identify any criminal activity.

72.     Following this dismissal, Plaintiffs McCrory and White finally received their cell phones back from the Livingston Police Department.  These officers seized their phones when they were arrested without a warrant and did not return them to Plaintiffs when they were released from

jail.  Defendant City's officers held these phones for 22 months before finally releasing Plaintiffs' property back to them.

73.     Back in 1775, Delegate Patrick Henry openly challenged the Second Virginia Convention with the following words: "Is life so dear, or peace so sweet, as to be purchased at the price of chains and slavery? Forbid it, Almighty God! I know not what course others may take; but as for me, give me liberty or give me death!"[18]

74.     Today, just telling a police officer he does not know the law he swore to uphold and sharing that comment publicly can land a person in jail for over a month on a $105,000.00 bond followed by years of criminal prosecution for a felony charge of the second degree with the risk of two to twenty years in prison and a fine of up to $10,000.00.

75.     This country's Founding Fathers fought and died so that all Americans would be free to speak their thoughts without fear of governmental retaliation.

76.     Do those who have sworn to preserve, protect, and defend that very law still believe in their oath?  In that freedom?  In morality at all?

77.     Defendant Officers' and Defendant City's actions are inexcusable.  Plaintiffs have been harmed.  They seek redress in this matter.

### COUNT I
### VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (First Amendment - Retaliation)

78.     Plaintiff Rankin repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

---

[18] Patrick Henry, *"Give Me Liberty or Give Me Death!"*, Colonial Williamsburg (Mar. 3, 2020), https://www.colonialwilliamsburg.org/learn/deep-dives/give-me-liberty-or-give-me-death/.

79.     This First Amendment retaliation claim is asserted against all Defendant Officers as they all actively participated in initiating the arrests and prosecutions of Plaintiff simply because they did not agree with Plaintiff's viewpoints, namely that he is a First Amendment auditor, that he verbally challenges the officers' conduct, or that he films the officers performing their public duties—all conduct which the First Amendment protects.

80.     Defendants knew that Plaintiff Rankin was engaged in protected First Amendment activity; their conduct of seeking and initiating the arrest and prosecution of Plaintiff without any lawful basis resulted in injuries that would chill a person of ordinary firmness from continuing to engage in that activity; and the Defendant Officers' adverse actions were substantially motivated against his exercise of constitutionally protected conduct.

### COUNT II
### VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (Fourth Amendment – Unlawful Seizure)

81.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

82.     Plaintiff Rankin asserts that Defendant Simmons lacked any lawful authority to initiate a traffic stop of Plaintiffs on February 4, 2022, while they were on private property. Defendant Simmons then unreasonably prolonged the traffic stop in further violation of Plaintiff's rights guaranteed under the Fourth Amendment.

### COUNT III
### VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (Fourth Amendment – Unlawful Arrest)

83.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

84.     Plaintiff Rankin asserts this claim against Defendants Barker and Middleton for submitting arrest affidavits that they knew were false or would have known they were false had they not recklessly disregarded the truth.

85.     Defendants Barker and Middleton supplied false affidavits with the specific intent of misleading the judge and permitting the unlawful arrest of Plaintiff Rankin despite lacking any probable cause or other lawful basis to arrest Plaintiff.

86.     These Defendants violated clearly established law as the Constitution prohibits an officer from making perjurious or recklessly false statements in support of a warrant.  This is especially true here, where the Defendants knew or had reason to know that they supplied information that materially misled a judge on the basis of a finding of probable cause.

87.     Had Defendants Barker and Middleton provided truthful information in their affidavits, they would have clearly failed to establish probable cause to seek the arrest of Plaintiff.

**COUNT IV**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983**
**(Fourth Amendment – Malicious Prosecution)**

88.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

89.     Plaintiff Rankin asserts this claim against Defendants Barker and Middleton who initiated criminal prosecution against Plaintiff without any lawful basis.  These Defendants knew they lacked probable cause or legal justification to initiate prosecution but did it anyway.  The false charges were terminated in favor of the Plaintiff.

***MONELL* LIABILITY**

90.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

91.     The individual Defendants at all times relevant were City of Livingston police officers.

92.     Defendant City maintains a spoken or unspoken policy, practice or custom to permit the unlawful arrests and prosecutions of people they believe are engaged in First Amendment conduct without fear of investigation or discipline.

93.     Defendant City knew that Plaintiff Rankin has a First Amendment right to engage in auditor activities.  They provide training informing their officers of this right.  However, Defendant City repeatedly fails to hold its officers accountable for violating the rights of people they assume are auditors.

94.     Defendant Officers knew they would face no repercussions for conspiring to initiate the false arrest and prosecution of Plaintiff Rankin.  They were right.  The City and its policymakers ratified the officers' conduct when the Police Chief published an official statement declaring that the recklessly false statements made in affidavits by his officers were true.

95.     The City of Livingston acted with deliberate indifference, and it was foreseeable that permitting the custom, policies, and practices would violate Plaintiff Matthew Rankin's constitutional rights.

96.     Defendant City is directly responsible for the individual Defendants' conduct described herein.

## DAMAGES

97.     **Actual damages.**  Defendants' acts or omissions were a proximate cause and the moving force behind actual damages suffered by Plaintiff Rankin, and the Defendants should be held jointly and severally liable.

98.     **Punitive/Exemplary      Damages      against      individual      defendants.**
Punitive/exemplary damages are recoverable under Section 1983 when the conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.  Here, the conduct of the Defendant Officers was done with evil motive or intent, or at the very least, was reckless or callously indifferent to the federally protected rights of Plaintiff.  As such, Plaintiff Rankin requests punitive and exemplary damages from the individual officers to deter this type of conduct in the future.

99.     Nominal Damages.

100.    Prejudgment and post judgment interest.

101.    Costs of court.

102.    Reasonable and necessary attorney's fees incurred by Plaintiff Rankin through trial, and reasonable and necessary attorney's fees that may be incurred by Plaintiff for any post-trial proceedings, or appeal, interlocutory or otherwise, pursuant to 42 U.S.C. § 1988, and as otherwise permitted by law.

103.    Plaintiff seeks unliquidated damages in an amount that is within the jurisdictional limits of the Court.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Matthew Rankin prays Defendants be cited to appear and answer herein; and upon final trial hereof the Court grant Plaintiff Rankin declaratory and injunctive relief; and judgment be entered in favor of Plaintiff awarding from Defendants actual damages, exemplary damages, pre-judgment interest at the legal rate; interest on said judgment at the legal rate; attorney fees; costs of court; and such other and further relief, both general and special, at law and in equity, to which Plaintiff is justly entitled.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable, pursuant to Fed. R. Civ. P. 38(b).

Respectfully submitted,

**GRABLE GRIMSHAW PLLC**

*/s/ Brandon J. Grable*
**BRANDON J. GRABLE**
Texas State Bar No. 24086983
brandon@g2.law
1603 Babcock Road, Suite 280
San Antonio, Texas 78229
Telephone: (210) 963-5297
Facsimile: (210) 641-3332
**COUNSEL FOR PLAINTIFFS**