# THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### LUFKIN DIVISION

| | | |
|---|---|---|
| MATTHEW RANKIN, | § | |
| MELANIE TRIMBLE, and | § | |
| BRANDON MICHAEL WHITE, | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | |
| | § | **CIVIL NO. 9:24-CV-00027-MJT** |
| CITY OF LIVINGSTON, | § | |
| DETECTIVE KALEB BARKER, | § | |
| SERGEANT RONNIE BOGANY, | § | |
| OFFICER SCOTT PASKE, | § | |
| DETECTIVE LEON MIDDLETON, and | § | |
| OFFICER CHRISTOPHER SIMMONS, | § | |
| *Defendants.* | § | |
| | § | |

---

## PLAINTIFF MELANIE TRIMBLE'S FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

---

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ........................................................................................................ iii

I.      JURISDICTION AND VENUE ................................................................................ 1

II.     PARTIES ................................................................................................................ 1

III.    STATEMENT OF FACTS ...................................................................................... 3

    Initial Statement ........................................................................................................ 3

    First Incident ............................................................................................................. 5

    Interlude .................................................................................................................... 5

    Second Incident ......................................................................................................... 6

    A Tale Told ............................................................................................................... 23

    A Tale Believed ........................................................................................................ 23

COUNT I:    First Amendment – Retaliation ............................................................ 24

COUNT II:   Fourth Amendment – Unlawful Seizure ............................................. 25

COUNT III:  Fourth Amendment – Unlawful Arrest ............................................... 25

COUNT IV:  Fourth Amendment – Malicious Prosecution ..................................... 26

*MONELL* LIABILITY .............................................................................................. 26

DAMAGES .............................................................................................................. 27

PRAYER FOR RELIEF ........................................................................................... 28

JURY DEMAND ...................................................................................................... 28

ii

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Turner v. Driver*,
848 F.3d 678 (5th Cir. 2017) .......................................................................... 7

**Federal Constitutional Provisions**

U.S. CONST. amend. IV ........................................................................... 1, 25, 26

U.S. CONST. amend. XIV ................................................................................... 1

**Federal Statutes**

28 U.S.C. § 1331 ................................................................................................. 1

28 U.S.C. § 1391(b)(2) ...................................................................................... 1

42 U.S.C. § 1983 ..................................................................................... 1, 2, 28

42 U.S.C. § 1988 ............................................................................................. 28

**Federal Rules**

FED. R. CIV. P. 38(b) ...................................................................................... 29

**Other Authorities**

Henry, *"Give Me Liberty or Give Me Death!"*,
Colonial Williamsburg (Mar. 3, 2020) ......................................................... 24

Merriam-Webster, Inc., *Merriam-Webster.com Dictionary,*
https://www.merriam-webster.com (2024) ...................................................... 4

Paine, *Common Sense,*
R. BELL, IN THIRD-STREET (1776) ................................................................. 4

NOW COMES Plaintiff **MELANIE TRIMBLE,** by and through her attorney, Brandon J. Grable of Grable Grimshaw PLLC, complaining of Defendants **CITY OF LIVINGSTON, DETECTIVE KALEB BARKER, SERGEANT RONNIE BOGANY, OFFICER SCOTT PASKE, DETECTIVE LEON MIDDLETON,** and **OFFICER CHRISTOPHER SIMMONS,** and respectfully alleging as follows:

## I.
## JURISDICTION AND VENUE

1.      This is a civil rights action in which Plaintiff Trimble seeks relief for the violations of her rights secured by 42 U.S.C. § 1983 and the First, Fourth, and Fourteenth Amendments.

2.      Jurisdiction of this Court is found upon 28 U.S.C. § 1331.

3.      Venue is properly laid in the Eastern District of Texas under 28 U.S.C. § 1391(b)(2).

4.      The events that gave rise to this lawsuit primarily took place in Livingston, Texas, in Polk County.

5.      Pursuant to 42 U.S.C. § 1983, and other applicable laws, the Court may award nominal, compensatory, and punitive damages, as well as equitable relief against all of the Defendants in their individual capacity, for the violations of Plaintiff Melanie Trimble's Constitutional rights and harm caused by their actions/inactions.

## II.
## PARTIES

6.      Plaintiff MATTHEW RANKIN ("Plaintiff Rankin") is a law-abiding citizen of the United States and a resident of the City of Corpus Christi, County of Nueces, State of Texas.

7.      Plaintiff MELANIE TRIMBLE ("Plaintiff Trimble") (formerly Melanie McCrory) is a law-abiding citizen of the United States and a resident of the City of Livingston, County of Polk, State of Texas.

8.      Plaintiff BRANDON MICHAEL WHITE ("Plaintiff White") is a law-abiding citizen of the United States and a resident of the City of Dayton, County of Liberty, State of Texas.

9.      Defendant KALEB BARKER ("Defendant Barker") was at all pertinent times a detective employed by the City of Livingston and was at all pertinent times acting under color of state law in the performance of his duties as a Livingston police officer.

10.     Defendant RONNIE BOGANY ("Defendant Bogany") was at all pertinent times a sergeant employed by the City of Livingston and was at all pertinent times acting under color of state law in the performance of his duties as a Livingston police officer.

11.     Defendant SCOTT PASKE ("Defendant Paske") was at all pertinent times a police officer employed by the City of Livingston and was at all pertinent times acting under color of state law in the performance of his duties as a Livingston police officer.

12.     Defendant LEON MIDDLETON ("Defendant Middleton") was at all pertinent times a detective employed by the City of Livingston and was at all pertinent times acting under color of state law in the performance of his duties as a Livingston police officer.

