## THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## LUFKIN DIVISION

| | |
|---|---|
| **MATTHEW RANKIN,** | § |
| **MELANIE TRIMBLE, and** | § |
| **BRANDON MICHAEL WHITE,** | § |
| *Plaintiffs,* | § |
| | § |
| **vs.** | § |
| | § **CIVIL NO. 9:24-CV-00027-MJT** |
| **CITY OF LIVINGSTON,** | § |
| **DETECTIVE KALEB BARKER,** | § |
| **SERGEANT RONNIE BOGANY,** | § |
| **OFFICER SCOTT PASKE,** | § |
| **DETECTIVE LEON MIDDLETON, and** | § |
| **OFFICER CHRISTOPHER SIMMONS,** | § |
| *Defendants.* | § |
| | § |

---

## PLAINTIFF BRANDON MICHAEL WHITE'S FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

---

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ................................................................................................ iii

I.      JURISDICTION AND VENUE ......................................................................... 1

II.     PARTIES ............................................................................................................ 1

III.    STATEMENT OF FACTS ................................................................................. 3

Initial Statement ........................................................................................................ 3

First Incident ............................................................................................................. 3

Interlude ..................................................................................................................... 3

Second Incident ......................................................................................................... 4

A Tale Told ................................................................................................................ 4

A Tale Believed ......................................................................................................... 24

COUNT I:      First Amendment – Retaliation ............................................................ 25

COUNT II:     Fourth Amendment – Unlawful Seizure .............................................. 25

COUNT III:    Fourth Amendment – Unlawful Arrest ................................................ 26

COUNT IV:     Fourth Amendment – Malicious Prosecution ...................................... 26

*MONELL* LIABILITY ...................................................................................................... 27

DAMAGES ......................................................................................................................... 28

PRAYER FOR RELIEF ..................................................................................................... 28

JURY DEMAND ................................................................................................................ 29

# TABLE OF AUTHORITIES

*Page(s)*

**Federal Constitutional Provisions**

U.S. CONST. amend. IV ............................................................................................ 1, 25, 26

U.S. CONST. amend. XIV ..................................................................................................... 1

**Federal Statutes**

28 U.S.C. § 1331 ................................................................................................................... 1

28 U.S.C. § 1391(b)(2) ......................................................................................................... 1

42 U.S.C. § 1983 ......................................................................................................... 1, 2, 28

42 U.S.C. § 1988 ................................................................................................................. 28

**Federal Rules**

FED. R. CIV. P. 38(b) .......................................................................................................... 29

**State Statutes**

TEX. PENAL CODE § 37.02 ................................................................................................. 21

TEX. PENAL CODE § 37.03 ................................................................................................. 21

**Other Authorities**

Ben Smith, *7 deadly sins of police report writing*,
    POLICE 1 (Oct. 3, 2022) ................................................................................................. 5

Fortenbary, *Developing Ethical Law Enforcement Leaders*,
    FBI LAW ENFORCEMENT BULLETIN (May 5, 2015) .................................................... 22

Henry, *"Give Me Liberty or Give Me Death!"*,
    Colonial Williamsburg (Mar. 3, 2020) ......................................................................... 24

Terrence P. Dwyer, *Falsified facts by any other name are still false*,
    POLICE1 (Jan. 13, 2022) ............................................................................................... 21

Twain, *The Innocents Abroad*,
    https://archive.org/details/bub_gb_fFjyA7FJorUC/page/649/mode/2up (1869) ...................... 16

Williams, *Style: Lessons in Clarity and Grace*,
    (Joseph Bizup rev., 11th ed. 2013). ........................................................................... 8, 21

NOW COMES Plaintiff **BRANDON MICHAEL WHITE,** by and through his attorney, Brandon J. Grable of Grable Grimshaw PLLC, complaining of Defendants **CITY OF LIVINGSTON, DETECTIVE KALEB BARKER, SERGEANT RONNIE BOGANY, OFFICER SCOTT PASKE, DETECTIVE LEON MIDDLETON,** and **OFFICER CHRISTOPHER SIMMONS,** and respectfully alleging as follows:

## I.
## JURISDICTION AND VENUE

1.      This is a civil rights action in which Plaintiff seeks relief for the violations of his rights secured by 42 U.S.C. § 1983 and the First, Fourth, and Fourteenth Amendments.

2.      Jurisdiction of this Court is found upon 28 U.S.C. § 1331.

3.      Venue is properly laid in the Eastern District of Texas under 28 U.S.C. § 1391(b)(2).  The events that gave rise to this lawsuit primarily took place in Livingston, Texas, in Polk County.

4.      Pursuant to 42 U.S.C. § 1983, and other applicable laws, the Court may award nominal, compensatory, and punitive damages, as well as equitable relief against all of the Defendants in their individual capacity, for the violations of Plaintiff Brandon Michael White's Constitutional rights and harm caused by their actions/inactions.

## II.
## PARTIES

5.      Plaintiff MATTHEW RANKIN ("Plaintiff Rankin") is a law-abiding citizen of the United States and a resident of the City of Corpus Christi, County of Nueces, State of Texas.

6.      Plaintiff MELANIE TRIMBLE ("Plaintiff Trimble") (formerly Melanie McCrory) is a law-abiding citizen of the United States and a resident of the City of Livingston, County of Polk, State of Texas.

7.      Plaintiff BRANDON MICHAEL WHITE ("Plaintiff White") is a law-abiding citizen of the United States and a resident of the City of Dayton, County of Liberty, State of Texas.

8.      Defendant KALEB BARKER ("Defendant Barker") was at all pertinent times a detective employed by the City of Livingston and was at all pertinent times acting under color of state law in the performance of his duties as a Livingston police officer.

9.      Defendant RONNIE BOGANY ("Defendant Bogany") was at all pertinent times a sergeant employed by the City of Livingston and was at all pertinent times acting under color of state law in the performance of his duties as a Livingston police officer.

10.     Defendant SCOTT PASKE ("Defendant Paske") was at all pertinent times a police officer employed by the City of Livingston and was at all pertinent times acting under color of state law in the performance of his duties as a Livingston police officer.

11.     Defendant LEON MIDDLETON ("Defendant Middleton") was at all pertinent times a detective employed by the City of Livingston and was at all pertinent times acting under color of state law in the performance of his duties as a Livingston police officer.

12.     Defendant CHRISTOPHER SIMMONS ("Defendant Simmons") was at all pertinent times a police officer employed by the City of Livingston and was at all pertinent times acting under color of state law in the performance of his duties as a Livingston police officer.

