THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| **MATTHEW RANKIN,** | § | |
| **MELANIE TRIMBLE, and** | § | |
| **BRANDON MICHAEL WHITE,** | § | |
| *Plaintiffs,* | § | |
| | § | |
| **vs.** | § | |
| | § | **CIVIL ACTION NO.: 9:24-CV-00027** |
| **CITY OF LIVINGSTON,** | § | |
| **DETECTIVE KALEB BARKER,** | § | **JUDGE MICHAEL J. TRUNCALE** |
| **SERGEANT RONNIE BOGANY,** | § | |
| **OFFICER SCOTT PASKE,** | § | |
| **DETECTIVE LEON MIDDLETON, and** | § | |
| **OFFICER CHRISTOPHER SIMMONS,** | § | |
| *Defendants.* | § | |
| | § | |

---

**SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

---

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ................................................................................. iii

I.      INTRODUCTION ...................................................................................1

II.     JURISDICTION AND VENUE ..............................................................2

III.    PARTIES .................................................................................................2

IV.     STATEMENT OF FACTS ......................................................................4

   First Incident .............................................................................................4

   Second Incident .........................................................................................5

   A Tale Told ..............................................................................................10

   A Tale Believed ........................................................................................26

COUNT I:       First Amendment – Retaliation...............................................27

COUNT II:      Fourth Amendment – Unlawful Seizure .................................28

COUNT III:     Fourth Amendment – Unlawful Arrest ...................................28

COUNT IV:      Fourth Amendment – Malicious Prosecution .........................29

*MONELL* LIABILITY ................................................................................29

DAMAGES.............................................................................................................30

PRAYER FOR RELIEF .........................................................................................30

# TABLE OF AUTHORITIES

*Page(s)*

**Federal Constitutional Provisions**

U.S. Const. amend. I.............................................................................................. 1, 2, 27, 28

U.S. Const. amend. II ..................................................................................................... 1

U.S. Const. amend. IV ........................................................................................... 2, 28, 29

U.S. Const. amend. XIV ................................................................................................. 2

**Federal Statutes**

28 U.S.C. § 1331 ............................................................................................................ 2

28 U.S.C. § 1391(b)(2) .................................................................................................. 2

42 U.S.C. § 1983............................................................................................................ 2, 3

**Federal Rules**

Fed. R. Civ. P. 38(b) ..................................................................................................... 2

**State Statutes**

Tex. Gov't Code § 2.102 ............................................................................................. 13

Tex. Penal Code § 38.02 ........................................................................................... 8, 9, 12

# I.
## INTRODUCTION

1.      MATTHEW RANKIN, MELANIE TRIMBLE, and BRANDON MICHAEL WHITE bring this civil action for damages against the CITY OF LIVINGSTON, DETECTIVE KALEB BARKER, SERGEANT RONNIE BOGANY, OFFICER SCOTT PASKE, DETECTIVE LEON MIDDLETON, and OFFICER CHRISTOPHER SIMMONS for retaliatory conduct in response to Plaintiffs exercising their First and Second Amendment rights, including lawfully carrying a handgun in compliance with state and federal laws, filming police activity, contradicting police officers' understanding of the law; refusing to submit to unlawful searches without a search warrant, probable cause, or even reasonable suspicion; and refusing to comply with orders contrary to state law.  This retaliatory conduct includes the unlawful arrest of Plaintiffs Trimble and White by KALEB BARKER, RONNIE BOGANY, SCOTT PASKE, LEON MIDDLETON, CHRISTOPHER SIMMONS, and/or other CITY OF LIVINGSTON police officers at the direction or under the supervision of MATT PARRISH; and the issuance of the unlawful arrest warrants for Plaintiff Rankin and Mr. Rincon by which they were arrested in San Antonio.  It also includes the retaliatory prosecution following all of those arrests.  These incidents clearly violated Plaintiffs' rights afforded to them under the United States Constitution.  Plaintiffs were harmed and seek recovery in this suit.

2.      Plaintiffs allege that the **CITY OF LIVINGSTON** and its policymakers, City Manager **BILLY S. WIGGINS** ("Wiggins"), Chief of Police **MATT PARRISH** ("Chief Parrish"), Mayor **JUDY B. COCHRAN** ("Cochran"), and the City of Livingston City Council Members: Alan Cook, Elgin Davis, Bobby Jackson, and Raymond Luna (collectively referred herein as the "Policymakers") not only failed to uphold the laws of the land and to abide by the Constitution of the United States of America, but rather allowed the officers of the Livingston

Police Department to brazenly operate outside the bounds of law and conscience.   These Policymakers, specifically the city manager, Wiggins; mayor, Cochran; and the police chief, Chief Parrish, had a duty to implement and/or enforce policies, practices, and procedures for the Livingston Police Department that respected Plaintiffs' constitutional rights.   They failed. Plaintiffs were harmed and seek answers and compensation in this lawsuit for their damages.

3.      Plaintiffs hereby demand a trial by jury of all issues so triable, pursuant to Fed. R. Civ. P. 38(b).

## II.
## JURISDICTION AND VENUE

4.      This is a civil rights action in which the Plaintiffs seek relief for the violations of their rights secured by 42 U.S.C. § 1983 and the First, Fourth, and Fourteenth Amendments.

5.      Jurisdiction of this Court is found upon 28 U.S.C. § 1331.

6.      Venue is properly laid in the Eastern District of Texas under 28 U.S.C. § 1391(b)(2).  The events that gave rise to this lawsuit primarily took place in Livingston, Texas, in Polk County.

## III.
## PARTIES

7.      Plaintiff MATTHEW RANKIN ("Plaintiff Rankin") is a law-abiding citizen of the United States and a resident of the City of Corpus Christi, County of Nueces, State of Texas.

8.      Plaintiff MELANIE TRIMBLE ("Plaintiff Trimble") (formerly Melanie McCrory) is a law-abiding citizen of the United States and a resident of the City of Livingston, County of Polk, State of Texas.

9.      Plaintiff BRANDON MICHAEL WHITE ("Plaintiff White") is a law-abiding citizen of the United States and a resident of the City of Dayton, County of Liberty, State of Texas.

10.     Defendant KALEB BARKER ("Defendant Barker") was at all pertinent times a detective employed by the City of Livingston and was at all pertinent times acting under color of state law in the performance of his duties as a Livingston police officer.

11.     Defendant RONNIE BOGANY ("Defendant Bogany") was at all pertinent times a sergeant employed by the City of Livingston and was at all pertinent times acting under color of state law in the performance of his duties as a Livingston police officer.

12.     Defendant SCOTT PASKE ("Defendant Paske") was at all pertinent times a police officer employed by the City of Livingston and was at all pertinent times acting under color of state law in the performance of his duties as a Livingston police officer.