13.     Defendant CHRISTOPHER SIMMONS ("Defendant Simmons") was at all pertinent times a police officer employed by the City of Livingston and was at all pertinent times acting under color of state law in the performance of his duties as a Livingston police officer.

14.     Defendant CITY OF LIVINGSTON ("Defendant City") is a political subdivision of the State of Texas, acting under color of state law, and is a person for the purposes of a 42 U.S.C. § 1983 action.  Defendant City's policymakers include City Manager BILLY S. WIGGINS

("Wiggins"), Chief of Police MATT PARRISH ("Chief Parrish"), Mayor JUDY B. COCHRAN ("Cochran"), and the City of Livingston City Council Members: Alan Cook, Elgin Davis, Bobby Jackson, and Raymond Luna (collectively referred herein as the "Policymakers").  Defendant City is responsible for the policies, practices, and procedures of its Police Department and individual officers.  Defendant City is also responsible for the policies implemented, endorsed, and enforced by its Policymakers, the ordinances passed by its Councilmembers and Mayor, and even the actions and statements of its Police Chief.

15.     Each and all of the acts of Defendant Officers alleged herein were committed by said Defendants while acting within the scope of their employment with Defendant City, including Defendant City's Police Department.

16.     These Defendant Officers committed each and all of the acts herein despite their knowledge that they were engaging in unlawful and unconstitutional acts. Yet, they did them anyway, knowingly, recklessly, intentionally, wantonly, callously, purposely, purposefully, sadistically, cruelly, deliberately, and/or with deliberate indifference, gross negligence, and/or reckless disregard.

### III.
### STATEMENT OF FACTS

*Initial Statement*

17.     In 1776 Thomas Paine published the pamphlet *Common Sense* advocating for the Colonies' separation from England.  In updated publications printed the same year, he added the following words in an appendix: "We have it in our power to begin the world over again."[1]  People

---

[1] Thomas Paine, *Common Sense; with the whole appendix: the address to the Quakers: also, the Large additions, and A dialogue between the ghost of General Montgomery, just arrived from the Elysian Fields; and an American delegate in a wood, near Philadelphia: on the grand subject of American independency*, R. BELL, IN THIRD-STREET.,

read this work, these words, and they believed them.  They believed them so much that they went and liberated the American colonies from the tyranny of their British overlords and established a new system of government.  Words have power, or, as John Adams wrote, "Without the pen of the author of *Common Sense*, the sword of Washington would have been raised in vain."

18.     The pen is mightier than the sword.  Written words, the foundation for modern civilization, can raise countries to greatness or topple them to the ground.  Written words can change lives for good or for ill.  Words have power.  That is why one must be careful what one writes.  That is also why one must be very careful that the words one writes conveys exactly the meaning that one intended to convey.  In the end, word choice matters more than intent, because the words on the page are what the readers actually see and understand, not the words left in the author's head.

19.     One writing technique known as *slant* makes especial use of this power.  The act of slanting means to take specific facts and then "to interpret or present [them] in line with a special interest"—to "angle" them.[2]  Slant effectively reveals opinions; however, this is not the furthest extent to which slant can be used.  Slant also can take specific facts and "maliciously or dishonestly distort or falsify" them.[3]  It is all in how one presents the facts, in which facts get presented and which get left out, or even in a combination of both.

20.     The following incidents which occurred would have been nearly unremarkable had it not been for a number of individuals wanting to tell a story—whether or not the facts actually

---

1776, at 134, available at https://quod.lib.umich.edu/cgi/t/text/text-idx?c=evans;idno=N11853.0001.001;rgn=div1;view=text;cc=evans;node=N11853.0001.001:17.

[2] Merriam-Webster, Inc., *Merriam-Webster.com Dictionary* (2024) https://www.merriam-webster.com/dictionary/slant.

[3] *Id.*

supported that story.  Those stories told, those stories believed, those stories acted upon are why Plaintiffs bring this complaint today.

### First Incident

21.     Plaintiff Trimble fully incorporates, by reference, pages 5-13, paragraphs 21-46, for the section "First Incident," of *Plaintiff Matthew Rankin's First Amended Complaint and Demand for Jury Trial*, filed at Dkt. No. 4.

### Interlude

22.     Five years ago, the Livingston Police Department compiled a video of Livingston police officers—all the way up to the Chief of Police—wiggling their hips, lip-syncing to "What Is Love" by Haddaway, and eating donuts and posted it on YouTube.[4]

23.     Why is this relevant?

24.     This is relevant because the Livingston Police Department does not mind being filmed in public and having that video posted on YouTube.  It also shows that these officers are familiar with the videographic form of First Amendment expression, with YouTube fame, and even with YouTube advertisements.  None of the above bother them.

25.     The Livingston Police Department also does not mind when they are filmed by someone whom they consider to be a member of the press.[5, 6]

26.     The Livingston Police do mind very much, however, when a dissenting voice challenges their conduct.  Publicly.  Openly.  Fearlessly.  It bothers them.  It bothers them so much

---

[4] Dkt. No. 4-1, Exhibit 1.

[5] willie preston, *Cop Shop 2014, Livingston, Texas…*, YouTube (Dec. 20, 2014), https://www.youtube.com/watch?v=UeWJFwM0CUQ.

[6] willie preston, *ENGINE FAILURE, SMALL PLANE CRASH, LIVINGSTON, TEXAS 06/13/20…*, YouTube (Jun. 13, 2020), https://www.youtube.com/watch?v=2MFMCQVcD-M.

they willingly conspire to contrive false allegations of criminal conduct in violation of the Fourth and Fourteenth Amendments to suppress the creation and dissemination of those messages in violation of the First and Fourteenth Amendments.

27.     This attitude can be glimpsed in the next incident and their collusion is fully seen in the events that followed after.