13.     Defendant CITY OF LIVINGSTON ("Defendant City") is a political subdivision of the State of Texas, acting under color of state law, and is a person for the purposes of a 42 U.S.C. § 1983 action.  Defendant City's policymakers include City Manager BILLY S. WIGGINS ("Wiggins"), Chief of Police MATT PARRISH ("Chief Parrish"), Mayor JUDY B. COCHRAN ("Cochran"), and the City of Livingston City Council Members: Alan Cook, Elgin Davis, Bobby Jackson, and Raymond Luna (collectively referred herein as the "Policymakers").  Defendant City

is responsible for the policies, practices, and procedures of its Police Department and individual officers.  Defendant City is also responsible for the policies implemented, endorsed, and enforced by its Policymakers, the ordinances passed by its Councilmembers and Mayor, and even the actions and statements of its Police Chief.

14.     Each and all of the acts of Defendant Officers alleged herein were committed by said Defendants while acting within the scope of their employment with Defendant City, including Defendant City's Police Department.

15.     These Defendant Officers committed each and all of the acts herein despite their knowledge that they were engaging in unlawful and unconstitutional acts. Yet, they did them anyway, knowingly, recklessly, intentionally, wantonly, callously, purposely, purposefully, sadistically, cruelly, deliberately, and/or with deliberate indifference, gross negligence, and/or reckless disregard.

### III.
### STATEMENT OF FACTS

*Initial Statement*

16.     Plaintiff White fully incorporates, by reference, pages 3-5, paragraphs 17-20, for the section "Initial Statement," of *Plaintiff Matthew Rankin's First Amended Complaint and Demand for Jury Trial*, filed at

17.     . 4.

*First Incident*

18.     Plaintiff White fully incorporates, by reference, pages 5-13, paragraphs 21-46, for the section "First Incident," of *Plaintiff Matthew Rankin's First Amended Complaint and Demand for Jury Trial*, filed at Dkt. No. 4.

*Interlude*

19.     Plaintiff White fully incorporates, by reference, pages 5-6, paragraphs 22-27, for the section "Interlude," of *Plaintiff Melanie Trimble's First Amended Complaint and Demand for Jury Trial*, filed at Dkt. No. 5.

### Second Incident

20.     Plaintiff White fully incorporates, by reference, pages 6-23, paragraphs 28-96, for the section "Second Incident," of *Plaintiff Melanie Trimble's First Amended Complaint and Demand for Jury Trial*, filed at Dkt. No. 5.

### A Tale Told

21.     Officers are supposed to be trustworthy.  If one can trust anyone, one should be able to believe a police officer.  When an officer tells one something, one should be able to think that it is the truth.  Unfortunately, not all officers are good; not all officers tell the truth, the whole truth, and nothing but the truth.  Sometimes officers lie, and sometimes they slant their stories— which is nearly the same thing.

22.     Heretofore, only one narrative has been presented: Plaintiffs' account of the events that occurred to them.  Now, this complaint turns to the stories the Defendant Officers told.[1]

23.     Defendant Officers Detective Kaleb Barker, Sergeant Ronnie Bogany, Officer Scott Paske, John Doe Officers, Detective Leon Middleton, and Officer Christopher Simmons with

---

[1] Notice the subtle slant: "Plaintiffs' *account* of the events that *occurred*" versus the words "stories" and "told." "Story" can mean "an account of incidents or events;" it can also mean "a fictional narrative shorter than a novel" or even "a widely circulated rumor."  "Story" introduces doubt in the tale, whereas "account" suggests a bald recitation of facts.  "Told," the past tense of tell, means "to relate in detail" or "to express in words."  It suggests words spoken about an event, not the cold hard facts associated with the actual event that happened.

Slant can use specific word choices to steer the reader's thoughts in the direction the author wants the reader to go.  A slanted affidavit crafted by a police officer could persuade a judge unfamiliar with the facts to grant an arrest or search warrant that would not have been granted had the officer been more straightforward—as seen in these incidents.

Merriam-Webster, Inc., *Merriam-Webster.com Dictionary* (2024) https://www.merriam-webster.com.

other officers from Defendant City's police department, including Police Chief Matt Parrish, conspired as members of the Livingston Police Department to intentionally and knowingly harm Plaintiffs by unlawful acts in retaliation for their status as independent journalists and activists.

24.    Together, these Defendant Officers determined to take the above events and twist the facts to support affidavits for arrest warrants for misdemeanor and felony charges.[2]

25.    Before the Defendant Officers could bring these charges, they first had to discover the identities of the individuals involved.  They eventually confirmed the identities of three of the people present for the first incident and all four individuals present for the second encounter.  They must have ultimately decided that this was an acceptable percentage of alleged participants, because these were the only individuals they charged with crimes.

26.    For the first incident, Defendant Barker, with the help of Defendant Officers and under the direction or supervision of Police Chief Parrish, drafted an affidavit for the misdemeanor offense "False Report to Induce Emergency Response."

27.    To claim a crime where none existed, Defendant Barker had to first toss out the totality of circumstances.  After all, Defendants Bogany, Paske, Baker, and all the other John Doe Officers on scene knew that Plaintiffs had not committed a crime.  He then had to do away with any facts that could conceivably dispel probable cause.  A judge might ask questions he did not wish to answer if the probable cause seemed iffy.  Finally, he had to use a number of writing tactics including slant to transform a benign misunderstanding into criminal activity.

---

[2] **"It should go without saying that lying is unacceptable in police reports.** Intentionally inventing facts or misrepresenting the truth can get you fired, sued, or prosecuted. While most officers would never blatantly lie in a police report, even unintentional factual errors or omissions can mislead readers into thinking something happened that didn't, or something didn't happen that should have."

Ben Smith, *7 deadly sins of police report writing*, POLICE 1 (Oct. 3, 2022), https://www.police1.com/police-products/police-technology/software/report-writing/articles/7-deadly-sins-of-police-report-writing-FRy5EMai7H29O1dA/.

28.     One, to accuse Plaintiffs, including Plaintiff White, of wasting police resources by making a false report, he had to exclude the fact that the police knew who had called 9-1-1.  The first caller Megan Ross, a neighbor of Plaintiff Trimble's, had provided the officers with her name,

address, and phone number when she called asking the officers to come investigate.  The second person who called was Ms. Ross's self-described baby daddy who later admitted that he never saw Plaintiff Rankin's gun merely listened to what his girlfriend told him.  How could

| LPD DETAILED CALL REPORT | | | |
|---|---|---|---|
| CFS#: | 202200736 | INCIDENT#: | 220200736 |
| | | SOURCE: | PHONE |
| DATE: | 2/4/2022 | DISPOSITION: | WRITTEN REPORT |
| | | DISPATCHER ID: | 583 |
| SIGNAL: | FALSE ALARM OR REPORT | LICENSE NO: | |
| LOCATION: | | | |
| 113  BANKS DR | | APT: | DISTRICT | PHONE: | (936) - |
| BUSINESS: | | CALLER PHONE: | |
| CALLER NAME: | MEGAN | ROSS | |
| ADDRESS: | | | APT: |
| CITY: | LIVINGSTON | STATE: | TX | ZIP: | 77351 |
| UNIT:  212 | OFFICER:  199 | Agency CFS: 202200736 | TIME RECEIVED: | 13:30 |
| TIME DISPATCHED: | 13:30 | TIME ARRIVED: | 13:32 | TIME CLEARED: | 14:10 |
| TIME OUT: | | TIME CLR SCENE: | | TIME AT HOSP: | |
| TIME CLR HOSP: | | TIME BACK: | | TIME FREED: | |
| | | | | RESPONSE TIME: | 2 |
| | | | | TOTAL TIME: | 40 |

Defendant Barker persuade a judge that Plaintiffs had made a false call to waste police resources, if none of them were even the individual that had called 9-1-1?  A judge would have had uncomfortable questions over *that*, so he intentionally excluded this information from the affidavit.