13.     Defendant LEON MIDDLETON ("Defendant Middleton") was at all pertinent times a detective employed by the City of Livingston and was at all pertinent times acting under color of state law in the performance of his duties as a Livingston police officer.

14.     Defendant CHRISTOPHER SIMMONS ("Defendant Simmons") was at all pertinent times a police officer employed by the City of Livingston and was at all pertinent times acting under color of state law in the performance of his duties as a Livingston police officer.

15.     Defendant CITY OF LIVINGSTON ("Defendant City") is a political subdivision of the State of Texas, acting under color of state law, and is a person for the purposes of a 42 U.S.C. § 1983 action.  Defendant City is responsible for the policies, practices, and procedures of its Police Department and individual officers.  Defendant City is also responsible for the policies implemented, endorsed, and enforced by its Policymakers, the ordinances passed by its Councilmembers and Mayor, and even the actions and statements of its Police Chief.

16.     Each and all of the acts of Defendant Officers alleged herein were committed by said Defendants while acting within the scope of their employment with Defendant City, including

Defendant City's Police Department.  These Defendant Officers committed each and all of the acts herein despite their knowledge that they were engaging in unlawful and unconstitutional acts. Yet, they did them anyway, knowingly, recklessly, intentionally, wantonly, callously, purposely, purposefully, sadistically, cruelly, deliberately, and/or with deliberate indifference, gross negligence, and/or reckless disregard.

## IV.
## STATEMENT OF FACTS

***First Incident***

17.     On February 4, 2022, Plaintiffs Matthew Rankin and Brandon White gathered at Plaintiff Melanie Trimble's apartment to decorate posters for a peaceful protest they intended to stage the next day at a nearby city.

18.     After exchanging pleasantries with everyone inside, Plaintiff Rankin returned to his vehicle to grab their supplies, including posters, from his trunk.  There would be nothing remarkable about this little jaunt had he not been legally openly carrying his firearm at the time. What some might consider unusual was that Plaintiff Rankin had a silencer attached to his handgun.[1]

19.     Plaintiff Trimble's neighbor saw the holstered handgun, panicked, and called the cops.

20.     A couple of minutes later, officers from the Livingston Police Department pulled their patrol vehicles up to the curb outside.  Defendants Sergeant Ronnie Bogany and Officer Scott Paske approached Plaintiff Trimble's apartment; Defendant Bogany knocked on her door.

---

[1] Plaintiff Matthew Rankin legally possessed this suppressor in compliance with all federal and state laws.

21.     These officers demanded to see the paperwork for the firearm.  Rankin agreed to do so if the officers thought he had committed a crime.  They did not.  Instead, the officers attempted to contact the landlord to see if they could obtain permission to remove the Plaintiffs from the apartment.  They also threatened to tow Rankin's vehicle.  These attempts were unsuccessful.

22.     Defendant Detective Kaleb Barker eventually made the scene. He told Plaintiff Rankin that he was just there to keep the peace.  Plaintiff Rankin expressed concern to Barker that Defendant Paske had made threats about getting Plaintiff Trimble and her children kicked out of her home for not showing his paperwork.  Defendant Barker informed them that he was not a supervisor and could not help with that, but he could get them the information to file a complaint. Rankin told him he might see him out later with a camera watching.  With a laugh, Defendant Barker told them, "Somebody's got to watch us.  We can't watch ourselves."  After providing his name and joking about being unable to golf, the detective wished them a good day and left.

23.     Defendants reported to dispatch that "nothing criminal happened."

24.     Plaintiffs, free to resume their day, finished making their signs.

***Second Incident***

25.     After their visit to the neighboring city, Plaintiffs returned to Livingston.  The rest of the day had gone quietly, and Plaintiffs were now looking for a little excitement.  Accordingly, Plaintiffs Trimble, White, and Rankin met up with Mr. Rincon to go driving around Livingston looking for entertainment.

26.     While parked in the Livingston Walmart parking lot, Plaintiffs noticed a Livingston patrol vehicle rapidly leaving the parking lot and heading northwest on U.S. Highway 190, going faster than the 45-mph speed limit.  Operating under the assumption that the officer—at that

speed—must be heading out for a call for service, the Plaintiffs decided to follow the officer to see what was happening.

27.    Now Plaintiffs are the sort of people who start conversations.  Mr. Ismael Rincon runs the YouTube channel "Corners News"; he describes himself as a "Constitutional Rights Exerciser/Defender" and "Human Rights Exerciser/Defender."  Plaintiff Matthew Rankin runs the YouTube channel "hbomatt"; he describes himself as a "Constitutional activist and journalist focused on 2nd amendment rights and police accountability."  Plaintiff Brandon Michael White runs the YouTube channel "America First"; he describes his mission statement as follows:

> My goal is to effect as much change as I can, with as much civil disobedience as the law allows, and I deem appropriate. As James Baldwin is quoted "Freedom is not something anybody can be given. Freedom is something people take, and people are as free as they want to be." A few years ago we the people were quoting Benjamin Franklin about Liberty and Safety. We are again allowing our Liberties to be constrained for Safety and this time we are selling it."[2]

Plaintiff Melanie Trimble runs the YouTube channel "Blue The Blue Line Watcher"; she describes her mission statement as follows: "Our Veterans fought for OUR Freedom and Rights, and OUR PUBLIC SERVANTS WILL BE EDUCATED and HELD ACCOUNTABLE."

28.    They are each different individuals with differing motivations and methods. They film police officers performing their duties as public servants under the public's purview. This conduct is an established First Amendment-protected activity.

29.    Plaintiffs followed the Livingston police officer intent on filming police activity. To the Plaintiffs' surprise and disappointment, the police officer only stopped at the Stripes convenience store to buy a beverage before leaving again.  Accordingly, the Plaintiffs headed back into Livingston proper.

---

[2] America First, YOUTUBE (accessed on Dec. 19, 2023), https://www.youtube.com/@AmericaFirst77000.

30.     Plaintiffs returned to City Hall, but even a few laps around the building revealed no new police activity.  Plaintiffs drove around Livingston again before returning to circle City Hall and the police department.

31.     Mr. Rincon parked out front of the First Community Financial Group to retrieve his binoculars from the trunk.  As he did so, a police officer approached Plaintiffs' parking spot in his patrol vehicle.  As, the police officer—who did *not* have his lights or siren on—passed behind Plaintiffs and pulled into the parking spot next to them.  Mr. Rincon backed out and headed down the street.  He then parked—between the lines—in a spot at the First National Bank of Livingston next to City Hall.

32.     A different officer pulled his patrol vehicle with its lights on in behind Plaintiffs, blocking their vehicle in.  The officer, Defendant Christopher Simmons, then initiated either a traffic stop in a private parking lot or an investigative detention.  Accordingly, the Plaintiffs recorded the police stop on their cameras or phones while Defendant Simmons (presumably) did the same on his body-worn camera (BWC).