***Second Incident***

28.     After their visit to the neighboring city, Plaintiffs, including Plaintiff Trimble, returned to Livingston.  The rest of the day had gone quietly, and Plaintiffs were now looking for a little excitement.  Accordingly, Plaintiffs Trimble, White, and Rankin met up with Mr. Rincon to go driving around Livingston looking for entertainment.

29.     While parked in the Livingston Walmart parking lot, Plaintiffs noticed a Livingston patrol vehicle rapidly leaving the parking lot and heading northwest on U.S. Highway 190, going faster than the 45-mph speed limit.  Operating under the assumption that the officer—at that speed—must be heading out for a call for service, Mr. Rincon and the Plaintiffs decided to follow the officer to see what was happening.

30.     Now, Mr. Rincon and Plaintiffs are the sort of people who start conversations.  Mr. Ismael Rincon runs the YouTube channel "Corners News" with 49,800 subscribers; he describes himself as a "Constitutional Rights Exerciser/Defender" and "Human Rights Exerciser/Defender."[7]  Plaintiff Matthew Rankin runs the YouTube channel "hbomatt" with 8,790 subscribers; he describes himself as a "Constitutional activist and journalist focused on 2nd

---

[7] Corners News, YOUTUBE (accessed on Dec. 19, 2023), https://www.youtube.com/@CornersLaredo.

amendment rights and police accountability."[8]  Plaintiff Brandon Michael White runs the YouTube channel "America First" with 2,060 subscribers; he describes his mission statement as follows:

> My goal is to effect as much change as I can, with as much civil disobedience as the law allows, and I deem appropriate. As James Baldwin is quoted "Freedom is not something anybody can be given. Freedom is something people take, and people are as free as they want to be." A few years ago we the people were quoting Benjamin Franklin about Liberty and Safety. We are again allowing our Liberties to be constrained for Safety and this time we are selling it. Ben Franklin is by far my favorite Founding Father and the only to sign the four documents that kickstarted our young Nation. Like a selection of verses from a musical by Lin-Manuel Miranda-"just like my country. I'm young, scrappy, and hungry. And I'm not throwing away my shot."[9]

Plaintiff Melanie Trimble runs the YouTube channel "Blue The Blue Line Watcher" with 1,490 subscribers; she describes her mission statement as follows: "Our Veterans fought for OUR Freedom and Rights, and OUR PUBLIC SERVANTS WILL BE EDUCATED and HELD ACCOUNTABLE."[10]

31.     They are each different individuals with differing motivations and methods.  They do all film police officers performing their duties as public servants in the public purview.  This conduct is established First Amendment protected activity.[11]

32.     Mr. Rincon, with Plaintiffs as his passengers, followed the Livingston police officer intent on filming police activity.  To their surprise and disappointment, the police officer only stopped at the Stripes convenience store to buy a beverage before leaving again.  Accordingly, the Mr. Rincon with the Plaintiffs headed back into Livingston proper.

---

[8] hbomatt, YOUTUBE (accessed on Dec. 19, 2023), https://www.youtube.com/@hbomatt.

[9] America First, YOUTUBE (accessed on Dec. 19, 2023), https://www.youtube.com/@AmericaFirst77000.

[10] Blue The Blue Line Watcher, YOUTUBE (accessed on Dec. 19, 2023), https://www.youtube.com/@BlueTheBlueLineWatcher.

[11] *Turner v. Driver*, 848 F.3d 678 (5th Cir. 2017).

33.     Still hoping to see police activity, they headed to the Livingston joint City Hall and Police Department, where they circled the building looking for any other events involving police officers.  When they found none, Mr. Rincon parked near the mixed-use municipal building to wait and see if anything else might be going on.  As the Friday night remained quiet, Mr. Rincon went back to driving around Livingston looking for excitement.  There was nothing.



34.     Mr. Rincon and the Plaintiffs returned to City Hall, but even a few laps around the building revealed no new police activity.  He drove around Livingston again before returning to circle City Hall and the police department.  As they passed, an officer in the parking lot shouted out, "Hey!"  He did not order Mr. Rincon to stop or to pull over, so Mr. Rincon continued driving.

35.     Finally, Mr. Rincon parked out front of the First Community Financial Group. While stopped, Mr. Rincon exited the car to retrieve his binoculars from the trunk.



36.     Prior to his exiting the vehicle, Mr. Rincon had already been wearing a load bearing vest with items in some of the pockets.[12]   He had been wearing this vest all evening.  He did not take this vest off, adjust anything on the vest, put anything on the vest, add to the vest, or otherwise do anything to the vest except to casually wear it during this brief stop.

37.     As he did so, a police officer approached Plaintiffs' parking spot in his patrol vehicle.  Concerned that Mr. Rincon had not parked straight enough and that the officer could cite him for that, the other Plaintiffs encouraged him to get back into the vehicle and move the car.  Plaintiffs also checked to make certain that everyone had their seatbelts on.  Everyone did.

38.     Mr. Rincon hastily re-entered the vehicle.  As, the police officer—who did *not* have his lights or siren on—passed behind Plaintiffs and pulled into the parking spot next to them, Mr. Rincon backed out and headed down the street.



---

[12] The first picture of the vest was taken at a different time.  The second two photos were taken later that night.  It is a load-bearing vest.  It is *not* a tactical plate carrier vest.  A trained professional would easily be able to determine based on the slouchiness of the fabric that the vest lacks the stiff rigidity of a vest carrying an armor plate.