29.     Two, Defendant Barker selected facts to include out of context to create a picture of behavior that seemed suspicious:

> Affiant would show White, McCrory, and the unidentified male immediately began filming Sergeant Bogany and Officer Paske with their cell phones. Affiant would show another cell phone was observed propped up in a window that faced the front door where Sergeant Bogany and Officer Paske were standing.  Affiant would show Sergeant Bogany began an investigation and attempted to identify the individuals in the residence however they refused to comply with his demand to identify themselves. Affiant would show Rankin was the suspect in possession of the handgun and also refused to show any paperwork in regards to the silencer on his handgun which was requested by Officer Paske.

30.     Defendant Barker could have included any number of details: Plaintiffs were gathered in Plaintiff Trimble's living room making posters when the officers arrived.  Defendants Bogany and Paske filmed Plaintiffs on their BWC.  Plaintiffs informed the officers—and provided laws and cases in support—that they legally could not demand they identify or require Plaintiff

Rankin to show the officers his NFA paperwork absent the belief a crime had been committed. Defendant Paske threatened to tow Plaintiff Rankin's truck unless he exited the apartment. Defendants Bogany and Paske tried to convince the landlady to criminally trespass Plaintiff Rankin, and she refused.  Plaintiff Trimble's neighbor and her boyfriend refused to file a complaint after the officers finished investigating.  He did not include any of these details.

31.    Defendant Barker instead narrowed in on two sets of facts: Plaintiffs filmed a police interaction initiated and continued by the police officers, and Plaintiffs did not comply with Defendants' unlawful commands made after they realized no crime had been committed.[3]  This narrowing of facts further deprived the magistrate judge of information he should have been able to consider before he agreed to sign the arrest warrant.

32.    Three, Defendant Barker included imagery that portrayed Plaintiffs' actions in a suspicious light.  The imagery of a cell phone "observed propped up in a window" filming where the officers stood suggested Plaintiffs were covertly watching the officers.  The cell phone in the window was not a phone that had been converted into a cloud security camera months ago and left there to film a long, long time ago before the officers arrived.  No, according to Defendant Barker, they were trying to surveil the officers with a (poorly) hidden camera.  This carefully crafted imagery created further doubt in the reader's mind about Plaintiff's intentions.

---

[3] Both sets of facts should raise concerns with this Court.  The first, because it clearly shows that Defendant Officers believed filming police officers should be viewed as a suspicious activity—not protected First Amendment speech. The second, because it clearly shows that Defendant Officers lacked the basic training needed to know even a simple Texas law like Tex. Penal Code § 38.02: "(a) A person commits an offense if he intentionally refuses to give his name, residence address, or date of birth to a peace officer who has lawfully *arrested* the person and requested the information.  (b) A person commits an offense if he intentionally *gives a false or fictitious* name, residence address, or date of birth to a peace officer who has: (1) lawfully arrested the person; (2) lawfully detained the person; or (3) requested the information from a person that the peace officer has good cause to believe is a witness to a criminal offense."  As Plaintiffs were only detained, they were not required to identify themselves.  Merely, if they *chose* to identify, they could not provide a knowingly false identity.

33.    Four, Defendant Barker used strategic word choice to make the Plaintiffs' actions seem insurrectionary and the officers' common place.  The officers' actions are described with standard law enforcement terminology such as: "observed," "began an investigation," "attempted to identify," "demand to identify," and "requested," while Plaintiffs "refused to comply" and Plaintiff Rankin "refused to show."  "Refused" is a strong word with connotations like "hindered," "rebuffed," and "spurned" and is used in this instance to suggest an insurgent attitude.[4]  Instead of showing Defendant Officers posturing, threatening, and sputtering while Plaintiffs calmly imparted information about the law, Defendant Barker created a picture of harassed police officers dealing with recalcitrant suspects.  This negative portrayal was designed to persuade the judge to look with disfavor on Plaintiffs.

34.    Five, Defendant Barker used passive verb choice to shift the blame onto Plaintiff Rankin.  Joseph M. Williams, a writing professor for more than three decades at the University of Chicago and the 2006 Golden Pen Award recipient from the Legal Writing Institute, discussed this type of literary chicanery in his book *Style: Lessons in Clarity and Grace*: "Our choice of subjects is crucial not only when we want to be clear, but also when we want to be honest or deceptive."[5]  Stylistic manipulation allows a writer to deflect focus or to misdirect the reader.[6]  Instead of honestly writing that Ms. Ross called the cops on her neighbor's guest, Defendant Barker used the

---

[4] Of particular note, Defendant Barker claimed that Plaintiff Rankin refused to show his paperwork; Plaintiff Rankin made abundantly clear to the officers that he would provide his paperwork if they had reasonable suspicion he had committed a crime.  The officers could not even dredge up enough facts to support a suspicion—let alone probable cause—at the scene.  Defendant Barker intentionally excluded those facts.

[5] Joseph M. Williams, *Style: Lessons in Clarity and Grace*, 194 (Joseph Bizup rev., 11th ed. 2013).

[6] *Id.* at 191-194.

wording "due to the actions of" to shift the blame to Plaintiff Rankin.[7]  This passive tense moved the sentence structure from the more honest format *Person 1 performed Action 1* to *Person 2's actions caused Person 1 to perform Action 1*.  This sentence structure unfairly shifted the blame onto Plaintiff Rankin.  According to Defendant Barker, it was Plaintiff Rankin's fault Ms. Ross called 9-1-1 when no crime had been committed.  This intentional sentence structure choice allowed Defendant Barker to shift blame to the victim.  Since none of the Plaintiffs had called the cops, this was the only way Defendant Barker could accuse any of the Plaintiffs with the crime.

35.     Six, all three affidavits were identical.  Defendant Barker did not tailor the narratives to explain how each Plaintiff had allegedly committed the crime they were charged with outside of changing the name in bold listed as the Defendant.  Defendant Barker claimed that because Plaintiff Rankin openly carried his handgun "this agency received two 9-1-1 calls from individuals who perceived his actions as alarming."  He never justified why he believed that Plaintiffs Trimble and White had committed the crime outside of mentioning in passing the facts that (1) they were present and (2) they filmed the encounter with the police.  Even without offering any flimsy justification for why he believed that Plaintiffs Trimble and White had committed a crime, Defendant Barker still swore "upon [his] oath" that they had.