33.     Defendant Simmons approached the plaintiff's car's driver's side window and calmly introduced himself as Officer Simmons with the Livingston Police Department.

34.     Simmons tried to talk to Mr. Rincon, but could not understand Spanish.  Plaintiff White asked the officer if he was being detained or could step out of the car.  The officer maintained his position, standing with one arm braced against Plaintiff White's door, a flashlight pointed inside the driver's side window, but refused to answer.  Mr. Rincon and Plaintiffs Rankin, White, and Trimble were not free to leave the scene.

35.     At this point, Officer Tito Reyes made the scene.  Defendant Simmons told the officer that the driver did not speak English.  He concluded with, "So I'm trying to find out why they're here, what they're doing, why are they being suspicious."

36.     Officer Reyes approached the vehicle with a, "Hello. How are you all doing?" and a friendly wave.  Mr. Rincon told him in Spanish that he was doing well, but he did not know what Defendant Simmons wanted.  Officer Reyes introduced himself in Spanish by name and provided the name of the police department he was with.  Officer Reyes switched back to speaking to Defendant Simmons.  "And, so, I guess they're recording."  He then asked Mr. Rincon (in English), "Do you have a weapon on you, sir?"  Before Mr. Rincon could respond, Defendant Simmons interjected, **"I don't care if he has a weapon,** but why are they following the police around?  Why are they acting suspicious?  Who are they?"

37.     Defendant Simmons told Officer Reyes he wanted Mr. Rincon's driver's license.[3] Officer Reyes translated this command.  Mr. Rincon asked Officer Reyes in Spanish why and wanted to know what the nature of the encounter was.   Defendant Simmons told Officer Reyes that they were suspicious.  He then claimed, "And I can stop anybody that's acting suspicious." Mr. Rincon asked in Spanish what crime that would be.  Plaintiff White asked who determined what was "suspicious."  Defendant Simmons ignored Plaintiff White.

38.     Officer Reyes asked Defendant Simmons what was going on.  What did he want? Defendant Simmons answered, "I want his ID.  Texas law says if you're suspicious in a suspicious

---

[3] At the time of the incident, Tex. Penal Code § 38.02 only required an individual to identify if he was "lawfully arrested."  Otherwise, an individual could not provide an "intentionally false or fictitious name, residence address, or date of birth if he was "lawfully arrested," "lawfully detained," or if an officer believed the individual was "a witness to a criminal offense.

place, I can get your ID.  I can ID you.  I can stop you.  I can find out what you're doing."[4]  He continued, "So that's what I want to know.  What are you doing?"

39.     Mr. Rincon asked if he had committed a crime.  Officer Reyes responded that they were suspicious.  Mr. Rincon asked whether they were suspected of committing a crime.  Officer Reyes did not and directed them to Defendant Simmons.  Defendant Simmons, who had been quietly listening to a conversation he could not understand, interrupted again.  "Right now you're failing to ID, so I'm about to arrest you for that."

40.     Plaintiff Rankin interjected with expletives, asking Defendant Simmons if he had ever heard of 38.02.  He then explained that one only must give ID under arrest.  Defendant Simmons disagreed.  He then continued demanding Mr. Rincon's ID while Plaintiff White continued providing the officer with the section number for the relevant Texas code.

41.     At this point, Officer Reyes asked everyone to give him a second and pulled Defendant Simmons to the side to talk to him.  Defendant Simmons went, protesting that he just wanted a license.  Defendant Simmons accused Plaintiffs of following him around all night.  Officer Reyes reminded him of their training on America First and Mr. White.

42.     Defendant Simmons returned to the driver's side window.  "Okay, so again.  You're a suspicious person.  I need your ID."  After additional back and forth with the Plaintiffs, Officer Reyes again pulled Defendant Simmons to the side.  This time, Reyes asked, **"What is your reasonable suspicion?"**  "I just told you.  They've been following me around town," Defendant Simmons replied.  "And they could very well be somebody watching us to have another team commit a crime."  Officer Reyes asked, "What have you determined right now?  **We already know**

---

[4] The Livingston Police Department clearly provided substandard training to their officers or neglected to verify that their officers had received adequate training before placing their officers in positions of authority to enforce the law. This statement is NOT true under Texas law.  Texas is NOT a stop and ID state.

**who they are and what they're doing here."**  "Do we know who they are?" Defendant Simmons asked.  Officer Reyes told him, "Yeah, Brandon White.  Mr. White, the America First.  That's what they call him in the media." "Oh," Defendant Simmons said. "So, we do know who they are then.  Okay."  Officer Reyes asked him what he intended to do now; could they let them go? "Yeah.  I didn't realize that was Mr. White back there.  Who's Mr. White?  Which one?"

43.    The officers approached the driver's side window again, and Officer Reyes pointed to Plaintiff White sitting behind the driver.   "Mr. Popular."   Defendant Simmons loudly proclaimed, "Now I know who you are, so I will be happy to let you go."

44.    Plaintiffs were detained for over fifteen minutes by an officer who lacked particularized reasonable suspicion—let alone probable cause—to stop them in the first place. This should have been the end of it.  It was not.

*A Tale Told*

45.    Defendant Officers Detective Kaleb Barker, Sergeant Ronnie Bogany, Officer Scott Paske, John Doe Officers, Detective Leon Middleton, and Officer Christopher Simmons with other officers from Defendant City's police department, including Police Chief Matt Parrish, conspired as members of the Livingston Police Department to intentionally and knowingly harm Plaintiffs by unlawful acts in retaliation for their status as independent journalists and activists.

46.    Together, these Defendant Officers determined to take the above events by lying and omitting information essential for a probable cause determination so they could obtain arrest warrants against Plaintiffs for misdemeanor and felony charges.

47.    Before the Defendant Officers could bring these charges, they first had to discover the identities of the individuals involved.  They eventually confirmed the identities of three people present for the first incident and all four individuals present for the second encounter.

48.     For the first incident, Defendant Barker, with the help of Defendant Officers and under the direction or supervision of Police Chief Parrish, drafted an affidavit for the misdemeanor offense "False Report to Induce Emergency Response."

49.     To claim a crime where none existed, Defendant Barker had to first toss out the totality of circumstances.  After all, Defendants Bogany, Paske, Baker, and all the other John Doe Officers on scene knew that Plaintiffs had not committed a crime.  He then had to do away with any facts that could conceivably dispel probable cause.  Finally, he had to use a number of writing tactics including slant to transform a benign misunderstanding into criminal activity.