39.     Mr. Rincon in accordance with the Texas Transportation Code drove until the officer ceased following him.  He then parked on the other side of the Livingston City Hall and



parked—between the lines—in a spot at the First National Bank of Livingston.  A different officer pulled his patrol vehicle with its lights on in behind Plaintiffs, blocking Mr. Rincon's vehicle in. The officer, Defendant Christopher Simmons, then initiated either a traffic stop in a private parking lot or an investigative detention.  Accordingly, Mr. Rincon and the Plaintiffs recorded the police stop on their cameras or phones while Defendant Simmons (presumably) did the same on his body-worn camera (BWC).



40.     Defendant Simmons approached the driver's side window of Plaintiff's car and calmly introduced himself as Officer Simmons with the Livingston Police Department.  Since it was dark outside, he utilized a flashlight to observe the occupants of the vehicle.[13]

41.     Mr. Rincon asked him, "¿Mande?" [Translation: "Yes?" or "What?"]

---

[13] He was not armed with a weapon, shouting about weapons, utilizing body armor, or even carrying a tactical shield. He did not mention concerns about officer safety.

42.     Defendant Simmons asked Mr. Rincon if he was saying he didn't speak English. Mr. Rincon responded by telling him, "No entiendo." [Translation: "I don't understand."][14]

43.     While Defendant Simmons requested a Spanish-speaking officer make the scene, Plaintiff White, who was sitting behind the driver's seat, told Defendant Simmons that he speaks English and asked why the officer had pulled them over.  Defendant Simmons ignored him.

44.     As they waited for a Spanish-speaking officer to make scene, Mr. Rincon asked Defendant Simmons, "¿Que lo que pasa?" [Translation: "What's happening?" or "What's going on?"]

45.     Defendant Simmons tried asking, "¿Que?" before admitting, "No understand."[15]

46.     When Mr. Rincon asked Defendant Simmons if he spoke Spanish, Defendant Simmons responded, "Uno momento."  (His accent answered that question.)  He then told Mr. Rincon in English that someone would be there shortly.  After a couple of seconds, Defendant Simmons tried asking, "¿Licencia?" [Translation: "License?"]

47.     In response, Mr. Rincon asked, "¿Qué hice?" [Translation: "What did I do?"] Defendant Simmons gave up and told Mr. Rincon to wait, "Just a sec'."  Mr. Rincon asked him, "¿Qué es eso?" [Translation: "What is that?"]  Defendant Simmons admitted, in English, that he did not know what Mr. Rincon was saying, but if Mr. Rincon gave him one second, they would find out.  Mr. Rincon agreed, "Sí."

---

[14] Mr. Rincon never actually claimed to not speak English; he stated he did not understand.  Defendant Simmons assumed Plaintiff only spoke one language because he preferred to respond in Spanish, and Defendant Simmons does not speak Spanish.  "I do not understand" could also refer to not understanding why the officer had initiated a traffic stop while Mr. Rincon was parked in a private parking lot.

[15] Defendant Chris A. Simmons received *32 hours* of TCOLE credit for an Intermediate Spanish for Law Enforcement class in April of 2015.



48.   Plaintiff White asked the officer if he was being detained or if he could step out of the car.  The officer maintained his position, standing with one arm braced against Plaintiff White's door, a flashlight pointed inside the driver's side window, but refused to answer.  Mr. Rincon, and Plaintiffs Rankin, White, and Trimble did not feel free to leave the scene.

49.    At this point, Officer Tito Reyes made the scene.  Defendant Simmons told the officer that the driver did not speak English.  He concluded with, "So I'm trying to find out why they're here, what they're doing, why are they being suspicious."



50.    Officer Reyes approached the vehicle with a, "Hello. How are you all doing?" and a friendly wave.

51.    Mr. Rincon responded with a friendly, "¿Cómo estás?" [Translation: "How are you?"]  Officer Reyes responded, "Bien.  ¿Usted?" [Translation: "Good. You?"]  Mr. Rincon told him in Spanish that he was doing well, but he did not know that Defendant Simmons wanted.  Officer Reyes introduced himself in Spanish by name and provided the name of the police department he was with.

52.    Officer Reyes switched back to speaking to Defendant Simmons.  "And, so, I guess they're recording."  He did not provide any context for why he felt this fact merited comment.  He then asked Mr. Rincon (in English), "Do you have a weapon on you, sir?"  Before Mr. Rincon

could respond, Defendant Simmons interjected, **"I don't care if he has a weapon,** but why are they following the police around?  Why are they acting suspicious?  Who are they?"



53.     Officer Reyes asked Mr. Rincon, "¿Lo que el está preguntando porque estas sospechoso y persiguiendo la policía?"  [Translation: "What he is asking: Why are you acting suspicious and following the police?"]  Mr. Rincon queried, "¿Persiguiendo?  ¿Qué es sospechoso? ¿Es contra la ley?"  [Translation: "Following?  What is suspicious?  Is that against the law?"]

54.     Defendant Simmons told Officer Reyes he wanted Mr. Rincon's driver's license.[16] Officer Reyes translated this command.  Mr. Rincon asked Officer Reyes in Spanish why and

---

[16] At the time of the incident, Tex. Penal Code § 38.02 only required an individual to identify if he was "lawfully arrested."  Otherwise, an individual could not provide an "intentionally false or fictitious name, residence address, or date of birth if he was "lawfully arrested," "lawfully detained," or if an officer believed the individual was "a witness to a criminal offense.

[The 88th Texas Legislature added several subparts to the section which took effect on September 1, 2023, including Tex. Penal Code § 38.02(b-1), which requires an operator of a motor vehicle who has been "lawfully detained by a peace officer for an alleged violation of a law" to provide his driver's license or name, driver's license number, residence address, and date of birth.]

wanted to know what the nature of the encounter was.   Defendant Simmons told Officer Reyes that they were suspicious.  He then claimed, "And I can stop anybody that's acting suspicious."