36.     Defendant Barker crafted a narrative that made the Plaintiffs' actions out to be alarming, suspicious, and generally disruptive to the rule of law or at least to poor officers trying to complete their investigations while *inferring* that the Plaintiffs are guilty of committing the offense "False Report to Induce Emergency Response."  He then swore based on those facts that Plaintiffs "did knowingly initiate a report of a present offense . . . and the defendant knew that said

---

[7] "Affiant would show *due to the actions of* Rankin this agency received two 9-1-1 calls from individuals who perceived his actions as alarming."

report was false or baseless and would ordinarily cause action by an official agency organized to deal with emergencies, namely, the Livingston Police Department."

37.     The Polk County District Court Judge, absent any outside knowledge of the events that occurred, trusted Defendant Barker's deceit and signed the arrest warrants for Plaintiffs. Plaintiffs Rankin, White, and Trimble were arrested and held in jail until they could bail out as a result.

38.     "Somebody's got to watch us.  We can't watch ourselves," indeed.[8]

39.     In the same way, with the help of Defendant Officers and under the direction or supervision of Police Chief Parrish, Defendant Detective Leon Middleton drafted an affidavit for the second incident claiming that Plaintiffs White, Trimble, Rankin, along with Mr. Rincon, "Engage[ed] in Organized Criminal Activity."

40.     Like Defendant Barker, to claim a crime where none existed, Defendant Middleton had to first toss out the totality of circumstances.  After all, Defendant Simmons and Officer Reyes knew that Plaintiffs had not committed a crime.  Defendant Middleton also had to do away with any facts that could conceivably dispel probable cause and to use a number of writing tactics including slant; logical fallacies; and even lying to transform a series of unrelated events into criminal activity.

41.     One, to accuse Plaintiffs of engaging in organized crime, Defendant Middleton had to exclude the fact that no crime had been committed.  Defendant Simmons detained Plaintiffs with the assistance of Officer Reyes to investigate a situation he believed to be suspicious—not criminal, just suspicious.  After learning the identity of Plaintiff White—and presumably determining what Plaintiffs were doing (filming police activity)—at the urging of Officer Reyes,

---

[8] Defendant Barker's words to Plaintiff Rankin, when Plaintiff Rankin informed him that he might see them filming police activity in the area at a later time.

Defendant Simmons let Plaintiffs leave.  Any reasonable suspicion he might have had prior to the traffic and/or investigative stop was dispelled by the time the stop ended.  Based on the totality of circumstances, Defendant Simmons knew no crime had been committed.  How could Defendant Middleton persuade a judge that Plaintiffs had engaged in organized criminal activity if he admitted that Defendant Simmons had previously determined no crime had been committed? ("Now I know who you are, so I will be happy to let you go.")  A judge would have had to deny the arrest warrants.  So, Defendant Middleton excluded this information.

42.     Two, Defendant Middleton tried to cleverly hide that he had no personal knowledge of the validity of any of the information to which he was swearing.  He wrote, "Affiant would show that on February 4th, 2022, *his agency* investigated the offense. . . ."  This sentence sidestepped the matter of personal knowledge.  If Defendant Middleton had bluntly written, "I am swearing this affidavit based on third-party knowledge," the judge would have rightly questioned why either Defendant Simmons or Officer Reyes, as the investigating officers (and the only officers on scene), had not written the affidavits.  Defendant Middleton also failed to provide any sources for his information.  Nowhere in his affidavit did Defendant Middleton specify whether he spoke with Defendant Simmons and/or Officer Reyes, watched body worn camera or dash camera footage, read incident reports, or just spoke to another officer in the department.  His level of knowledge of the incidents could have affected how much trust the judge placed in the facts presented.  Accordingly, Defendant Middleton tried to minimize this information.

43.     Three, like Defendant Barker, he presented facts out of context to create a picture of suspicious behavior:

> Affiant would show that Officer Chris Simmons . . . observed a small 4 door blue car stalking him as he drove his marked patrol unit.  Affiant would show Officer Simmons stopped at a local convenience store and the vehicle stopped . . . in the parking lot. . . . Affiant would show no one ever exited the vehicle. . . . Affiant

would show Officer Simmons exited the business, entered his patrol unit and the vehicle continued to stalk Officer Simmons as he exited the parking lot. Affiant would show the suspect's vehicle later turned off and a short time later, it was circling the police department. . . .

Affiant would show Officer Simmons was able to obtain the license plate of the vehicle bearing Texas MRB1920. Affiant would show the vehicle registration was out of Laredo, Texas. . . .

Affiant would show the driver of the vehicle pretended he did not speak or understand the English language and was video recording all the actions of Officer Simmons. . . . Affiant would show the front seat white male passenger was video recording with his cell phone and being verbally rude to Officer Simmons while conducting his investigation. Affiant would show the white male sitting in the back seat behind the driver was positively identified and known as Brandon Michael White based on past law enforcement encounters for calls relating to his cell phone recordings and harassment of law enforcement. . . . Affiant would show . . . it was later determined the Hispanic male knew and could speak the English language after being verbally abusive to Officer Simmons. . . .

Affiant would further show Mr. Rincon has been stopped by the Texas Department of Public Safety in this same vehicle on at least four different traffic stops and issued citations.

44.     These were the five behaviors Defendant Middleton felt could be considered suspicious when divorced from any context: (1) Plaintiffs drove to several locations that Defendant Simmons drove to at about the same time and they traveled the roads around City Hall several times; (2) Mr. Rincon drove a vehicle registered in a different part of Texas; (3) Plaintiffs and Mr. Rincon either offended Defendant Simmons with their language during the traffic stop or had previously offended officers with their word choices; (4) Plaintiffs filmed the police officers in public with their phones while the police officers filmed them with their BWC; (5) Mr. Rincon had previously received traffic tickets while driving.

45.     The last fact is hardly related to the present offense, especially since Defendant Middleton did not specify which traffic laws other officers had cited Mr. Rincon for violating: Headlight burnt out? Speeding? Failing to stop for a full four seconds at a stop sign? Not using a turn signal? Defendant Middleton wanted to present Mr. Rincon as a man frequently on the

wrong side of the law, but he stopped short of actually providing the full facts for the judge to consider.

46.     Defendant Middleton also tried to claim Mr. Rincon's place of residence was a source of suspicion and fear, but lots of people travel and Mr. Rincon was with friends who were locals.  Since pointing that information out would diminish his goal of making Plaintiffs' behavior seem suspicious, Defendant Middleton left that information out.