50.     One, to accuse Plaintiffs of wasting police resources by making a false report, he had to exclude the fact that the police knew who had called 9-1-1.  The first caller Megan Ross, a neighbor of Plaintiff Trimble's, had provided the officers with her name, address, and phone number when she called asking the officers to come investigate.  The second person who called was Ms. Ross's self-described baby daddy who later admitted that he never saw Plaintiff Rankin's gun merely listened to what his girlfriend told him.

51.     Two, Defendant Barker selected facts to include out of context to create a picture of behavior that seemed suspicious:

> Affiant would show White, McCrory, and the unidentified male immediately began filming Sergeant Bogany and Officer Paske with their cell phones. Affiant would show another cell phone was observed propped up in a window that faced the front door where Sergeant Bogany and Officer Paske were standing.  Affiant would show Sergeant Bogany began an investigation and attempted to identify the individuals in the residence however they refused to comply with his demand to identify themselves. Affiant would show Rankin was the suspect in possession of the handgun and also refused to show any paperwork in regards to the silencer on his handgun which was requested by Officer Paske.

52.     Defendant Barker could have included any number of details: Plaintiffs were gathered in Plaintiff Trimble's living room making posters when the officers arrived.  Defendants

Bogany and Paske filmed Plaintiffs on their BWC. Plaintiffs informed the officers—and provided laws and cases in support—that they legally could not demand they identify or require Plaintiff Rankin to show the officers his NFA paperwork absent the belief a crime had been committed. Defendant Paske threatened to tow Plaintiff Rankin's truck unless he exited the apartment. Defendants Bogany and Paske tried to convince the landlady to criminally trespass Plaintiff Rankin, and she refused. Plaintiff Trimble's neighbor and her boyfriend refused to file a complaint after the officers finished investigating. He did not include any of these details.

53. Defendant Barker instead narrowed in on two sets of facts: Plaintiffs filmed a police interaction initiated and continued by the police officers, and Plaintiffs did not comply with Defendants' unlawful commands made after they realized no crime had been committed.[5] This narrowing of facts further deprived the magistrate judge of information he should have been able to consider before he agreed to sign the arrest warrant.

54. Three, Defendant Barker included imagery that portrayed Plaintiffs' actions in a suspicious light. The imagery of a cell phone "observed propped up in a window" filming where the officers stood suggested Plaintiffs were covertly watching the officers. The cell phone in the window was not a phone that had been converted into a cloud security camera months ago and left there to film a long, long time ago before the officers arrived. No, according to Defendant Barker,

---

[5] Both sets of facts should raise concerns with this Court. The first, because it clearly shows that Defendant Officers believed filming police officers should be viewed as a suspicious activity—not protected First Amendment speech. The second, because it clearly shows that Defendant Officers lacked the basic training needed to know even a simple Texas law like TEX. PENAL CODE § 38.02: "(a) A person commits an offense if he intentionally refuses to give his name, residence address, or date of birth to a peace officer who has lawfully *arrested* the person and requested the information. (b) A person commits an offense if he intentionally *gives a false or fictitious* name, residence address, or date of birth to a peace officer who has: (1) lawfully arrested the person; (2) lawfully detained the person; or (3) requested the information from a person that the peace officer has good cause to believe is a witness to a criminal offense." As Plaintiffs were only detained, they were not required to identify themselves. Merely, if they *chose* to identify, they could not provide a knowingly false identity.

they were trying to surveil the officers with a (poorly) hidden camera.  This carefully crafted imagery created further doubt in the reader's mind about Plaintiff's intentions.

55.     Four, Defendant Barker used strategic word choice to make the Plaintiffs' actions seem insurrectionary and the officers' common place.  The officers' actions are described with standard law enforcement terminology such as: "observed," "began an investigation," "attempted to identify," "demand to identify," and "requested," while Plaintiffs "refused to comply" and Plaintiff Rankin "refused to show."  "Refused" is a strong word with connotations like "hindered," "rebuffed," and "spurned" and is used in this instance to suggest an insurgent attitude.[6]  Defendant Barker knowingly lied and created a picture of harassed police officers dealing with recalcitrant suspects.

56.     Five, Defendant Barker used passive verb choice to shift the blame onto Plaintiff Rankin.  Instead of honestly writing that Ms. Ross called the cops on her neighbor's guest, Defendant Barker used the wording "due to the actions of" to shift the blame to Plaintiff Rankin.[7]  This passive tense moved the sentence structure from the more honest format *Person 1 performed Action 1* to *Person 2's actions caused Person 1 to perform Action 1*.  This sentence structure unfairly shifted the blame onto Plaintiff Rankin.  According to Defendant Barker, it was Plaintiff Rankin's fault Ms. Ross called 9-1-1 when no crime had been committed.  Since none of the Plaintiffs had called the cops, this was the only way Defendant Barker could accuse any of the Plaintiffs with the crime.

---

[6] Of particular note, Defendant Barker claimed that Plaintiff Rankin refused to show his paperwork, which inquiry violates TEX. GOV'T CODE § 2.102.  Moreover, Rankin made abundantly clear to the officers that he would provide his paperwork if they reasonably suspected he had committed a crime.  The officers could not even dredge up enough facts to support a suspicion—let alone probable cause—at the scene.  Defendant Barker intentionally excluded those facts.

[7] "Affiant would show *due to the actions of* Rankin this agency received two 9-1-1 calls from individuals who perceived his actions as alarming."

57.     Six, all three affidavits were identical.  Defendant Barker did not tailor the narratives to explain how each Plaintiff had allegedly committed the crime they were charged with outside of changing the name in bold listed as the Defendant.  Defendant Barker claimed that because Plaintiff Rankin openly carried his handgun "this agency received two 9-1-1 calls from individuals who perceived his actions as alarming."  He never justified why he believed that Plaintiffs Trimble and White had committed the crime outside of mentioning in passing the facts that (1) they were present and (2) they filmed the encounter with the police.  Even without offering any flimsy justification for why he believed that Plaintiffs Trimble and White had committed a crime, Defendant Barker still swore "upon [his] oath" that they had.

58.     Defendant Barker crafted a narrative that made the Plaintiffs' actions out to be alarming, suspicious, and generally disruptive to the rule of law or at least to poor officers trying to complete their investigations while *inferring* that the Plaintiffs are guilty of committing the offense "False Report to Induce Emergency Response."  He then swore based on those facts that Plaintiffs "did knowingly initiate a report of a present offense . . . and the defendant knew that said report was false or baseless and would ordinarily cause action by an official agency organized to deal with emergencies, namely, the Livingston Police Department."

59.     The Polk County District Court Judge, absent any outside knowledge of the events that occurred, trusted Defendant Barker's malicious and intentional deceit and signed the arrest warrants for Plaintiffs.