55.     Mr. Rincon asked in Spanish what crime that would be.  Plaintiff White asked who determined what was "suspicious."  Defendant Simmons ignored Plaintiff White.

56.     Without answering Mr. Rincon's question, Officer Reyes asked Mr. Rincon to stop moving his hands around and to avoid looking suspicious.  He also asked him if he had a firearm. (Defendant Simmons, meanwhile, did not look concerned.) Mr. Rincon told him that he usually did not answer questions.  Assuming Mr. Rincon had a firearm, Officer Reyes asked Mr. Rincon to not do anything to indicate danger to him or move his hands out of his sight.  When Mr. Rincon asked Officer Reyes if he was assuming he had a gun, Officer Reyes argued that one usually does not have magazines without a firearm. Defendant Simmons, watching the exchange, asked Officer Reyes what they were saying, twice. After finishing the conversation, Officer Reyes explained the situation, pointing out the bullets Mr. Rincon had stored in magazines in his vest's pockets.



57.     With that matter settled, Officer Reyes asked Defendant Simmons what was going on.  What did he want?  Defendant Simmons answered, "I want his ID.  Texas law says if you're

---

As Plaintiffs had not committed any crimes and were not lawfully arrested, none of them were required to provide their licenses or identities to Defendant Simmons per Texas law which Defendant Simmons knew or should have known.

suspicious in a suspicious place, I can get your ID.  I can ID you.  I can stop you.  I can find out

what you're doing."[17]  He continued, "So that's what I want to know.  What are you doing?"[18]

58.     Officer Reyes asked Mr. Rincon what he was doing in Spanish.  Mr. Rincon replied

in Spanish that, right then, he was parked there.  Officer Reyes explained that Defendant Simmons

was claiming that he had stopped Mr. Rincon because he was driving around acting suspicious—

59.     Defendant Simmons interrupted.  "Licencia, por favor."

60.     Officer Reyes ignored his fellow officer's interruption and continued explaining.

Mr. Rincon asked if he had committed a crime.  Officer Reyes responded that he was suspicious.

Mr. Rincon asked Officer Reyes to listen to his question: Did he commit a crime?  Officer Reyes

denied seeing it and directed him to Defendant Simmons.

61.     Defendant Simmons, who had been quietly listening to a conversation he could not

understand, interrupted again.  "Okay.  Give me your license or get out of the car."  Officer Reyes

translated the command.  Mr. Rincon asked why he needed to get out of the car.  Officer Reyes

told him that he needed to give Defendant Simmons the license he had been asking for.

62.     Mr. Rincon asked Officer Reyes why Defendant Simmons had detained him.

Officer Reyes told Defendant Simmons Mr. Rincon's question.  Defendant Simmons responded,

"I just told him.  He's suspicious."  He then commanded Mr. Rincon (in English), "Step out of the

vehicle, or give me your license.  One of the two.  Which one are you going to do?"  Officer Reyes

did not translate this order; Mr. Rincon did not respond.  Defendant Simmons tried again, "Right

now you're failing to ID, so I'm about to arrest you for that."

---

[17] The Livingston Police Department clearly provided substandard training to their officers or neglected to verify that
their officers had received adequate training before placing their officers in positions of authority to enforce the law.
This statement is NOT true under Texas law.  Texas is NOT a stop and ID state.

[18] Police officers are not entitled to know everything, just as the government must respect the privacy of its citizens.

63.     Plaintiff Rankin interjected with expletives, asking Defendant Simmons if he had ever heard of 38.02.  He then explained that one only must give ID under arrest.[19]

64.     Defendant Simmons ignored Plaintiff Rankin and, gesturing at Mr. Rincon, told him, "Step out of the vehicle."  Officer Reyes tried to explain something, but Defendant Simmons spoke over him.  "You're not going to tell me what the law is.  I know what the law is."

65.     [Defendant Simmons, in fact, did not know what the law was.]

66.     Plaintiff Rankin again tried to explain Texas Penal Code § 38.02, Failure to ID, requires an arrest.  Defendant Simmons told him, "Okay.  Then that's what I'm about to do."  Plaintiff Rankin asked him, "For what?"  Defendant Simmons responded, "For being suspicious.  For failing to ID."  Plaintiff Rankin informed him that Failing to ID is a secondary charge.

67.     At this point, Officer Reyes stepped back into the conversation.  He told Mr. Rincon (in Spanish) that he did not know why Defendant Simmons had pulled him over, because he was not there; Defendant Simmons was telling him what had happened.  Obviously, Plaintiffs had been driving around.  Officer Reyes had intended to speak with them and ask if they needed help or something.  He didn't know if they were lost.  But, Plaintiffs left, so. . . .

68.     Mr. Rincon noncommittally agreed with Officer Reyes.

69.     Officer Reyes then told Defendant Simmons about their previous interaction.  Defendant Simmons interrupted Officer Reyes to tell him that Mr. Rincon with the Plaintiffs had been following him around.  "They're suspicious as far as I'm concerned.  I don't know if they've

---

[19] Defendant Simmons knew or should have known TEX. PENAL CODE § 38.02.  The Livingston Police Department knew or should have known that Defendant Simmons would need to know this statute to fulfill his duties and failed to train him or to supervise his training accordingly.  One could easily foresee that Defendant Simmons not knowing this statute would result in egregious Constitutional violations.

got partners that are committing crimes somewhere else, and they're keeping an eye on our location.  So, you're going to give me your ID, or I'm going to arrest you for Fail to ID."