47.     Defendant Middleton highlighted any rude behavior he could attribute to Plaintiffs—even hearsay, but he avoided mentioning that Defendant Simmons had also been rude to Plaintiffs with his dismissive, unlawful commands and that Officer Reyes had had to step in as a voice of reason.  He included details on how Plaintiffs followed Defendant Simmons from the Walmart parking lot, but he failed to mention that at the time Defendant Simmons had been driving at a speed above the posted speed limit without his lights or sirens on.  Defendant Middleton focused on Plaintiffs continuing to follow Defendant Simmons after the gas station, but he neglected to mention that (1) Plaintiffs pulled out of the gas station parking lot directly onto U.S. Hwy 190 instead of following Defendant Simmons down a side road past the Discount Tire before he turned ahead of them onto U.S. Hwy 190, and (2) if Plaintiffs wanted to return to Livingston proper without going ten minutes out of their way, they had to drive southeast down U.S. Hwy 190 as well.



48.     Defendant Middleton highlighted the fact that Plaintiffs were filming the officers, but he only later mentioned in passing that the officers had been filming the traffic stop as well. He also did not mention that there is a growing trend in America for individuals to film traffic stops for their own safety or for their own records, as many police departments do not like to release BWC footage even if something happens.  He described Plaintiffs as "circling the police department" but failed to mention that the Livingston Police Department had received training on the presence of auditors (people who film government officials including police officers to hold them accountable for their official conduct) in Polk County—as evidenced by Defendant Simmons and Officer Reyes's knowledge concerning Plaintiff White.  He accused Mr. Rincon of pretending to not speak English, but he chose not to mention that Mr. Rincon speaks Spanish.  Defendant Middleton's carefully curated collection of facts prevented the magistrate judge from understanding the totality of circumstances before he agreed to sign the arrest warrant.

49.     Four, Defendant Middleton used careful word choice to make the Plaintiffs' actions seem insurrectionary and the officers' common place.  He stated that Defendant Simmons was "on a routine patrol and performing his law enforcement duties" in "his marked patrol unit."  Officer Reyes "observed" and "notified" Defendant Simmons "of what he had witnessed."  Defendant Simmons "request[ed] . . . identification" "while conducting his investigation."  Officer Reyes "arrived on scene for Officer safety and to assist in translating."  These words are bland and formal and standard law enforcement terminology.  In comparison, Plaintiffs are accused three times of "stalking" and once of "circling the police department."  Defendant Middleton calls them or their actions "suspicious" four times.  Plaintiff Rankin is accused of being "verbally rude," Plaintiff White is accused of previously "harass[ing] . . . law enforcement," and Mr. Rincon is accused of being "verbally abusive."  There is no emotion associated with the officers' actions; Plaintiffs'

actions, on the other hand, range from mean to alarming to outright dangerous.  With these representations, the judge would not have had any knowledge that Defendant Simmons had been decidedly unprofessional, nor could he, in good conscience, look at Plaintiffs with anything but animosity.

50.     Five, Defendant Middleton further resorted to logical fallacies.  He started with an alarming statement to add a touch of hysteria.  "Affiant would show Officer Simmons was concerned for his safety due to the recent killings and ambush of police officers on duty." Defendant Middleton, who in his sworn statement did not mention (1) having any conversations with Defendant Simmons or (2) reading any statements made by Defendant Simmons, provided no basis for his supposed knowledge of Defendant Simmons's thoughts.  He also failed to provide any factual basis for this sentiment.  Neither Livingston, Texas, nor Polk County, Texas, have a history of citizens ambushing police officers.[9]  Nor is there a trend in Texas for police ambushes in cities demographically similar to Livingston.  Defendant Middleton simply presented an emotional appeal as fact absent any proof or other basis for this claim.  An appeal to emotion is a logical fallacy.

51.     Defendant Middleton further wrote, after pointing out Mr. Rincon had traveled to Livingston from Laredo, "Affiant would show this raised more suspicion for the safety of Officers Simmons and Reyes due to their suspicious actions and stalking."  This statement is a non sequitur.[10]  Person A is from City A.  Person A traveled to City B.  Therefore, Person A is

---

[9] Livingston Police Officer Caran Renee Coward died while on duty in April of 2008, but her death was ruled a murder-suicide, with her dead husband blamed for her murder.

[10] Non sequitur (noun): "1: an inference . . . that does not follow from the premises . . . specifically : a fallacy resulting from a simple conversion of a universal affirmative . . . proposition or from the transposition of a condition and its consequent. . . .  2: a statement (such as a response) that does not follow logically from or is not clearly related to anything previously said."

suspicious.  This conclusion does not logically follow the premises.  Traveling is a normal activity pursued by billions of people worldwide.  It is not inherently suspicious.  As Mark Twain once wrote, "Travel is fatal to prejudice, bigotry, and narrow-mindedness, and many of our people need it sorely on these accounts.  Broad, wholesome, charitable views of men and things cannot be acquired by vegetating in one little corner of the earth all one's lifetime."[11]  Claiming Plaintiffs were more suspicious because Mr. Rincon's vehicle was registered in Laredo is another logical fallacy.

52.     Six, when those tactics were insufficient to establish a felony crime, Defendant Middleton lied.  Multiples times.  (1) Defendant Middleton claimed that Plaintiffs parked "adjacent" to Defendant Simmons at the convenience store.  Defendant Simmons, in fact, parked in front of the convenience store, while Plaintiffs parked in a parking spot on the side of the building.  (2) Defendant Middleton lied about the interaction at the gas station.  Without providing a source, Defendant Middleton claimed that "no one ever exited the vehicle while it waited on Officer Simmons to exit the business."  Except, Plaintiffs were parked on the side of the building, so Defendant Simmons could not have observed them while he was inside the convenience store purchasing his beverage.  Defendant Middleton also does not claim knowledge obtained from viewing videos of the scene, such as surveillance video from the convenience store.  Did he make this assertion up?  Did he provide conjecture as fact?  Or did he simply feel a judge did not need to know the basis for this information, because the judge might then question his basis for next claiming the occupants of the vehicle were "wait[ing] on Officer Simmons to exit the business."

---

Merriam-Webster, Inc., *Merriam-Webster.com Dictionary* (2024) https://www.merriam-webster.com/dictionary/non%20sequitur.

[11] Mark Twain (Samuel Clemens), *The Innocents Abroad or The New Pilgrims' Progress* 650 (1869), https://archive.org/details/bub_gb_fFjyA7FJorUC/page/649/mode/2up.

Defendant Middleton did not know Plaintiffs' motivations or plans.  He had not questioned them, watched a recording of them discussing their motivations, or even read their diaries (if they even have them).  He certainly did not read their minds, as that ability still firmly falls into the category of science fiction.  He could not truthfully, factually make this statement, but he still stated this opinion as a fact in his sworn testimony.