60.     "Somebody's got to watch us.  We can't watch ourselves," indeed.[8]

61.     In the same way, with the help of Defendant Officers and under the direction or supervision of Police Chief Parrish, Defendant Detective Leon Middleton drafted an affidavit for

---

[8] Defendant Barker's words to Plaintiff Rankin, when Plaintiff Rankin informed him that he might see them filming police activity in the area at a later time.

the second incident claiming that Plaintiffs White, Trimble, Rankin and Mr. Rincon "Engage[ed] in Organized Criminal Activity."

62.     Like Defendant Barker, to claim a crime where none existed, Defendant Middleton had to first toss out the totality of circumstances.  After all, Defendant Simmons and Officer Reyes knew that Plaintiffs had not committed a crime.  Defendant Middleton also had to do away with any facts that could conceivably dispel probable cause and to use a number of writing tactics including slant; logical fallacies; and even lying to transform a series of unrelated events into criminal activity.

63.     One, to accuse Plaintiffs of engaging in organized crime, Defendant Middleton had to exclude the fact that no crime had been committed.  Defendant Simmons detained Plaintiffs with the assistance of Officer Reyes to investigate a situation he believed to be suspicious—not criminal, just suspicious.   After learning the identity of Plaintiff White—and presumably determining what Plaintiffs were doing (filming police activity)—at the urging of Officer Reyes, Defendant Simmons let Plaintiffs leave.  Any reasonable suspicion he might have had prior to the traffic and/or investigative stop was dispelled by the time the stop ended.  Based on the totality of circumstances, Defendant Simmons knew no crime had been committed.  How could Defendant Middleton persuade a judge that Plaintiffs had engaged in organized criminal activity if he admitted that Defendant Simmons had previously determined no crime had been committed? ("Now I know who you are, so I will be happy to let you go.")

64.     Two, Defendant Middleton tried to cleverly hide that he had no personal knowledge of the validity of any of the information to which he was swearing.  He wrote, "Affiant would show that on February 4th, 2022, *his agency* investigated the offense. . . ."  This sentence sidestepped the matter of personal knowledge.  If Defendant Middleton had bluntly written, "I am

swearing this affidavit based on third-party knowledge," the judge would have rightly questioned why either Defendant Simmons or Officer Reyes, as the investigating officers (and the only officers on scene), had not written the affidavits.  Defendant Middleton also failed to provide any sources for his information.  Nowhere in his affidavit did Defendant Middleton specify whether he spoke with Defendant Simmons and Officer Reyes, watched body worn camera or dash camera footage, read incident reports, or just spoke to another officer in the department.  His level of knowledge of the incidents could have affected how much trust the judge placed in the facts presented.  Accordingly, Defendant Middleton tried to minimize this information.

65.     Three, like Defendant Barker, he presented facts out of context to create a picture of suspicious behavior:

> Affiant would show that Officer Chris Simmons . . . observed a small 4 door blue car stalking him as he drove his marked patrol unit.  Affiant would show Officer Simmons stopped at a local convenience store and the vehicle stopped . . . in the parking lot. . . . Affiant would show no one ever exited the vehicle. . . . Affiant would show Officer Simmons exited the business, entered his patrol unit and the vehicle continued to stalk Officer Simmons as he exited the parking lot.  Affiant would show the suspect's vehicle later turned off and a short time later, it was circling the police department. . . .
>
> Affiant would show Officer Simmons was able to obtain the license plate of the vehicle bearing Texas MRB1920.  Affiant would show the vehicle registration was out of Laredo, Texas. . . .
>
> Affiant would show the driver of the vehicle pretended he did not speak or understand the English language and was video recording all the actions of Officer Simmons. . . . Affiant would show the front seat white male passenger was video recording with his cell phone and being verbally rude to Officer Simmons while conducting his investigation. Affiant would show the white male sitting in the back seat behind the driver was positively identified and known as Brandon Michael White based on past law enforcement encounters for calls relating to his cell phone recordings and harassment of law enforcement. . . . Affiant would show . . . it was later determined the Hispanic male knew and could speak the English language after being verbally abusive to Officer Simmons. . . .

Affiant would further show Mr. Rincon has been stopped by the Texas Department of Public Safety in this same vehicle on at least four different traffic stops and issued citations.

66.     These were the five behaviors Defendant Middleton felt could be considered suspicious when divorced from any context: (1) Plaintiffs drove to several locations that Defendant Simmons drove to at about the same time and they traveled the roads around City Hall several times; (2) Mr. Rincon drove a vehicle registered in a different part of Texas; (3) Plaintiffs either offended Defendant Simmons with their language during the traffic stop or had previously offended officers with their word choices; (4) Plaintiffs filmed the police officers in public with their phones while the police officers filmed them with their BWC; (5) Mr. Rincon had previously received undisclosed traffic tickets.

67.     Defendant Middleton wanted to present Mr. Rincon as a man frequently on the wrong side of the law, but he stopped short of actually providing the full facts for the judge to consider.  Defendant Middleton also tried to claim Mr. Rincon's place of residence was a source of suspicion and fear, but lots of people travel and Mr. Rincon was with friends who were locals. Since pointing that information out would diminish his goal of making Plaintiffs' behavior seem suspicious, Defendant Middleton left that information out.

68.     Defendant Middleton highlighted any rude behavior he could attribute to Plaintiffs—even hearsay, but he avoided mentioning that Defendant Simmons had also been rude to Plaintiffs with his dismissive, unlawful commands and that Officer Reyes had had to step in as a voice of reason.  He included details on how Plaintiffs followed Defendant Simmons from the Walmart parking lot, but he failed to mention that at the time Defendant Simmons had been driving while performing public duties as a government official and at a speed above the posted speed limit without his lights or sirens on.

69.     Defendant Middleton highlighted the fact that Plaintiffs were filming the officers, but he only later mentioned in passing that the officers had been filming the traffic stop as well. He also did not mention that there is a growing trend in America for individuals to film traffic stops for their own safety or for their own records, as many police departments do not like to release BWC footage even if something happens, or that the Livingston Police Department had received training on the presence of auditors (people who film government officials including police officers to hold them accountable for their official conduct) in Polk County—as evidenced by Defendant Simmons and Officer Reyes's knowledge concerning Plaintiff White.

70.     He described Plaintiffs as "circling the police department" but failed to mention that the Livingston Police Department had received training on individuals who film police officers.  He accused Mr. Rincon of pretending to not speak English, but he chose not to mention that Mr. Rincon speaks Spanish.  Defendant Middleton's carefully curated collection of facts prevented the magistrate judge from understanding the totality of circumstances before he agreed to sign the arrest warrant.