70.     Plaintiff Rankin tried to explain to Defendant Simmons the consequences of that decision.  Defendant Simmons interrupted him, "And that's fine.  Okay, so you're either going to do it, or that's what's going to happen."  Officer Reyes translated for Mr. Rincon.

71.     The conversation devolved at that point, until Officer Reyes again interrupted.  He told Mr. Rincon (in Spanish) that he was going to ask a question and then everything would be okay: Was he just driving around recording?  Mr. Rincon told him that he was just driving, enjoying the city.  Officer Reyes explained that the people in his car were recording, and that Defendant Simmons had seen him recording as well.  Officer Reyes then asked if that would distract Mr. Rincon from driving?  Mr. Rincon denied doing that.



72.     Defendant Simmons, once again, tired of being left out of the conversation.  In English, he interjected, "Right now you're failing to ID.  Give me your license."  Plaintiff Rankin again referred the officer to Tex. Penal Code § 38.02.

73.     Officer Reyes ignored Defendant Simmons's interruption and continued trying to communicate with Mr. Rincon.  Mr. Rincon told Officer Reyes that he needed Defendant Simmons to tell him what crime he had committed.  Accordingly, Officer Reyes asked Defendant Simmons. Defendant Simmons again insisted, "He's been suspicious.  I want to know who he is and why is he—huh?"

74.     During Defendant Simmons's monologue, Mr. Rincon continued explaining to Officer Reyes that there had to be a crime.  At this point, Officer Reyes again interrupted Defendant Simmons to tell him that Mr. Rincon was asking for the crime.  Defendant Simmons defensively responded, "He is detained." Officer Reyes told Defendant Simmons that Mr. Rincon said that there had to be a crime for him to show his license.  Defendant Simmons disagreed.  "No, it doesn't. He has to be legally detained by the police."  He then continued demanding Mr. Rincon's ID while Plaintiff Rankin continued providing the officer with the section number for the relevant Texas code.

75.     Officer Reyes then tried to regain control of the conversation.  He asked Mr. Rincon, por favor, to answer his question: "¿Tiene armas de fuego en el vehículo?  Sí o no." [Translation: "Do you have firearms in the vehicle?  Yes or no."]  Mr. Rincon again told him that he usually does not answer questions.  Officer Reyes told him that he was assuming he had firearms because he had ammo and a bullet proof vest.[20]  He further told Mr. Rincon that he was going to assume because Mr. Rincon did not answer his questions.  He then asked Plaintiff Rankin if he had any firearms on him.  Plaintiff Rankin told him that he does not answer questions.

76.     Defendant Simmons told Officer Reyes, **"It doesn't matter if they have a firearm."**  Officer Reyes told Defendant Simmons that <u>he was not saying that it mattered</u>.  Plaintiff

---

[20] It was a load-bearing vest, not a plate carrier vest.  It was not a bullet proof vest as Officer Reyes assumed.

Rankin tried to interrupt again, but Officer Reyes stopped him, claiming that he was talking to the driver and not him.

77.     At this point, Officer Reyes had had enough.  He asked everyone to give him a second and pulled Defendant Simmons to the side to talk to him.  Defendant Simmons went, protesting that he just wanted a license.

78.     Plaintiffs either recorded audio from that conversation or were able to obtain a copy.

79.     Defendant Simmons accused Plaintiffs of following him around all night.  Officer Reyes reminded him of training they had received on America First and Mr. White and explained that that was what Plaintiffs had been doing.  Defendant Simmons argued that Mr. Rincon was still failing to ID.  Officer Reyes reminded him that they were not supposed to interfere because of that communication and that they needed to be careful.  That was all he was trying to say.

80.     Defendant Simmons returned to the driver's side window.  "Okay, so again.  You're a suspicious person.  I need your ID."  When Officer Reyes did not immediately move to translate, Defendant Simmons asked, "Tito?  ¿Licencia?"  Officer Reyes still did not provide a translation.

81.     Plaintiff Rankin told Defendant Simmons that he was going to lose the next five years of his life in court, bro.  Defendant Simmons ignored him and addressed Mr. Rincon in English: "Are you going to give me your license or am I going to arrest you for Fail to ID?  Which one is it?"  Mr. Rincon did not respond.

82.     Plaintiff Rankin asked the officers if they were of equal rank.  Defendant Simmons confirmed they were.  Plaintiff Rankin let Officer Reyes know that he could face liability for failing to intervene.  Officer Reyes objected several times that Plaintiff Rankin did not know what he had

discussed with Defendant Simmons, and Plaintiff Rankin told Officer Reyes also several times that he was just letting him know.

83.     Mr. Rincon asked Officer Reyes in Spanish if he knew about TEXAS PENAL CODE § 38.02.  Officer Reyes asked, "¿De qué?" [Translation: "About what?" or "What is it about?"] Mr. Rincon told Officer Reyes it was about Defendant Simmons talking about failing to ID. Defendant Simmons could only identify Mr. Rincon if he was lawfully arrested.  That was the only way.  Officer Reyes argued that if Mr. Rincon committed a violation, then Defendant Simmons could identify him as well.  Mr. Rincon responded that Defendant Simmons had not told him of a violation he had committed.  Officer Reyes told Mr. Rincon that he had already made Defendant Simmons aware of that, but that Defendant Simmons still wanted Mr. Rincon's ID.

84.     Mr. Rincon asked if Officer Reyes had a supervisor.  He denied having one at that time.  Mr. Rincon told him that he needed a supervisor on scene.  Officer Reyes translated that request for Defendant Simmons.  Even though Defendant Simmons and Officer Reyes had already confirmed that they were of equal rank, Defendant Simmons claimed to be the supervisor.  While Defendant Simmons continued demanding Mr. Rincon's license, Mr. Rincon told Officer Reyes, "Necesito, por favor." [Translation: "I need, please."]   Neither officer moved to radio for a supervisory officer.