53.     (3) Defendant Middleton later in his affidavit swore that "Officer Reyes . . . observed a Hispanic male exit the blue vehicle, put on a ballistic body armor vest and then entered the driver's side of the vehicle."  When Mr. Rincon exited his parked vehicle to access his trunk, he was already wearing a (non-ballistic) vest.  He, further, only removed his binoculars from his trunk.  He did not take his vest off, put it back on, or put another vest on.  Defendant Middleton brazenly lied about this event.  (4) Even if Mr. Rincon had put on a vest—which he did not—his alleged actions would not have been "overt" as Defendant Middleton claimed because Officer Reyes had to go looking to find Plaintiffs in the out-of-the-way parking spot.

54.     (5) Immediately following Lies #3 and #4, Defendant Middleton made a very serious accusation, "Officers felt as if they were about to commit a criminal act and cause them bodily injury and/or death."  First off, one can logically deduce that if the alleged causes are made up, so too must be the alleged effect.  Defendant Middleton failed to provide factual support for his contention that the officers felt fear of imminent injury because the initial incident—Mr. Rincon overtly donning a vest—never occurred.  Secondly, this claim completely contradicts the officers' words and actions recorded at the traffic stop.  (a) The officers clearly had not discussed Plaintiffs prior to Defendant Simmons's asking for a translator at his traffic stop.  Officer Reyes admitted as much to Plaintiffs when he told them that Defendant Simmons had not communicated which crime he believed Mr. Rincon had committed.  This was also clear when Officer Reyes then

took the time to tell Defendant Simmons that he had previously stopped beside Plaintiffs because he thought they might be lost or need help, and when Defendant Simmons, in turn, responded by informing Officer Reyes that Plaintiffs had been following him earlier.  There was no previous conference that resulted in fears of a police ambush; the two officers filled each other in mid-detention.  (b) If Defendant Simmons had feared for his life, after he had parked behind Plaintiffs' vehicle to block their vehicle from leaving, he would have approached the situation tactically, such as (at a minimum) staying sheltered behind his patrol vehicle while, with his gun drawn and at the low ready, yelling at Plaintiffs to slowly exit the vehicle with their hands above their heads.  He



would not have approached the driver's side window in a non-tactical manner with his gun holstered and then presented his open profile (see white rectangles) to potentially get shot at.   Nor would Officer Reyes, if he had feared imminent bodily injury or death, have approached weaponless without cover to duck behind and with an equally open profile (see white rectangle) to also get shot at.  These officers did not fear imminent bodily injury or death.  Defendant Simmons even told Officer Reyes twice he did not care if Plaintiffs had a firearm, and Officer Reyes agreed with him the second time.  (c) Near the end of the traffic stop, Officer Reyes pulled Defendant Simmons to the side to talk.  This



conversation was not for the officers to confer on whether they still believed Plaintiffs were planning an ambush.  This conversation was so Officer Reyes could ask Defendant Simmons why he had

detained and was still detaining Plaintiffs.  Defendant Middleton perjured himself when he swore that these officers detained Plaintiffs because they feared imminent bodily injury or death.

55.     Lastly, (6) the windows of Mr. Rincon's vehicle were not "dark tinted windows," as Defendant Middleton claimed.

56.     By claiming that Plaintiffs were "stalking a uniformed police officer in his marked patrol unit while driving a vehicle *with dark tinted windows*, wearing a *ballistic proof* vest with ammunition" that Mr. Rincon allegedly "*put on*" as an "overt action" so that officers "*felt*" they might suffer imminent "bodily injury and/or death" Defendant Middleton was able to manufacture some semblance of a crime that he could argue Plaintiffs had committed.  Defendant Middleton as a "credible person" swore that this testimony was true even though he knew it was a lie.  He knew that no crime had been committed—Defendant Simmons had released Plaintiffs at Officer Reyes's urging because he did not even have a suspicion that a crime had been committed—but Defendant Middleton wanted or was instructed to charge Plaintiffs with a felony crime, so he resorted to deception to support this agenda.

57.     Seven, Plaintiffs were not charged with a crime related to officer safety.  They were not even charged with Stalking.  Plaintiffs were charged with criminal activity because they appeared suspicious, used language the officers did not like, disagreed with the officers' understanding of the law, and filmed the encounter.  The last three are protected under the First Amendment.  The first is not a crime.  Defendant Middleton still swore to a judge that, based on all of the above, Plaintiffs had committed the felony "Engaging in Organized Criminal Activity."

58.     Eight, all four affidavits were essentially identical.  Defendant Middleton did not tailor the narratives to explain how each Plaintiff had allegedly committed the crime they were charged with outside of changing which name was listed in bold as the Defendant and which were

listed as other defendants.  Defendant Middleton claimed that because Mr. Rincon allegedly "stalk[ed] a uniformed police officer in his marked patrol unit while driving a vehicle with dark tinted windows, wearing a ballistic proof vest with ammunition," Mr. Rincon and all three Plaintiffs not only obstructed or retaliated against Defendant Simmons and Officer Reyes, but also conspired to commit this crime together.  This conspiracy charge enhanced a felony of the third degree to the second degree.  Defendant Middleton never justified why he believed Plaintiffs Trimble, Rankin, and White had committed either crime outside of mentioning in passing the facts that (1) they were present in the vehicle, (2) they did not identify themselves (even though Defendant Simmons only asked for Mr. Rincon to identify himself), (3) Plaintiff Rankin filmed the encounter and questioned the officers, and (4) Plaintiff White had a history with local law enforcement.  Even without offering any flimsy justification for his belief that Plaintiffs Trimble, Rankin, and White had committed a crime, Defendant Middleton still swore "upon his oath" they had.  He further used their inclusion to justify bringing a conspiracy charge against Mr. Rincon.

59.     The Polk County District Court Judge, absent any outside knowledge of the events that occurred, trusted Defendant Middleton's deceit and signed the arrest warrants for Plaintiffs. After all, Defendant Middleton is a police detective.  A man in his position of authority ought to be a trustworthy individual.  Plaintiffs Rankin, White, Trimble, along with Mr. Rincon, were arrested and held in jail until they could bail out as a result.

60.     Defendant Middleton's affidavits for felony charges against all Plaintiffs were submitted to the Honorable Judge John Wells of the 411th District Court on February 8, 2022—four days post-incidents—with the recommended bond of $100,00.00.  Defendant Barker's affidavits for the misdemeanor charges against three of the Plaintiffs were submitted to the same judge the next day with the recommended bond of $5,000.00.