71.     Four, Defendant Middleton used careful word choice to make the Plaintiffs' actions seem insurrectionary and the officers' common place.  He stated that Defendant Simmons was "on a routine patrol and performing his law enforcement duties" in "his marked patrol unit."  Officer Reyes "observed" and "notified" Defendant Simmons "of what he had witnessed."  Defendant Simmons "request[ed] . . . identification" "while conducting his investigation."  Officer Reyes "arrived on scene for Officer safety and to assist in translating."  These words are bland and formal and standard law enforcement terminology.  In comparison, Plaintiffs are accused three times of "stalking" and once of "circling the police department."  Defendant Middleton calls them or their actions "suspicious" four times.  Plaintiff Rankin is accused of being "verbally rude," Plaintiff

White is accused of previously "harass[ing] . . . law enforcement," and Mr. Rincon is accused of being "verbally abusive."  There is no emotion associated with the officers' actions; Plaintiffs' actions, on the other hand, range from mean to alarming to outright dangerous.  With these representations, the judge would not have had any knowledge that Defendant Simmons had been decidedly unprofessional, nor could he, in good conscience, look at Plaintiffs with anything but animosity.

72.     Five, Defendant Middleton further resorted to logical fallacies.  He started with an alarming statement to add a touch of hysteria.  "Affiant would show Officer Simmons was concerned for his safety due to the recent killings and ambush of police officers on duty."  Defendant Middleton, who in his sworn statement did not mention (1) having any conversations with Defendant Simmons or (2) reading any statements made by Defendant Simmons, provided no basis for his supposed knowledge of Defendant Simmons's thoughts.  He also failed to provide any factual basis for this sentiment.  Neither Livingston, Texas, nor Polk County, Texas, have a history of citizens ambushing police officers.  Nor is there a trend for police ambushes in cities demographically similar to Livingston.  Defendant Middleton simply presented an emotional appeal as fact absent any proof or other basis for this claim.  An appeal to emotion is a logical fallacy.

73.     Defendant Middleton further wrote, after pointing out Mr. Rincon had traveled to Livingston from Laredo, "Affiant would show this raised more suspicion for the safety of Officers Simmons and Reyes due to their suspicious actions and stalking."  This statement is a non sequitur.[9]  Person A is from City A.  Person A traveled to City B.  Therefore, Person A is

_____

[9] Non sequitur (noun): "1: an inference . . . that does not follow from the premises . . . specifically : a fallacy resulting from a simple conversion of a universal affirmative . . . proposition or from the transposition of a condition and its

suspicious.  This conclusion does not logically follow the premises.  Traveling is a normal activity pursued by billions of people worldwide.  It is not inherently suspicious.

74.     Six, when those tactics were insufficient to establish a felony crime, Defendant Middleton lied.   Multiples times.   (1) Defendant Middleton claimed that Plaintiffs parked "adjacent" to Defendant Simmons at the convenience store.  Defendant Simmons, in fact, parked in front of the convenience store, while Plaintiffs parked in a parking spot on the side of the building.  (2) Defendant Middleton lied about the interaction at the gas station.  Without providing a source, Defendant Middleton claimed that "no one ever exited the vehicle while it waited on Officer Simmons to exit the business."  Except, Plaintiffs were parked on the side of the building, so Defendant Simmons could not have observed them while he was inside the convenience store purchasing his beverage.  Defendant Middleton also does not claim knowledge obtained from viewing videos of the scene, such as surveillance video from the convenience store.  Did he make this assertion up?  Did he provide conjecture as fact?  Or did he simply feel a judge did not need to know the basis for this information?  Defendant Middleton did not know Plaintiffs' motivations or plans.  He had not questioned them, watched a recording of them discussing their motivations, or even read their diaries (if they even had them).  He certainly did not read their minds.  He could not truthfully, factually make this statement, but he still stated this opinion as a fact in his sworn testimony.

75.     (3) Defendant Middleton later in his affidavit swore that "Officer Reyes . . . observed a Hispanic male exit the blue vehicle, put on a ballistic body armor vest and then entered

---

consequent. . . .  2: a statement (such as a response) that does not follow logically from or is not clearly related to anything previously said."

Merriam-Webster, Inc., *Merriam-Webster.com Dictionary* (2024) https://www.merriam-webster.com/dictionary/non%20sequitur.

the driver's side of the vehicle."  When Mr. Rincon exited his parked vehicle to access his trunk, he was already wearing a (non-ballistic) vest.  He, further, only removed his binoculars from his trunk.  He did not take his vest off, put it back on, or put another vest on.  Defendant Middleton brazenly lied about this event.  (4) Even if Mr. Rincon had put on a vest—which he did not—his alleged actions would not have been "overt" as Defendant Middleton claimed because Officer Reyes had to go looking to find Plaintiffs in the out-of-the-way parking spot.

76.     (5) Immediately following Lies #3 and #4, Defendant Middleton made a very serious accusation, "Officers felt as if they were about to commit a criminal act and cause them bodily injury and/or death."  First off, one can logically deduce that if the alleged causes are made up, so, too, must be the alleged effect.  Defendant Middleton failed to provide factual support for his contention that the officers feared imminent injury because of the initial incident—Mr. Rincon overtly donning a vest—never occurred.

77.     Secondly, this claim completely contradicts the officers' words and actions recorded at the traffic stop.  (a) The officers clearly had not discussed Plaintiffs prior to Defendant Simmons's asking for a translator at his traffic stop.  Officer Reyes admitted as much to Plaintiffs when he told them that Defendant Simmons had not communicated which crime he believed Mr. Rincon had committed.  This was also clear when Officer Reyes then took the time to tell Defendant Simmons that he had previously stopped beside Plaintiffs because he thought they might be lost or need help, and when Defendant Simmons, in turn, responded by informing Officer Reyes that Plaintiffs had been following him earlier.  There was no previous conference that resulted in fears of a police ambush; the two officers filled each other in mid-detention.  (b) If Defendant Simmons had feared for his life, after he had parked behind Plaintiffs' vehicle to block their vehicle from leaving, he would have approached the situation tactically, such as (at a

minimum) staying sheltered behind his patrol vehicle while, with his gun drawn and at the low ready, yelling at Plaintiffs to slowly exit the vehicle with their hands above their heads.  He would not have approached the driver's side window in a non-tactical manner with his gun holstered and then presented his open profile to potentially get shot at.  Nor would Officer Reyes, if he had feared imminent bodily injury or death, have approached weaponless without cover to duck behind and with an equally open profile to also get shot at.  These officers did not fear imminent bodily injury or death.  Defendant Simmons even told Officer Reyes twice he did not care if Plaintiffs had a firearm, and Officer Reyes agreed with him.  (c) Near the end of the traffic stop, Officer Reyes pulled Defendant Simmons to the side to talk.  This conversation was not for the officers to confer on whether they still believed Plaintiffs were planning an ambush.  This conversation was so Officer Reyes could ask Defendant Simmons why he had detained and was still detaining Plaintiffs.  Defendant Middleton perjured himself when he swore that these officers detained Plaintiffs because they feared imminent bodily injury or death.