85.     Instead, Defendant Simmons continued repeating himself like a scratched record. Mr. Rincon asked Officer Reyes why would he get out; Officer Reyes translated this for Defendant Simmons.  Defendant Simmons responded, "Cause I need to ID him."  Officer Reyes clarified. "What crime has he committed?"  "He's being suspicious," Defendant Simmons responded.[21]   Mr. Rincon asked in Spanish what the probable cause was.  Defendant Simmons spoke over Mr.

---

[21] This is not a crime.

Rincon, "Therefore, I have every right to ID him."  Plaintiff Rankin told the officers that they have every right to make contact and investigate.  That's it.  Nothing more.  Texas is not a stop and ID state.

86.     At this, Officer Reyes pulled Defendant Simmons to the side again.  Plaintiffs also obtained this audio.



87.     Officer   Reyes   started   off   with conciliatory  statements,  before  asking  Defendant Simmons, **"What is your reasonable suspicion?"**  "I just  told  you.   They've  been  following  me  around town," Defendant Simmons replied.  "And they could very well be somebody watching us to have another team commit a crime."  Officer Reyes asked, "What have you determined right now?  **We already know who they are and what they're doing here."**  "Do we know who they are?" Defendant Simmons asked.  Officer Reyes told him, "Yeah, Brandon White.  Mr. White, the America First.  That's what they call him in the media." "Oh," Defendant Simmons said.  "So, we do know who they are then.  Okay."  Officer Reyes asked him what he intended to do now; could they let them go?  "Yeah.  I didn't realize that was Mr. White back there.  Who's Mr. White?  Which one?"

88.     The officers approached the driver's side window again, and Officer Reyes pointed to Plaintiff White sitting behind the driver.  "Mr. Popular."

89.     Defendant Simmons confirmed, "Right here?"  He then asked, "How are you doing, Mr. White?"  Plaintiff White asked if the officers had received phone calls, which the officers denied.  When Plaintiff White asked why Defendant Simmons was shining his light in his eyes, Defendant Simmons told him it was so he could see through the window.   Officer Reyes volunteered that he could remember stuff.



90.     Defendant Simmons loudly proclaimed, "Now I know who you are, so I will be happy to let you go."  Officer Reyes tried to get Defendant Simmons to explain that statement, but this just confused Defendant Simmons.   Accordingly, Officer Reyes told Mr. Rincon and the Plaintiffs, "The reason why he needs to identify you is 'cause he doesn't know who you are.  I know who Mr. White is."

91.     Here, Defendant Simmons interjected with his theory that they could be in collusion with another team to commit a crime.

92.     Mr.   Rincon   asked   Defendant Simmons (in Spanish) to move the light away from his eyes.   When Defendant Simmons did not

immediately move it, Mr. Rincon shone his own little flashlight at the officers.

93.     Officer Reyes decided not to deal with that and continued.  "Like I said, if you're good, and you're all just recording for the media purposes that y'all say, like Mr. White says, man," he gestured.  "We're done here."  Officer Reyes then walked away.

94.     Mr. Rincon leaned out his window and asked Defendant Simmons, "Did you understand the law or no?"  Defendant Simmons tried to claim that he does understand the law.  Mr. Rincon asked him if he knew 38.02.  Defendant Simmons tried to claim expertise based on the fact that he was the one working as a cop.  (Regrettably, that does not guarantee superior knowledge.)  Mr. Rincon asked him again if he knew 38.02.  When Defendant Simmons told him, "Yeah," Mr. Rincon told him, "Obviously you don't, man."

95.     As the officers were leaving, Officer Reyes wished them, "Be safe," while Defendant Simmons called back, "By the way, you're English got real good."  Plaintiff Rankin called after him, "Yeah, you just got stupider."

96.     Ultimately Plaintiffs were detained for over fifteen minutes by an officer who lacked particularized reasonable suspicion—let alone probable cause—to stop them in the first place.  This should have been the end of it.  It was not.

*A Tale Told*

97.     Plaintiff Trimble fully incorporates, by reference, pages 4-24, paragraphs 20-66, for the section "A Tale Told," of *Plaintiff Brandon Michael White's First Amended Complaint and Demand for Jury Trial*, filed at Dkt. No. 6.

*A Tale Believed*

98.     Plaintiff Trimble fully incorporates, by reference, pages 15-19, paragraphs 55-72, for the section "A Tale Believed," of *Plaintiff Matthew Rankin's First Amended Complaint and Demand for Jury Trial*, filed at Dkt. No. 4.

99.     Back in 1775, Delegate Patrick Henry openly challenged the Second Virginia Convention with the following words: "Is life so dear, or peace so sweet, as to be purchased at the price of chains and slavery? Forbid it, Almighty God! I know not what course others may take; but as for me, give me liberty or give me death!"[22]

100.     Today, just telling a police officer he does not know the law he swore to uphold and sharing that comment publicly can land a person in jail for over a month on a $105,000.00 bond followed by years of criminal prosecution for a felony charge of the second degree with the risk of two to twenty years in prison and a fine of up to $10,000.00.

101.     This country's Founding Fathers fought and died so that all Americans would be free to speak their thoughts without fear of governmental retaliation.

102.     Do those who have sworn to preserve, protect, and defend that very law still believe in their oath?  In that freedom?  In morality at all?

103.     Defendant Officers' and Defendant City's actions are inexcusable.  Plaintiff has been harmed.  She seeks redress in this matter.


### COUNT I
### VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (First Amendment - Retaliation)

104.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

---

[22] Patrick Henry, *"Give Me Liberty or Give Me Death!"*, Colonial Williamsburg (Mar. 3, 2020), https://www.colonialwilliamsburg.org/learn/deep-dives/give-me-liberty-or-give-me-death/.