61.     In submitting these affidavits to the judge, Defendants Barker and Middleton, with either the support of or under the supervision of Police Chief Parrish, Defendant City's Manager, and/or Defendant City's City Council, knowingly perjured themselves to bring these false charges against Plaintiffs.[12]  In particular, Defendant Middleton committed Aggravated Perjury, a third-degree felony, in his attempt to bring third-degree felony charges against Plaintiffs, and Defendant Barker committed the same in his attempt to bring misdemeanor charges against Plaintiffs.[13]

62.     Defendants Middleton and Barker's perjuries violated the public trust placed in them as law enforcement officers, the entire Livingston Police Department, and Defendant City.[14] They also "abrade[d] the trust that sustains a civil society."[15]  Such egregious violations of ethics, duty, and law should not have occurred under the supervision of Defendant City's Police Chief, Matt Parrish.[16]  Yet they did.  Chief Parrish not only allowed such violations to occur, but he also approved of them.

---

[12] TEX. PENAL CODE § 37.02.

[13] TEX. PENAL CODE § 37.03.

[14] "Facts are not negotiable, or as John Adams more eloquently stated, 'facts are stubborn things.' Criminal complaints signed by arresting officers must retain all the relevant facts and accurately describe the crimes committed. When police officers have failed to do this and falsified facts, prosecutors have rightfully prosecuted them for doing so. . . . It is . . . a fraud that causes harm and negatively reflects on the integrity of the criminal justice system."

Terrence P. Dwyer, *Falsified facts by any other name are still false*, POLICE1 (Jan. 13, 2022), https://www.police1.com/patrol-issues/articles/falsified-facts-by-any-other-name-are-still-false-zPuNbX3kTHAFmJg3/.

[15] "But what is at stake here . . . is the ethical foundation of a literate society.  We write ethically when, as a matter of principle, we would trade places with our intended readers and experience the consequences they do after they read our writing. . . . The ethics of writing are clearer when writers knowingly use language . . . to disguise their own [interests]. . . . When we knowingly write in ways that we would not want others to write to us, we abrade the trust that sustains a civil society."

Williams, *supra* note 5, at 190, 191, 193.

[16] "The prevalence of ethics violations in an organization often is proportionate to the quality of its leadership. . . . Directing the actions of subordinates is an important function of effective leaders. If a supervisor notices unethical activities and fails to take immediate corrective action, that supervisor has conveyed to the officer that the behavior was acceptable. Leaders constantly must display strong moral character and not tolerate unscrupulous activities on

63.     Seven days post-incidents, Defendant City's police chief released an official statement in the form of a press release on behalf of the Livingston Police Department, a division of Defendant City.  During those seven days, Chief Parrish had every opportunity to thoroughly investigate the events that occurred: to not just read his officers' reports or his detectives' affidavits, but also to watch the BWC footage from his officers' cameras along with Plaintiff Trimble's YouTube video of Plaintiff Rankin's conversation with the Livingston police at her apartment, Plaintiff Rankin's YouTube livestream of the traffic stop, and Mr. Rincon's YouTube video of the detention with Spanish translations which had already been posted online.  Defendant City's police chief had every opportunity and resource needed to personally confirm the veracity of any information he released to the public under his name and Defendant City's authority.

64.     This are sections of what he chose to write:

During the investigation officers recognized two of the individuals in the apartment as Melanie McCrory and Brandon White. Officers determined that there was no threat to anyone and that these individuals had created the panic in the residential district to have police respond so that they could be recorded for their social media channels. . . .

While this was going on Officers recognized Brandon White in the back seat of the vehicle. Officers again, [sic] realized that that this was a staged event to record the officer's response and for individuals to post on their social media pages. Upon realizing this, officers disengaged with the individuals. . . .

On February 9th, 2022, Melanie Renee McCrory 39 of Livingston TX. And [sic] Brandon Michael White 38 of Dayton, TX. Both [sic] were arrested on warrants for

---

any level. . . .  To ensure and motivate compliance with rules, regulations, and policies, law enforcement organizations must have strict guidelines and investigate all ethics complaints. Agencies must not tolerate unscrupulous actions. They consistently must maintain clear and accurate standards in all investigations. An incident of unethical conduct that is not dealt with sends mixed messages to officers that can upset years of ethical behavior enforcement. . . .  The public image of an agency is determined greatly by the quality of the internal affairs function. How the department responds to misconduct complaints is crucial in the struggle to maintain ethical behavior and community trust."

Jay Fortenbary, *Developing Ethical Law Enforcement Leaders: A Plan of Action*, FBI LAW ENFORCEMENT BULLETIN (May 5, 2015), https://leb.fbi.gov/articles/featured-articles/developing-ethical-law-enforcement-leaders-a-plan-of-action.

Engaging in Organized Criminal Activity-Obstruction or Retaliation (F2) and False
Report to Induce Emergency Response (MA).

65.    These statements can be broken down as follows:

o   Fact 1: Plaintiffs Rankin, Trimble, White and Mr. Rincon exercised their
constitutional rights.

o   Fact 2: The Livingston Police Department knew Plaintiffs Trimble and
White frequently exercised their constitutional rights.

o   Fact 3: Defendant Officers engaged in interactions with Plaintiffs because
they felt that Fact 1 (in spite of Fact 2) was suspicious.

o   Fact 4: Defendant Officers determined on-scene that Plaintiffs had
committed no crimes and released them.  Twice.

o   Fact 5: Defendant Officers later decided, based on Plaintiffs' status alone
(Fact 2), that they could be charged with crimes despite Fact 4.

o   Fact 6: Plaintiffs were clearly treated differently from other members of
society (see Fact 5) because of Facts 1 and 2.

o   Fact 7: Defendant City's Chief of Police proclaimed Facts 5 and 6 to the
public in his official statement.

o   Fact 8: Defendant City did not retract or even apologize for Fact 7, nor did
Defendant City stop Chief Parrish or his officers from submitting charges
against Plaintiffs to the District Attorney's office.

o   Fact 9: Defendant City clearly *approved* of Chief Parrish's public statement
and of the charges his officers brought against Plaintiffs (see Fact 8).

o   Fact 10: Defendant Officers, Chief Parrish, and Defendant City clearly
violated Plaintiffs' First, Second, Fourth, and/or Fourteenth Amendment
rights.

66.    The commanding officer over an entire police department supported his officers

bringing felony charges against Plaintiffs even though they all knew no crimes had been

committed.  Why?  Because Plaintiffs "record[ officer interactions] for their social media

channels."  Restated, all that the affidavits and the press release show is that these police officers

find it disturbing when someone else films them.  Why else would they continually mention in

their affidavits or press releases—as if it was somehow suspicious behavior—that these individuals were filming them?  (Especially in this day and age.)[17]

67.     Defendants, part of the dancing Livingston Police Department, intentionally and knowingly harmed Plaintiffs by unlawful acts in retaliation for their status as independent journalists and activists.

### *A Tale Believed*

68.     Plaintiff White fully incorporates, by reference, pages 15-19, paragraphs 55-72, for the section "A Tale Believed," of *Plaintiff Matthew Rankin's First Amended Complaint and Demand for Jury Trial*, filed at Dkt. No. 4.