78.     Lastly, (6) the windows of Mr. Rincon's vehicle were not "dark tinted windows," as Defendant Middleton claimed.

79.     By claiming that Plaintiffs were "stalking a uniformed police officer in his marked patrol unit while driving a vehicle *with dark tinted windows*, wearing a *ballistic proof* vest with ammunition" that Mr. Rincon allegedly "*put on*" as an "overt action" so that officers "*felt*" they might suffer imminent "bodily injury and/or death" Defendant Middleton was able to manufacture some semblance of a crime that he could argue Plaintiffs had committed.  Defendant Middleton as a "credible person" swore that this testimony was true even though he knew it was a lie.  He knew that no crime had been committed—Defendant Simmons had released Plaintiffs at Officer Reyes's urging because he did not even have a suspicion that a crime had been committed—but Defendant

Middleton wanted or was instructed to charge Plaintiffs with a felony crime, so he resorted to deception to support this agenda.

80.     Seven, Plaintiffs were not charged with a crime related to officer safety.  They were not even charged with Stalking.  Plaintiffs were charged with criminal activity because they appeared suspicious, used language the officers did not like, disagreed with the officers' understanding of the law, and filmed the encounter.  The last three are protected under the First Amendment.  The first is not a crime.  Defendant Middleton still swore to a judge that, based on all of the above, Plaintiffs had committed the crime "Engaging in Organized Criminal Activity."

81.     Eight, all four affidavits were essentially identical.  Defendant Middleton did not tailor the narratives to explain how each Plaintiff had allegedly committed the crime they were charged with outside of changing which name was listed in bold as the Defendant and which were listed as other defendants.  Defendant Middleton claimed that because Mr. Rincon allegedly "stalk[ed] a uniformed police officer in his marked patrol unit while driving a vehicle with dark tinted windows, wearing a ballistic proof vest with ammunition," all four Plaintiffs not only obstructed or retaliated against Defendant Simmons and Officer Reyes, but also conspired to commit this crime together.  This conspiracy charge enhanced a felony of the third degree to the second degree.  Defendant Middleton never justified why he believed that Plaintiffs Trimble, Rankin, and White had committed either crime outside of mentioning in passing the facts that (1) they were present in the vehicle, (2) they did not identify themselves (even though Defendant Simmons only asked for Mr. Rincon to identify himself), (3) Plaintiff Rankin filmed the encounter and questioned the officers, and (4) Plaintiff White had a history with local law enforcement.  Even without offering any flimsy justification for why he believed that Plaintiffs Trimble, Rankin, and

White had committed a crime, Defendant Middleton still swore "upon his oath" that they had.  He further used their inclusion to justify bringing a conspiracy charge against Mr. Rincon.

82.     The Polk County District Court Judge, absent any outside knowledge of the events that occurred, trusted Defendant Middleton's deceit and signed the arrest warrants for Plaintiffs. Plaintiffs Rankin, White, Trimble and Mr. Rincon were arrested and held in jail until they could bail out.

83.     Defendant Middleton's affidavits for felony charges against all Plaintiffs were submitted to the Honorable Judge John Wells of the 411th District Court on February 8, 2022—four days post-incidents—with the recommended bond of $100,00.00.  Defendant Barker's affidavits for the misdemeanor charges against three of the Plaintiffs were submitted to the same judge the next day with the recommended bond of $5,000.00.

84.     In submitting these affidavits to the judge, Defendants Barker and Middleton, with either the support of or under the supervision of Police Chief Parrish, Defendant City's Manager, and/or Defendant City's City Council, knowingly perjured themselves to bring these false charges against Plaintiffs.

85.     Such egregious violations of ethics, duty, and law should not have occurred under the supervision of Defendant City's Police Chief, Matt Parrish.  Yet they did.

86.     Chief Parrish not only allowed such violations to occur, but he also approved of them.  Seven days post-incidents, Defendant City's police chief released an official statement in the form of a press release on behalf of the Livingston Police Department, a division of Defendant City.  During those seven days, Chief Parrish had every opportunity to thoroughly investigate the events that occurred: to not just read his officers' reports or his detectives' affidavits, but also to watch the BWC footage from his officers' cameras and Plaintiff Trimble's YouTube video of

Plaintiff Rankin's conversation with the Livingston police at her apartment, Plaintiff Rankin's YouTube livestream of the traffic stop, and Mr. Rincon's YouTube video of the detention with Spanish translations.  Defendant City's police chief had every opportunity and resource needed to personally confirm the veracity of any information he released to the public under his name and Defendant City's authority.

87.   This is what he chose to write:

During the investigation officers recognized two of the individuals in the apartment as Melanie McCrory and Brandon White. Officers determined that there was no threat to anyone and that these individuals had created the panic in the residential district to have police respond so that they could be recorded for their social media channels. . . .

While this was going on Officers recognized Brandon White in the back seat of the vehicle. Officers again, [sic] realized that that this was a staged event to record the officer's response and for individuals to post on their social media pages. Upon realizing this, officers disengaged with the individuals. . . .

On February 9th, 2022, Melanie Renee McCrory 39 of Livingston TX. And Brandon Michael White 38 of Dayton, TX. both were arrested on warrants for Engaging in Organized Criminal Activity-Obstruction or Retaliation (F2) and False Report to Induce Emergency Response (MA).

88.   These statements can be broken down as follows:

- o Fact 1: Plaintiffs Rankin, Trimble, White and Mr. Rincon exercised their constitutional rights.
- o Fact 2: The Livingston Police Department knew Plaintiffs Trimble and White frequently exercised their constitutional rights.
- o Fact 3: Defendant Officers engaged in interactions with Plaintiffs because they felt that Fact 1 (in spite of Fact 2) was suspicious.
- o Fact 4: Defendant Officers determined on-scene that Plaintiffs had committed no crimes and released them.  Twice.
- o Fact 5: Defendant Officers later decided, based on Plaintiffs' status alone (Fact 2), that they could be charged with crimes despite Fact 4.
- o Fact 6: Plaintiffs were clearly treated differently from other members of society (see Fact 5) because of Facts 1 and 2.
- o Fact 7: Defendant City's Chief of Police proclaimed Facts 5 and 6 to the public in his official statement.

- o Fact 8: Defendant City did not retract or even apologize for Fact 7, nor did Defendant City stop Chief Parrish or his officers from submitting charges against Plaintiffs to the District Attorney's office.
- o Fact 9: Defendant City clearly *approved* of Chief Parrish's public statement and of the charges his officers brought against Plaintiffs (see Fact 8).
- o Fact 10: Defendant Officers, Chief Parrish, and Defendant City clearly violated Plaintiffs' First, Second, Fourth, and/or Fourteenth Amendment rights.

89.     The commanding officer over an entire police department supported his officers bringing felony charges against Plaintiffs even though they all knew no crimes had been committed.   Why?   Because Plaintiffs "record[ officer interactions] for their social media channels."