105.     This First Amendment retaliation claim is asserted against all Defendant Officers as they all actively participated in initiating the arrest and prosecution of Plaintiff Trimble simply because they did not agree with Plaintiff's viewpoints, namely that she is a First Amendment auditor, that she verbally challenges the officers' conduct, or that she films the officers performing their public duties—all conduct which the First Amendment protects.

106.     Defendants knew that Plaintiff was engaged in protected First Amendment activity; their conduct of seeking and initiating the arrest and prosecution of Plaintiff Trimble without any lawful basis resulted in injuries that would chill a person of ordinary firmness from continuing to engage in that activity; and the Defendant Officers' adverse actions were substantially motivated against her exercise of constitutionally protected conduct.

**COUNT II**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983**
**(Fourth Amendment – Unlawful Seizure)**

107.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

108.     Plaintiff Trimble asserts that Defendant Simmons lacked any lawful authority to initiate a traffic stop of Mr. Rincon and Plaintiffs on February 4, 2022, while they were on private property.  Defendant Simmons then unreasonably prolonged the traffic stop in further violation of Plaintiff's rights guaranteed under the Fourth Amendment.

**COUNT III**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983**
**(Fourth Amendment – Unlawful Arrest)**

109.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

110.    Plaintiff Trimble asserts this claim against Defendants Barker and Middleton for submitting arrest affidavits that they knew were false or would have known they were false had they not recklessly disregarded the truth.

111.    Defendants Barker and Middleton supplied false affidavits with the specific intent of misleading the judge and permitting the unlawful arrest of Plaintiff Trimble despite lacking any probable cause or other lawful basis to arrest Plaintiff.

112.    These Defendants violated clearly established law as the Constitution prohibits an officer from making perjurious or recklessly false statements in support of a warrant.  This is especially true here, where the Defendants knew or had reason to know that they supplied information that materially misled a judge on the basis of a finding of probable cause.

113.    Had Defendants Barker and Middleton provided truthful information in their affidavits, they would have clearly failed to establish probable cause to seek the arrest of Plaintiff.

**COUNT IV**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983**
**(Fourth Amendment – Malicious Prosecution)**

114.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

115.    Plaintiff Trimble asserts this claim against Defendants Barker and Middleton who initiated criminal prosecution against Plaintiff without any lawful basis.  These Defendants knew they lacked probable cause or legal justification to initiate prosecution but did it anyway.  The false charges were terminated in favor of Plaintiff.

***MONELL* LIABILITY**

116.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

117.    The individual Defendants at all times relevant were City of Livingston police officers.

118.    Defendant City maintains a spoken or unspoken policy, practice or custom to permit the unlawful arrests and prosecutions of people they believe are engaged in First Amendment conduct without fear of investigation or discipline.

119.    Defendant City knew that Plaintiff Trimble has a First Amendment right to engage in auditor activities.  They provide training informing their officers of this right.  However, Defendant City repeatedly fails to hold its officers accountable for violating the rights of people they assume are auditors.

120.    Defendant Officers knew they would face no repercussions for conspiring to initiate the false arrest and prosecution of Plaintiff Trimble.  They were right.  The City and its policymakers ratified the officers' conduct when the Police Chief published an official statement declaring that the recklessly false statements made in affidavits by his officers were true.

121.    The City of Livingston acted with deliberate indifference, and it was foreseeable that by permitting the custom, policies, and practices would violate Plaintiff's constitutional rights.

122.    Defendant City is directly responsible for the individual Defendants' conduct described herein.

## DAMAGES

123.    **Actual damages.**  Defendants' acts or omissions were a proximate cause and the moving force behind actual damages suffered by Plaintiff Trimble, and the Defendants should be held jointly and severally liable.

124.    **Punitive/Exemplary    Damages    against    individual    defendants.** Punitive/exemplary damages are recoverable under Section 1983 when the conduct is shown to be

motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.  Here, the conduct of the Defendant Officers was done with evil motive or intent, or at the very least, was reckless or callously indifferent to the federally protected rights of Plaintiff.  As such, Plaintiff requests punitive and exemplary damages from the individual officers to deter this type of conduct in the future.

125.    Nominal Damages.

126.    Prejudgment and post judgment interest.

127.    Costs of court.

128.    Reasonable and necessary attorney's fees incurred by the Plaintiff Trimble through trial, and reasonable and necessary attorney's fees that may be incurred by Plaintiff for any post-trial proceedings, or appeal, interlocutory or otherwise, pursuant to 42 U.S.C. § 1988, and as otherwise permitted by law.

129.    Plaintiff seeks unliquidated damages in an amount that is within the jurisdictional limits of the Court.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Melanie Trimble prays Defendants be cited to appear and answer herein; and upon final trial hereof the Court grant Plaintiff declaratory and injunctive relief; and judgment be entered in favor of Plaintiff awarding from Defendants actual damages, exemplary damages, pre-judgment interest at the legal rate; interest on said judgment at the legal rate; attorney fees; costs of court; and such other and further relief, both general and special, at law and in equity, to which Plaintiff is justly entitled.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable, pursuant to Fed. R. Civ. P. 38(b).

Respectfully submitted,

**GRABLE GRIMSHAW PLLC**

*/s/ Brandon J. Grable*
**BRANDON J. GRABLE**
Texas State Bar No. 24086983
brandon@g2.law
1603 Babcock Road, Suite 280
San Antonio, Texas 78229
Telephone: (210) 963-5297
Facsimile: (210) 641-3332
**COUNSEL FOR PLAINTIFFS**