69.     Back in 1775, Delegate Patrick Henry openly challenged the Second Virginia Convention with the following words: "Is life so dear, or peace so sweet, as to be purchased at the price of chains and slavery? Forbid it, Almighty God! I know not what course others may take; but as for me, give me liberty or give me death!"[18]

70.     Today, just telling a police officer he does not know the law he swore to uphold and sharing that comment publicly can land a person in jail for over a month on a $105,000.00 bond followed by years of criminal prosecution for a felony charge of the second degree with the risk of two to twenty years in prison and a fine of up to $10,000.00.

71.     This country's Founding Fathers fought and died so that all Americans would be free to speak their thoughts without fear of governmental retaliation.

---

[17] Snapchat. TikTok. Instagram. Facebook. YouTube. Vimeo. X. Tumblr.

[18] Patrick Henry, *"Give Me Liberty or Give Me Death!"*, Colonial Williamsburg (Mar. 3, 2020), https://www.colonialwilliamsburg.org/learn/deep-dives/give-me-liberty-or-give-me-death/.

72.     Do those who have sworn to preserve, protect, and defend that very law still believe in their oath?  In that freedom?  In morality at all?

73.     Defendant Officers' and Defendant City's actions are inexcusable.   Plaintiff Brandon Michael White has been harmed.  He seeks redress in this matter.

### COUNT I
### VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (First Amendment - Retaliation)

74.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

75.     This First Amendment retaliation claim is asserted against all Defendant Officers as they all actively participated in initiating the arrest and prosecution of Plaintiff White simply because they did not agree with Plaintiff's viewpoints, namely that he is a First Amendment auditor, that he verbally challenges the officers' conduct, or that he films the officers performing their public duties—all conduct which the First Amendment protects.

76.     Defendants knew that Plaintiff was engaged in protected First Amendment activity; their conduct of seeking and initiating the arrest and prosecution of Plaintiff White without any lawful basis resulted in injuries that would chill a person of ordinary firmness from continuing to engage in that activity; and the Defendant Officers' adverse actions were substantially motivated against his exercise of constitutionally protected conduct.

### COUNT II
### VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (Fourth Amendment – Unlawful Seizure)

77.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

78.     Plaintiff White asserts that Defendant Simmons lacked any lawful authority to initiate a traffic stop of Mr. Rincon and the Plaintiffs on February 4, 2022, while they were on private property.  Defendant Simmons then unreasonably prolonged the traffic stop in further violation of Plaintiff White's rights guaranteed under the Fourth Amendment.

**COUNT III**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983**
**(Fourth Amendment – Unlawful Arrest)**

79.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as is fully set forth herein.

80.     Plaintiff White asserts this claim against Defendants Barker and Middleton for submitting arrest affidavits that they knew were false or would have known they were false had they not recklessly disregarded the truth.  Defendants Barker and Middleton supplied false affidavits with the specific intent of misleading the judge and permitting the unlawful arrest of Plaintiff despite lacking any probable cause or other lawful basis to arrest Plaintiff.

81.     These Defendants violated clearly established law as the Constitution prohibits an officer from making perjurious or recklessly false statements in support of a warrant.  This is especially true here, where the Defendants knew or had reason to know that they supplied information that materially misled a judge on the basis of a finding of probable cause.

82.     Had Defendants Barker and Middleton provided truthful information in their affidavits, they would have clearly failed to establish probable cause to seek the arrest of Plaintiff.

**COUNT IV**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983**
**(Fourth Amendment – Malicious Prosecution)**

83.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

84.     Plaintiff White asserts this claim against Defendants Barker and Middleton who initiated criminal prosecution against Plaintiff without any lawful basis.  These Defendants knew they lacked probable cause or legal justification to initiate prosecution but did it anyway.  The false charges were terminated in favor of Plaintiff White.

## *MONELL* LIABILITY

85.     Plaintiff White repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

86.     The individual Defendants at all times relevant were City of Livingston police officers.

87.     Defendant City maintains a spoken or unspoken policy, practice or custom to permit the unlawful arrests and prosecutions of people they believe are engaged in First Amendment conduct without fear of investigation or discipline.

88.     Defendant City knew that Plaintiff has a First Amendment right to engage in auditor activities.  They provide training informing their officers of this right.  However, Defendant City repeatedly fails to hold its officers accountable for violating the rights of people they assume are auditors.

89.     Defendant Officers knew they would face no repercussions for conspiring to initiate the false arrest and prosecution of Plaintiff White.  They were right.  The City and its policymakers ratified the officers' conduct when the Police Chief published an official statement declaring that the recklessly false statements made in affidavits by his officers were true.

90.     The City of Livingston acted with deliberate indifference, and it was foreseeable that permitting the custom, policies, and practices would violate Plaintiff's constitutional rights. Defendant City is directly responsible for the individual Defendants' conduct described herein.

## DAMAGES

91.    **Actual damages.**  Defendants' acts or omissions were a proximate cause and the moving force behind actual damages suffered by Plaintiff White, and the Defendants should be held jointly and severally liable.

92.    **Punitive/Exemplary    Damages    against    individual    defendants.** Punitive/exemplary damages are recoverable under Section 1983 when the conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.  Here, the conduct of the Defendant Officers was done with evil motive or intent, or at the very least, was reckless or callously indifferent to the federally protected rights of Plaintiff.  As such, Plaintiff White requests punitive and exemplary damages from the individual officers to deter this type of conduct in the future.

93.    Nominal Damages.

94.    Prejudgment and post judgment interest.

95.    Costs of court.

96.    Reasonable and necessary attorney's fees incurred by the Plaintiff through trial, and reasonable and necessary attorney's fees that may be incurred by Plaintiff for any post-trial proceedings, or appeal, interlocutory or otherwise, pursuant to 42 U.S.C. § 1988, and as otherwise permitted by law.

97.    Plaintiff seeks unliquidated damages in an amount that is within the jurisdictional limits of the Court.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Brandon Michael White prays Defendants be cited to appear and answer herein; and upon final trial hereof the Court grant Plaintiff declaratory and injunctive relief;

and judgment be entered in favor of Plaintiff awarding from Defendants actual damages, exemplary damages, pre-judgment interest at the legal rate; interest on said judgment at the legal rate; attorney fees; costs of court; and such other and further relief, both general and special, at law and in equity, to which Plaintiff is justly entitled.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury of all issues so triable, pursuant to Fed. R. Civ. P. 38(b).

Respectfully submitted,

**GRABLE GRIMSHAW PLLC**

*/s/ Brandon J. Grable*
**BRANDON J. GRABLE**
Texas State Bar No. 24086983
brandon@g2.law
1603 Babcock Road, Suite 280
San Antonio, Texas 78229
Telephone: (210) 963-5297
Facsimile: (210) 641-3332
**COUNSEL FOR PLAINTIFFS**