90.     Restated, all that the affidavits and the press release show is that these police officers find it disturbing when someone else films them.   Why else would they continually mention in their affidavits or press releases—as if it was somehow suspicious behavior—that these individuals were filming them?

91.     Defendants, part of the dancing Livingston Police Department, intentionally and knowingly harmed Plaintiffs by unlawful acts in retaliation for their status as independent journalists and activists.

### *A Tale Believed*

92.     Defendant Officers put words down on paper.   Words with the power to change lives.   Words that when taken together amounted to lies.   They then maliciously submitted those life-altering words on arrest affidavits to the honorable Judge John Wells of the 411th District Court.

93.     Judge Wells signed on those arrest warrants.   Defendant City's officers, to potentially include Defendant Officers Middleton, Barker, Simmons, Bogany, Paske, and John Doe Officers, then arrested Plaintiff Trimble and White on the warrants on February 9, 2022.

Rincon and and Plaintiff Rankin turned themselves in.  Plaintiffs were held on $105,000.00 bonds.

Rankin bonded out while White and Trimble remained in jail for 28 and 35 days, respectively.

94.     Following Plaintiffs' release from jail, Defendant Officers under the direction or

supervision of Chief Parrish, the Chief of Police for Defendant City, continued the deception that

they had concocted.  As a result, the Grand Jury believed Defendant Officers' perjuries, mistruths,

and false statements; and Plaintiffs were indicted on the felony charges.  Accordingly, Plaintiffs

had to hire criminal attorneys to defend themselves from these baseless misdemeanor and felony

charges.

95.     All of the charges brought were terminated in Plaintiffs' favors.

96.     Following this dismissal, Plaintiffs McCrory and White finally received their cell

phones back from the Livingston Police Department.  These officers seized their phones when they

were arrested without a warrant and did not return them to Plaintiffs when they were released from

jail.  Defendant City's officers held these phones for 22 months before finally releasing Plaintiffs'

property back to them.

97.     Defendant Officers' and Defendant City's actions are inexcusable.  Plaintiffs have

been harmed.  They seek redress in this matter.

## COUNT I
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (First Amendment - Retaliation)

98.     Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above

and incorporate them as is fully set forth herein.

99.     This First Amendment retaliation claim is asserted against all Defendant Officers

as they all actively participated in initiating the arrests and prosecutions of Plaintiffs simply

because they did not agree with Plaintiffs' viewpoints, namely that they are First Amendment

auditors, that they verbally challenge the officer's conduct, or that they film the officers performing their public duties—all conduct which the First Amendment protects.

100.    Defendants knew that Plaintiffs were engaged in protected First Amendment activity; their conduct of seeking and initiating the arrest and prosecution of Plaintiffs without any lawful basis resulted in injuries that would chill a person of ordinary firmness from continuing to engage in that activity; and the Defendant Officers' adverse actions were substantially motivated against their exercise of constitutionally protected conduct.

**COUNT II**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983**
**(Fourth Amendment – Unlawful Seizure)**

101.    Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above and incorporate them as is fully set forth herein.

102.    Plaintiffs assert that Defendant Simmons lacked any lawful authority to initiate a traffic stop of Plaintiffs on February 4, 2022, while they were on private property.  Defendant Simmons then unreasonably prolonged the traffic stop in further violation of Plaintiffs' rights guaranteed under the Fourth Amendment.

**COUNT III**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983**
**(Fourth Amendment – Unlawful Arrest)**

103.    Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above and incorporate them as is fully set forth herein.

104.    Plaintiffs assert this claim against Defendants Barker and Middleton for submitting arrest affidavits that they knew were false or would have known it was false had they not recklessly disregarded the truth.

105.    Defendants Barker and Middleton supplied false affidavits with the specific intent of misleading the judge and permitting the unlawful arrest of Plaintiffs despite lacking any probable cause or other lawful basis to arrest Plaintiffs.

106.    These Defendants violated clearly established law as the Constitution prohibits an officer from making perjurious or recklessly false statements in support of a warrant.  This is especially true, whereas here, the Defendants knew or had reason to know that they supplied information that materially misled a judge on the basis of a finding of probable cause.

107.    Had Defendants Barker and Middleton provided truthful information in their affidavits, they would have clearly failed to establish probable cause to seek the arrest of Plaintiffs.

**COUNT IV**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983**
**(Fourth Amendment – Malicious Prosecution)**

108.    Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above and incorporate them as is fully set forth herein.

109.    Plaintiffs assert this claim against Defendants Barker and Middleton who initiated criminal prosecution against Plaintiffs without any lawful basis.  These Defendants knew they lacked probable cause or legal justification to initiate prosecution but did it anyway.  The false charges were terminated in favor of the Plaintiffs.

***MONELL* LIABILITY**

110.    Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above and incorporate them as is fully set forth herein.

111.    The individual Defendants at all times relevant were City of Livingston police officers.

112.     Defendant City maintains a spoken or unspoken policy, practice or custom to permit the unlawful arrests and prosecutions of people they believe are engaged in First Amendment conduct without fear of investigation or discipline.

113.     Defendant City knew that Plaintiffs have a First Amendment right to engage in auditor activities.  They provide training informing their officers of this right.  However, Defendant City repeatedly fails to hold its officers accountable for violating the rights of people they assume are auditors.

114.     Defendant Officers knew they would face no repercussions for conspiring to initiate false arrests and prosecutions of Plaintiffs.  They were right.  The City and its policymakers ratified the officers' conduct when the Police Chief published an official statement declaring that the recklessly false statements made in affidavits by his officers were true.

115.     The City of Livingston acted with deliberate indifference, and it was foreseeable that by permitting the custom, policies, and practices would violate Plaintiffs' constitutional rights.

116.     Defendant City is directly responsible for the individual Defendants' conduct described herein.

## DAMAGES

117.     Actual, punitive (against individual defendants), and nominal damages for which Defendants should be held jointly and severally liable.

118.     Prejudgment and post judgment interest, costs of court, and reasonable and necessary attorney fees.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray Defendants be cited to appear and answer herein; and upon final trial hereof the Court grant Plaintiffs all relief to which they are justly entitled.

Respectfully submitted,

**GRABLE GRIMSHAW PLLC**

*/s/ Brandon J. Grable*
**BRANDON J. GRABLE**
Texas State Bar No. 24086983
brandon@g2.law
1603 Babcock Road, Suite 280
San Antonio, Texas 78229
Telephone: (210) 963-5297
Facsimile: (210) 641-3332
**COUNSEL FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby affirm that on this 19th day of April 2024, that the foregoing document was filed with the Court's CM/ECF electronic filing system, and that a copy of said document was served upon all parties of record, via electronic service.

*/s/ Brandon J. Grable*